ACCEPTED
03-15-00423-CV
7966631
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/24/2015 10:53:22 AM
JEFFREY D. KYLE
CLERK

IN THE THIRD COURT OF APPEALS

## NO. <u>03-15-00423-CV</u>

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

11/24/2015 10:53:22 AM

JEFFREY D. KYLE
Clerk

**STAR OPERATIONS, INC.**
**and**
**GREAT AMERICAN INSURANCE COMPANY OF NEW YORK**
*Appellants*
**VS.**
**DIG TECH, INC.**
*Appellee*

Appealed from the 22nd Judicial District Court
Caldwell County, Texas

## BRIEF OF
## APPELLANTS STAR OPERATIONS, INC.
## AND GREAT AMERICAN INSURANCE
## COMPANY OF NEW YORK

James H. Robichaux
SBN 17083000
jrobichaux@branscombpc.com
Clinton W. Twaddell, III
SBN 24071537
ctwaddell@branscombpc.com
BRANSCOMB PC
802 N. Carancahua, Suite 1900
Corpus Christi, TX 78401-0036
Telephone: 361/886-3800
Telecopier: 361/886-3805

**ORAL ARGUMENT REQUESTED**

{C1208515.DOCX:}

# IDENTITY OF PARTIES AND COUNSEL

**Appellant:**                                          **Star Operations, Inc.**

**Lead Counsel at Trial & on Appeal:**    James H. Robichaux
BRANSCOMB PC
802 N. Carancahua, Suite 1900
Corpus Christi, TX 78401-0036
Telephone: 361/886-3800
Telecopier: 361/886-3805


**Appellant:**                                          **Great American Insurance Company of New York**

**Lead Counsel on Appeal[1]:**              Clinton W. Twaddell, III
BRANSCOMB PC
802 N. Carancahua, Suite 1900
Corpus Christi, TX 78401-0036
Telephone: 361/886-3800
Telecopier: 361/886-3805


**Appellee:**                                            **Dig Tech, Inc.**

**Lead Counsel at Trial & on Appeal:**    Brian Melton
Chanler A. Langham
SUSMAN GODFREY, LLP
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: 713/651-9366
Telecopier: 713/651-6666

---

[1] James H. Robichaux was lead trial counsel for Great American Insurance Company of New York.

# TABLE OF CONTENTS

Identity of the Parties and Counsel .................................................................................i

Table of Contents .....................................................................................................ii-iv

Index of Authorities ..................................................................................................v-ix

Record Legend ..............................................................................................................x

Statement of the Case ....................................................................................................x

Statement Regarding Oral Argument ..........................................................................xi

Issues Presented ....................................................................................................xi-xiv

Statement of Facts .........................................................................................................1

Summary of Argument .................................................................................................11

Argument......................................................................................................................13

I.   **Issue 1**: The trial court erred in failing to apply federal law to Dig Tech's contract claim because the project was undisputedly a federally funded highway project, which automatically invoked federal law.................................................................................................13

A. **Issues 2 and 3**: The trial court erred in refusing to submit proposed jury question(s) on: (1) Dig Tech's failure to procure a written contract with Star; and (2) Dig Tech's failure to procure TxDOT approval to the purported verbal contract with Star, both of which were federally mandated conditions precedent to formation and/or enforceability of any purported contract between Star and Dig Tech ...................................................................................................19

B. **Issue 4**: The trial court erred in refusing to submit proposed jury question(s) on Dig Tech's failure to provide statutorily compliant "certified payroll" to Star, which was a federally mandated

condition precedent to any payment obligation arising against Star in favor of Dig Tech on any purported contract between Star and Dig Tech .......................................................................................23

C. **Issues 5-7**: The trial court erred in awarding Dig Tech contract damages because it was undisputed that Dig Tech failed to: (1) obtain a written contract with Star; (2) obtain TxDOT approval to its purported verbal contract with Star; or (3) provide statutorily compliant "certified payroll" to Star ........................................25

II. **Issues 8-11**: The trial court erred in applying the law to Dig Tech's claim(s) against the GAIC payment bonds....................................................26

A. **Issue 8**: The trial court erred in refusing to dismiss Dig Tech's claim(s) against the GAIC payment bonds for lack of jurisdiction because the federal Miller Act applied to the claim(s).............................26

B. **Issue 9**: If the Texas McGregor Act applied to Dig Tech's payment bond claim(s), the trial court erred in ruling as a matter of law that Dig Tech perfected any claim against the bonds.....................................27

C. **Issue 10**: If the McGregor Act applied to Dig Tech's payment bond claim(s), the trial court erred in denying GAIC's Motion for Instructed Verdict and its Motion for Judgment Notwithstanding the Verdict because Dig Tech failed as a matter of law to perfect any payment bond claim under the McGregor Act ..................................32

D. **Issue 11**: Alternatively, if the McGregor Act applied to Dig Tech's payment bond claim(s) and a fact issue existed as to whether Dig Tech perfected any claim against the bonds, the trial court erred in refusing to submit GAIC's proposed jury questions on whether Dig Tech substantially complied with the McGregor Act's notice requirements ...............................................................................32

III.       **Issue 12**: The trial court erred in awarding damages to Dig Tech without any evidence of Dig Tech's actual damages as net loss after reduction of income tax payments or unpaid income tax liability as required by TEX. CIV. PRAC. & REM. CODE § 18.091.............33

IV.       **Issue 13**: The trial court erred in awarding attorney's fees to Dig Tech because Dig Tech failed to segregate recoverable attorney's fees from unrecoverable attorney's fees....................................................35

V.       **Issue 14**: The trial court erred in awarding Dig Tech costs of deposition transcripts as "taxable costs" when Dig Tech did not notice or initiate the depositions...............................................................37

Conclusion .......................................................................................................39

Prayer ..............................................................................................................40

Certificate of Compliance ................................................................................41

Certificate of Service .......................................................................................41

Index to Appendix.............................................................................................42

# INDEX OF AUTHORITIES

## FEDERAL AUTHORITIES

### U.S. Supreme Court:

*American Tel. and Tel. Co. v. Central Office Telephone, Inc.*,
524 U.S. 214 (1998)................................................................................16

*Federal Crop Ins. Corp. v. Merrill*,
332 US 380 (1947)................................................................................22

### U.S. Courts of Appeal:

*Century Marine, Inc. v. U.S.*,
153 F.3d 225 (5th Cir. 1998)................................................................22

*Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*,
730 F.2d 186 (5th Cir. 1984) ...............................................................14

*Continental Cas. Co. v. C.O. Brand, Inc.*,
355 F.2d 969 (5th Cir. 1966)................................................................26

*Gen. Eng'g & Mach. Works v. O'Keefe*,
991 F.2d 775 (Fed. Cir. 1993)........................................................15, 22

*U.S. v. New Orleans Pub. Surv., Inc.*,
553 F.2d 459 (5th Cir. 1977) (*vacated on other grounds*,
*New Orleans Public Service, Inc. v. U.S.*, 436 U.S. 942 (1978)) ...........14

*Worthen v. Fidelity Nat. Prop. & Cas. Ins. Co.*,
463 Fed. Appx. 422 (5th Cir. 2012)......................................................22

### U.S. District Courts:

*Dingle v. Halliburton Co.*, Civil Action No. H-05-3719,
2006 WL 2729286 (S.D. Tex. Sept. 25, 2006) (not reported)................15

*Ex rel. United Rentals, Inc. v. Hartford Fire Ins. Co.*,
339 F. Supp.2d 799, 801-02 (W.D. Tex. 2004)....................................27

*UPMC Braddock  v. Harris*,
934 F. Supp. 2d 238 (D.D.C., 2013)
*vacated on other grounds as moot* 584 Fed.Appx.1 (D.C. Cir. 2014) ..............15, 22

**U.S. Court of Claims:**

*G.L. Christian and Assocs. v. U.S.*,
312 F.2d 418 (Ct. Cl. 1963) ...................................................................................14, 19

**U.S.C.:**

40 U.S.C. § 3131 ...............................................................................................................26

**C.F.R.:**

23 CFR § 635.102 ..............................................................................................................20

23 CFR § 635.103 ..............................................................................................................14

23 CFR § 635.116(b) ........................................................................................................20

**TEXAS AUTHORITIES**

**Texas Supreme Court:**

*Associated Indem. Corp. v. CAT Contracting, Inc.*,
964 S.W.2d 276 (Tex. 1998)................................................................................21, 24, 33

*Centex Corp. v. Dalton*,
840 S.W.2d 952 (Tex. 1992)........................................................................................21

*Christus Health Gulf Coast v. Aetna, Inc.*,
397 S.W.3d 651 (Tex. 2013)........................................................................................34

*Clayton W. Williams, Jr., Inc. v. Olivo*,
952 S.W.2nd 523, 529 (Tex. 1997) .....................................................23, 24, 25, 33

*Combs v. Healthcare Services, Corp.*,
401 S.W.3d 623 (Tex. 2013)........................................................................................34

*Hohenberg Bros. Co. v. George E. Gibbons & Co.*,
537 S.W.2d 1 (Tex. 1976)................................................................21

*In re Bank One, N.A.*,
216 S.W.3d 825 (Tex. 2007) ...........................................................19

*In re 24R, Inc.*,
324 S.W.3d 564 (Tex. 2010).............................................................19

*Jones v. Liberty Mutual Ins. Co.*,
745 S.W.2d 901 (Tex. 1988)............................................................34

*McKinley v. Stripling*,
763 S.W.2d 407, 410 (Tex. 1989).....................................23, 24, 25, 33

*NAFTA Traders, Inc. v. Quinn*,
339 S.W.3d 84 (Tex. 2011)..............................................................16

*Nat'l Prop. Holdings, LP v. Westergren*,
453 S.W.3d 419 (Tex. 2015) (*per curiam*) ...................................22

*Tex. Dep't. of Parks & Wildlife v. Miranda*,
133 S.W.3d 173 (Tex. 2004).............................................................27

*Tony Gullo Motors I, L.P. v. Chapa*,
212 S.W.3d 299 (Tex. 2006)............................................................35

*Wallace v. Briggs*,
348 S.W.2d 523, 527 (Tex. 1961)....................................................38

## Texas Courts of Appeal:

*Big Bird Tree Service v. Gallegos*,
365 S.W.3d 173 (Tex. App. – Dallas 2012, pet. denied.).....................34

*Bundren v. Holly Oaks Townhomes Ass'n, Inc.*,
347 S.W.3d 421 (Tex. App.—Dallas 2011, pet. denied)................37, 38

*Capital Indemn. Corp. v. Kirby Restaurant Equipment*

*and Chemical Supply Co., Inc.,*
170 S.W.3d 144 (Tex. App. – San Antonio 2005, pet. denied) ...............................30

*Crescendo Inv., Inc. v. Brice,*
61 S.W.3d 465 (Tex. App.—San Antonio 2001, pet. denied) ...............................39

*Dallas Cty. Med. Co'y v. Ubinas-Brache*,
68 S.W.3d 31, 40 (Tex. App. – Dallas 2001, pet. denied).................................23, 25

*Fasken Land & Minerals, Ltd. v. Occidental Permian Ltd.*,
225 S.W.3d 577 (Tex. App.—El Paso 2005, pet. denied)......................................39

*Featherlite Bldg. Products Corp. v. Constructors Unlimited, Inc.*, ........................30
714 S.W.2d 68, 69 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.)

*Fitzgibbons v. Hughes,*
2014 WL 3747247 (Tex. App. – San Antonio July 30, 2014, no pet.)....................21

*Gumpert v. ABF Freight System, Inc.*,
312 S.W.3d 237 (Tex. App.—Dallas 2010, no pet.) ........................................37, 39

*Hatfield v. Solomon,*
316 S.W.3d 50 (Tex. App.—Houston [14th Dist.] 2010, no pet.)..........................38

*Interconex, Inc. v. Ugarov*,
224 S.W.3d 523 (Tex. App. – Houston [1st Dist.] 2007, no pet.)...........................33

*Laboratory Design & Equipment, Inc. v. Brooks Development Authority*,
No. 04-07-00284-CV, 2008 WL 36614 at *3
(Tex. App. – San Antonio Jan. 2, 2008, no pet.) ...................................................31

*May v. Ticor Title Ins.*,
422 S.W.3d 93(Tex. App.—Houston [14th Dist.] 2014, rehearing overruled).......38

*Physicians & Surgeons Gen. Hosp. v. Koblizek*,
752 S.W.2d 657, 660 (Tex. App. – Corpus Christi 1988, writ denied).......23, 24, 25

*Shenandoah Assocs. v. J& K Properties, Inc.*,
741 S.W.2d 470, 487 (Tex. App.—Dallas 1987, writ denied) ...............................38

*Snyder v. Eanes ISD*,
860 S.W.2d 692 (Tex. App. – Austin 1993, writ denied.)................................21, 22

*Suretec Ins. Co. v. Myrex Industries,*
232 S.W.3d 811 (Tex. App. – Beaumont 2007, pet. denied)................................30

**Texas Statutes:**

TEX. CIV. PRAC. & REM. CODE § 18.091................................................9, 12, 33, 40

TEX. CIV. PRAC. & REM. CODE § 31.007(b)......................................................38, 39

TEX. GOV'T. CODE § 2253....................................................................8, 12, 40

TEX. GOV'T. CODE § 2253.001...............................................................27, 31

TEX. GOV'T. CODE § 2253.001(3)..............................................................28

TEX. GOV'T. CODE § 2253.041...........................................................28, 29, 31

TEX. GOV'T. CODE § 2253.047(c) .......................................................28, 31

TEX. GOV'T. CODE § 2253.048(a) ...........................................................28

**Texas Rules of Civil Procedure:**

TEX. R. CIV. P. 140.......................................................................................39

TEX. R. CIV. P. 141.......................................................................................38

## RECORD LEGEND

References to the one-volume Clerk's Record are denoted "CR __." References to live testimony in the Reporter's Record are denoted "RR Vol. __ at [page]: [line]–[line]." Reporter's Record Volumes 23-34 containing the trial exhibits are not internally paginated. Accordingly, references to trial exhibits are denoted "RR Vol. __: PX/DX __, at__," with Plaintiff's exhibits denoted "PX" and Defendants' exhibits denoted "DX."

## STATEMENT OF THE CASE

Dig Tech, Inc. ("Dig Tech") brought this lawsuit against Star Operations, Inc. ("Star Operations" or "Star") alleging breach of an oral contract. Dig Tech claimed to be Star's subcontractor on a federally funded highway project (the "Project"). The Project's purpose was to construct sections of the SH130 toll road southeast of Austin, Texas. Great American Insurance Company ("GAIC") was the payment bond surety for Star on the Project.

Star denied the existence of any enforceable contract between itself and Dig Tech. Star also asserted that Dig Tech had failed to comply with federally mandated and applicable statutes, rules, and regulations that were conditions precedent to (1) the formation and/or enforcement of any purported contract between Star and Dig Tech; and (2) any obligation of Star to pay Dig Tech on any purported contract.

The case was tried to a jury, resulting in a verdict in favor of Dig Tech on its breach of oral contract claim. The trial court denied GAIC's Motion for Directed Verdict on claims against the surety on the payment bonds and instead ruled Dig Tech perfected its bond claims as a matter of law. The trial court entered judgment on the verdict in favor of Dig Tech, denying Appellants' First Amended Motion for Judgment NOV. Appellants' Motion for New Trial was overruled by operation of law. Star and GAIC timely appealed.

## STATEMENT REGARDING ORAL ARGUMENT

Star and GAIC request oral argument. The legal issues in this case involve an intricate web of contractual relations and complex interplay between federal and state authorities. Appellants believe the Court would benefit from in-person dialogue with counsel.

## ISSUES PRESENTED

### Issue No. 1

The trial court erred in failing to apply federal law to Dig Tech's contract claim because the Project was undisputedly a federally funded highway project, which automatically invoked federal law.

### Issue No. 2

The trial court erred in refusing to submit proposed jury question(s) on Dig Tech's failure to procure a written contract with Star, which was a federally

mandated condition precedent to formation and/or enforcement of any purported contract between Star and Dig Tech.

## Issue No. 3

The trial court erred in refusing to submit proposed jury question(s) on Dig Tech's failure to obtain TxDOT's approval to its purported contract with Star, which was a federally mandated condition precedent to formation and/or enforcement of any purported contract between Star and Dig Tech.

## Issue No. 4

The trial court erred in refusing to submit proposed jury question(s) on Dig Tech's failure to provide statutorily compliant "certified payroll" to Star, which was a federally mandated condition precedent to any payment obligation arising against Star on any purported contract between Star and Dig Tech.

## Issue No. 5

The trial court erred in awarding Dig Tech contract damages because a writing was a federally mandated condition precedent to contract formation and enforceability, and it was undisputed that Dig Tech failed to comply with such condition.

## Issue No. 6

The trial court erred in awarding Dig Tech contract damages because TxDOT approval to any purported contract with Star was a federally mandated

condition precedent to contract formation and enforceability, and it was undisputed that Dig Tech failed to comply with such condition.

## Issue No. 7

The trial court erred in awarding contract damages to Dig Tech because Dig Tech's provision of statutorily compliant "certified payroll" was a federally mandated condition precedent to any payment obligation arising against Star, and it was undisputed that Dig Tech failed to comply with such condition.

## Issue No. 8

The trial court erred in failing to dismiss Dig Tech's claim(s) against the GAIC payment bonds for lack of jurisdiction because the federal Miller Act applied to the claim(s).

## Issue 9

If the McGregor Act applied to Dig Tech's claim(s) against the GAIC payment bonds, the trial court erred in ruling as a matter of law that Dig Tech perfected any claim against the payment bonds.

## Issue 10

If the McGregor Act applied to Dig Tech's claim(s) against the GAIC payment bonds, the trial court erred in denying GAIC's Motion for Instructed Verdict and its Motion for Judgment Notwithstanding the Verdict because Dig

Tech failed as a matter of law to perfect any payment bond claim under the McGregor Act.

## Issue 11

If the McGregor Act applied to Dig Tech's payment bond claim(s) and a fact issue existed as to whether Dig Tech perfected any claim against the bonds, the trial court erred in refusing to submit GAIC's proposed jury questions on whether Dig Tech substantially complied with the McGregor Act's notice requirements.

## Issue No. 12

The trial court erred in awarding damages to Dig Tech without any evidence of Dig Tech's actual damages as net loss after reduction of income tax payments or unpaid income tax liability as required by TEX. CIV. PRAC. & REM. CODE § 18.091.

## Issue No. 13

The trial court erred in awarding attorney's fees to Dig Tech because Dig Tech failed to segregate recoverable attorney's fees from unrecoverable attorney's fees.

## Issue No. 14

The trial court erred in awarding costs for copies of deposition transcripts to Dig Tech as "taxable costs" when Dig Tech did not notice or initiate the depositions.

<h1 style="text-align: center;">STATEMENT OF FACTS</h1>

**Background**. This case arises out of construction on a federally funded highway project, specifically construction of SH130 toll road sections southeast of Austin, Texas. Appellant Star was a subcontractor hired by the design/build contractor Central Texas Highway Constructors ("Central Texas") to construct infrastructure for the illumination, signal, intelligent transportation, and toll collection systems. Appellee Dig Tech claims it had a verbal agreement with Star to provide boring (horizontal hole-drilling) work for the installation of electrical conduit. Dig Tech also had its own written contract with Central Texas which was not the primary subject of this litigation, but whose terms will be relevant to this appeal as explained below. The following diagram illustrates the pertinent contractual relationships (both disputed and agreed):



**Dig Tech never formed an enforceable contract with Star**. It was undisputed and uncontroverted that the Project involved the use of federal funds. (Appx Item 14, RR Vol. 16: DX1at p. 69 (Star Subcontract CSUB116 with Central Texas); Appx Item 15, RR Vol. 18: DX2 at p. 117 (Dig Tech Subcontract CSUB122 with Central Texas); Appx Item 16, RR Vol. 19: DX3 at p. 69 (Star Subcontract CSUB140 with Central Texas); Appx Item 17, RR Vol. 34: DX119 at p. 175 (Facility Concession Agreement)). Because the Project was federally funded, both federal law and the prime contract required that any lower-tier subcontracts be in writing and approved by TxDOT. Further, as a condition of payment on any lower-tier subcontract, any subcontractor (in this case Dig Tech) was required to submit statutorily compliant "certified payroll" to the upstream contractor (in this case, Star), attesting under oath that it had properly categorized and paid its workers according to federally recognized worker classifications and federally promulgated prevailing wage rates for the workers' respective crafts.[2] (Appx Item 19, RR Vol. 22: DX9; Appx Item 14, RR Vol. 15: DX1 at pp. 11-12 (art. 9.4 and 9.6.1(a)), and at p. 15 (art. 10; 10.3(d)); RR Vol. 16: DX1 at p. 90 (art. VII(1)(e)); Appx Item 15, RR Vol. 17: DX2 at pp. 11-12 (art. 9.4 and 9.6.1(a)), and at p. 15 (art. 10; 10.3(d)); RR Vol. 18: DX2 at p. 139 (Art. VII(1)(e)); Appx Item

---

[2] The specifics of what constitutes "compliant certified payroll" are discussed in detail below.

16, RR Vol. 19: DX3 at 68, 69, 84-88, 94, 95, 98-100;  Appx Item 17, RR Vol. 34: DX119 at p. 175 (art. 23.1); Appx Item 18A (art. 10.2.3)).[3] [4]

Dig Tech was fully aware of these requirements at all relevant times. As shown in the diagram above, prior to Dig Tech discussing any alleged oral agreement with any employee of Star, Dig Tech had its own written subcontract with Central Texas. (Appx Item 15, RR Vol. 17: DX 2). This written subcontract with Central Texas contained various provisions—identical to those in the Star/Central Texas subcontracts—which specifically placed Dig Tech on actual notice that any agreement it might enter into on the Project: (1) had to be in writing; (2) had to be approved by Central Texas and TxDOT; and (3) required Dig Tech to provide statutorily compliant certified payroll as a condition of payment. (Appx Item 15, RR Vol. 17: DX2 at pp. 11-12 (art. 9.6.1), p. 15 (art. 10.3(d)); RR Vol. 18: DX2 at pp. 116-117, pp. 135-138 (art. V(1)(d)(iii))).

Dig Tech claims it performed work for Star Operations as a lower-tier subcontractor on the Project between October, 2011 and April, 2012. (RR Vol. 14: PX89 (Dig Tech invoices)).  However, it is undisputed and uncontroverted that Dig

---

[3] Pages 68 and 69 of DX119 were omitted from RR Vol. 33 by the court reporter. The missing page 69 is included in the Appendix as Item 18A. Appellee does not oppose this supplementation, as noted in the Rule 11 Agreement included in the Appendix as Item 18B.

[4] For the convenience of the Court excerpts from the three subcontracts and the Facility Concession Agreement between TxDOT and SH 130 Concession Company are collectively gathered and attached in the Appendix. The pertinent contract provisions in each of the three subcontracts are identical; they sometimes simply appear on different pages of the respective contracts.

Tech had no written agreement with Star Operations for the work Dig Tech claims it performed for Star. (RR Vol. 4 at 62: 9-14; 64: 8-11, 20-24; 67:10-24; 68: 22-70:8; 70:19-24; 71:16-22 (Dig Tech corporate representative Bodie Leslie); RR Vol. 5 at 124:7–125:11; 125: 20-126:3 (Dig Tech owner Mike Furry); RR Vol. 13: PX71 (Letter from Star's counsel to Dig Tech's counsel)). The uncontroverted testimony established that Dig Tech's alleged verbal subcontract with Star Operations was never approved by Central Texas or TxDOT. (RR Vol. 7 at 173:8–174:7; 189:17-25; 197:8-12; 211:19 –213:9; RR Vol. 8 at 66:9-16 (Central Texas representative Michael Kiehnau)).

Further, Dig Tech's own representatives acknowledged that its certified payroll was noncompliant and that some of its laborers were both misclassified and paid below the statutorily mandated minimum hourly wage rates. (RR Vol. 6 at 10:19–11:25; 13:13-20; 14:19 –15:19; 16:23–18:5; 18:16 –19:6; 20:1-8; 20:21–22:4; 23:16–24:4; 24:8–33:16 (Dig Tech office manager Tracy Lambert); RR Vol. 5 at 126:16–127:7 (Dig Tech owner Mike Furry)). This was confirmed by testimony of Central Texas, Star's owner, and an unchallenged government contracts expert witness. (RR Vol. 8 at 20:4–30:12 (Central Texas representative Mike Kiehnau); RR Vol. 8 at 126:17-20; 136:8– 137:11; 165: 10-21 (Star

Operations' owner Lana Lewis); RR Vol. 8 at 95:8–108:1; 119:17–122:2 (Government contracts expert, John Dulske)).[5]

Dig Tech claims the purported verbal contract with Star was formed between former Dig Tech employee Bodie Leslie and former Star employees Maury Milliorn and Anthony Lopez. Dig Tech argues that each of these individuals had legal authority to contract for their respective employers. However, Mr. Leslie confirmed that Milliorn and Lopez both had advised him that they lacked authority to bind Star Operations or enter into any subcontract on behalf of Star Operations. (RR Vol. 4 at 67:10–68:25; 69:24–71:5; 71:16–72:10; 92:2-24; 115:15-22 (Dig Tech representative Bodie Leslie); RR Vol. 4 at 210:16-19 (former Star employee Maury Milliorn)). Dig Tech's owner (Mike Furry) and its designated corporate representative (Bodie Leslie) confirmed that Dig Tech made no attempt to contact Star's owner Lana Lewis to determine the scope of Lopez's or Milliorn's authority, who had previously advised Dig Tech they lacked authority to contract on behalf of Star. (RR Vol. 4 at 72:2-24; 115:15-22 (Dig Tech representative Bodie Leslie); RR Vol. 5 at 110:10-15 (Dig Tech owner Mike Furry)).

Dig Tech sued both Star Operations and its payment bond surety GAIC. (CR 53-57). In their live pleadings, Star Operations and GAIC repeatedly raised the

---

[5] For the convenience of the Court, an exemplary copy of one of Dig Tech's certified payrolls is attached in the Appendix as Item 19 (RR Vol. 22: DX9). The four misclassified employees are highlighted. The two employees who were never paid at least the minimum statutorily mandated wage rates were Sintico Chaparro and Josue Chaparro. The testimony confirms the misclassification and underpayment was consistent on all twenty-six certified payrolls.

failure of the condition(s) precedent, specifically that: (1) any agreement between Star Operations and Dig Tech was required by federal law to be in writing and approved by TxDOT to be enforceable; and (2) Dig Tech's failure to provide compliant certified payroll was a condition precedent to any <u>payment</u> obligation. (CR 1346-1358 at Pars. 4, 6(e), and 7). Each of the three written subcontracts with Central Texas (Star's subcontracts CSUB116 and CSUB140, and Dig Tech's subcontract CSUB122) contained an identical Art. 10 which provided:

> **Payment is subject to complying with items 10.1-10.11 below:**
>
> **\*\*\*\*\***
>
> **10.3 <u>INVOICE REQUIREMENTS</u>:**
>
> **(d)     Certified payrolls, for the invoice period, if required by the Agreement Documents.**

(<u>Appx Item 14</u>, RR Vol. 15: DX1 at p. 15 (Art. 10); <u>Appx Item 15</u>, RR Vol. 17: DX2 at p. 15 (Art. 10); <u>Appx Item 16</u>, RR Vol. 18: DX3 at p. 15 (Art. 10)).

This contract provision prohibited Star Operations from seeking or receiving any payment from Central Texas for work Dig Tech allegedly performed in light of its admittedly non-compliant certified payroll in violation of both the contract provisions and federal law. As a condition precedent for Star being paid for work allegedly performed for Star by Dig Tech, Star had to submit Dig Tech's certified

payroll to Central Texas and certify that Dig Tech's certified payroll was accurate.[6] Since the certified payroll was inaccurate and violated federal law, Star Operations could not and did not submit Dig Tech's certified payroll to Central Texas. (RR Vol. 8 at 96:5–108:1; 119:17–122:2 (Government contracts expert John Dulske)). Central Texas' own corporate representative confirmed in testimony that Dig Tech's certified payroll was noncompliant. (RR Vol. 8 at 20:4–30:12 (Central Texas representative Mike Kiehnau)). He confirmed that Central Texas would not pay Star Operations for work Dig Tech claims it performed in light of the noncompliant certified payroll. Star Operations never received payment for Dig Tech's work. (RR Vol. 7 at 68:10–69:12; 76:19–77:15; 87:6–91:8 (attorney Stephanie O'Rourke)).

Despite the fact that Dig Tech had the burden of proof to establish it met each applicable condition precedent (a written contract approved by TxDOT and provision of compliant certified payroll) Dig Tech failed to submit questions to the jury on any of them. Star objected to these omissions, and the trial court overruled the objections. Star Operations and GAIC also attempted to submit jury questions on Dig Tech's failure to comply with conditions precedent, but the trial court refused to submit them. (RR Vol. 9 at 136:10-17; 143:5–144:24). The trial court also refused to apply applicable federal law (1) mandating that any (sub)contract

---

[6] See Appendix Items 14, 16.

on the federally funded project must be in writing to be enforceable; and/or (2) mandating accurate certified payroll as a condition precedent of payment.

**Dig Tech's failure to perfect claims against the GAIC payment bonds**. Star and GAIC also alleged that Dig Tech failed to comply with conditions precedent to perfecting its claims upon the surety GAIC. (CR1350-1352 at Pars. 8-9). Dig Tech also failed to prove that it complied with these conditions precedent.

This was a "public works" contract on State Highway 130, governed by either the federal Miller Act or TEX. GOV'T. CODE CH. 2253 (the McGregor Act). If the Miller Act applied, exclusive jurisdiction was in federal court. If the McGregor Act applied, in order to perfect any claim against the bonds, Dig Tech was required to provide <u>multiple</u> specific, statutorily-mandated notices to the "prime"[7] and the surety. Dig Tech failed to offer evidence of compliance with any of the statutory notice provisions.

At the close of Dig Tech's case GAIC moved for a directed verdict on Dig Tech's claims for failure to prove compliance with TEX. GOV'T. CODE CH. 2253 as a condition precedent to GAIC's liability, which the trial court denied. (RR Vol. 5 at 223:23–227:19; 229:14–230:3; 232:9-15). GAIC submitted proposed jury questions relating to Dig Tech's (non)compliance with the McGregor Act. Instead,

---

[7] As discussed below, the "prime" is statutorily defined to be the entity with the direct contract with the State (i.e., TxDOT). It is undisputed that the only entity with a direct contract with TxDOT was SH 130 Concession Company, LLC as reflected in the Facility Concession Agreement (<u>Appx Item 17</u>, RR Vol. 32: DX119).

the trial court ruled as a matter of law that the federal Miller Act did not apply, and that Dig Tech had "substantially complied" with the McGregor Act, thus perfecting its bond claim(s). The trial court denied GAIC's request to submit the issue of Dig Tech's compliance with the McGregor Act's notice requirements to the jury. (RR Vol. 9 at 136:18–137:7; 141:1–142:18).

**Dig Tech failed to submit evidence of damages in compliance with Texas Civil Practice and Remedies Code § 18.091**. TEX. CIV. PRAC. & REM. CODE § 18.091 requires that a claimant present evidence of damages "in the form of a net loss after reduction for income tax payments or unpaid tax liability pursuant to any federal income tax law." When Dig Tech's representative Mike Furry was questioned as to whether Dig Tech's requested damages conformed to this requirement, Dig Tech objected and the trial court sustained its objection. (RR Vol. 5 at 101:14-103:19 (Dig Tech owner Mike Furry)). By Offer of Proof pursuant to TEX. R. EVID. 103, Appellants established that Dig Tech did not comply with the mandatory provisions of § 18.091 which are a precondition to such recovery. (RR Vol. 5 at 111:19–113:10 (Dig Tech owner Mike Furry)).

**Dig Tech failed to segregate recoverable from unrecoverable attorney's fees**. In addition to the contract and bond claims made the subject of this appeal, the trial court litigation also involved certain counterclaims by Star against Dig Tech. Dig Tech's attorney's fees incurred in defending these counterclaims were

not recoverable under any theory recognized by Texas law. Instead of properly segregating these unrecoverable fees, Dig Tech took the position that it was not required to do so because the subject matter of the counterclaims was inextricably intertwined with the subject matter of the rest of the case. (RR Vol. 5 at 217:2–218:21 (David Pfeuffer)). This is legally incorrect, making any award of attorney's fees to Dig Tech improper.

**Award of impermissible costs**. In the final judgment, the Court awarded costs not authorized by law for such things as Dig Tech's costs for obtaining transcript photocopies for depositions that Dig Tech did not notice nor initiate. (CR 1820-1822).

**Verdict and post-trial proceedings**. Because of these erroneous limitations placed upon Appellants by the trial court, the jury returned a verdict in favor of Dig Tech for the amount claimed on the alleged verbal contract, together with attorney's fees for trial and contingent appellate attorney's fees. (CR 1683).

Dig Tech filed a Motion for Entry of Judgment on the verdict (CR1705-1747), and Appellants filed a First Amended Motion for Judgment Notwithstanding the Verdict. (CR 1748-1760). The Court denied Appellants' First Amended Motion for Judgment Notwithstanding the Verdict (RR Vol. 11 at 22:14-25), and entered judgment on the verdict for the amount of Dig Tech's claim and attorney's fees. (CR 1820-1822). The judgment was entered on April 16, 2015.

Star Operations and GAIC timely filed a Motion for New Trial on May 11, 2015. (CR 1862-1868). The Motion for New Trial was overruled by operation of law. Appellants filed their Notice of Appeal with the trial court on July 9, 2015, perfecting their appeal to this Court. (CR 1910-1912).

## SUMMARY OF ARGUMENT

Because the Project was a federally funded highway project, all contracts on the Project were governed by federal law. Federal law required as a condition precedent to forming an enforceable contract that – among other things – any lower-tier subcontract be in writing and approved by TxDOT. In addition, pursuant to provisions of the Davis Bacon Act and related applicable federal regulations, as a condition to the receipt of payment all contractors, subcontractors, and downstream (lower-tier) subcontractors had to provide statutorily compliant certified payroll with respect to its hourly employees to their upstream contractor.

The failure of any of these conditions precedent is fatal to the rights of any subcontractor to seek payment. It is uncontroverted that Dig Tech's alleged oral contract with Star Operations and its certified payroll did not comply with these requirements. As such, no enforceable contract was formed and even if it was, Dig Tech had no right to payment from Star. The trial court refused to apply federal law and refused to charge the jury on the existence and/or compliance with these federally mandated conditions precedent.

Separately, the surety bonds provided by Appellant GAIC were governed by either the federal Miller Act, in which case the trial court lacked subject matter jurisdiction, or by provisions of the Texas Government Code Chapter 2253 (the McGregor Act). The McGregor Act provides strict notice requirements in order to perfect any bond claim. While it is undisputed that Dig Tech did not comply with these notice requirements, the trial court nonetheless granted an instructed verdict in favor of Dig Tech that it had perfected claims against both GAIC bonds, refused to grant an instructed verdict for GAIC, and refused to submit GAIC's requested jury questions regarding compliance with the notice provisions of the Act.

Further, in presenting its evidence to recover attorney's fees, Dig Tech failed to segregate attorney's fees incurred in pursuing those claims for which attorney's fees are potentially recoverable from attorney's fees incurred in defending Star's counterclaims, for which recovery is not allowed. Similarly, it failed to present its damages in compliance with TEX. CIV. PRAC. & REM. CODE § 18.091 - being the "net loss after reduction of income tax payments or unpaid income tax liability[.]"

Finally, the trial court improperly awarded Dig Tech costs for deposition transcript photocopies even though Dig Tech neither noticed nor initiated the depositions. For each of these reasons the judgment entered by the trial court is flawed. The trial court committed reversible error, requiring reversal and rendition of a take nothing judgment in favor of Appellants.

## ARGUMENT

I. **Issue 1**: The trial court erred in failing to apply federal law to Dig Tech's contract claim because the project was undisputedly a federally funded highway project, which automatically invoked federal law

The uncontroverted evidence in the case was that the Project was a federally funded highway project. Dig Tech's own witnesses confirmed in cross-examination that they knew or assumed the Project was federally funded. (RR Vol. 4 at 90:23–91:2 (Dig Tech representative Bodie Leslie); RR Vol. 6 at 20:1-8 (Dig Tech office manager Tracy Lambert)). Dig Tech's subcontract with Central Texas was admitted without objection, as were Star's two subcontracts with Central Texas. (DX1-3). The three subcontracts contained identical pertinent terms and conditions, including Attachment 1 to Exhibit 8 (FEDERAL REQUIREMENTS FOR FEDERAL-AID HIGHWAY PROJECTS), which states:

> GENERAL – The work herein proposed will be financed in whole or in part with Federal funds, and therefore all of the statutes, rules and regulations promulgated by the Federal Government and applicable to work financed in whole or in part with Federal funds will apply to such work.[8]

---

[8] Appx Item 14, RR Vol. 16: DX1 at p. 69 (Star Subcontract CSUB116 with Central Texas); Appx Item 15, RR Vol. 18: DX2 at p. 117 (Dig Tech Subcontract CSUB122 with Central Texas); Appx Item 16, RR Vol. 19: DX3 at p. 69 (Star Subcontract CSUB140 with Central Texas)

Further, because this project was federally funded, federal contract regulations applied as a matter of law, irrespective of whether they were expressly incorporated into the text of the contracts. Specifically, 23 CFR § 635.103 states:

> The policies, requirements, and procedures prescribed in this subpart [entitled "Contract Procedures" and embracing §§ 635.101-127] shall apply to all Federal aid highway projects.

(*See* Appx Item 6). In *G.L. Christian and Assocs. v. U.S.*, 312 F.2d 418 (Ct. Cl. 1963), the United States Supreme Court held that when the subject matter of a contract is governed by valid federal regulations, the regulations are incorporated into the contract as a matter of law, regardless of whether the parties agree to be bound by them. The Fifth Circuit has applied *Christian* to hold:

> Government contracts are different from contracts between ordinary parties. The Government has the unrestricted power to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases. Agreement to such conditions is unnecessary: ***where regulations apply and require the inclusion of a contract clause in every contract, the clause is incorporated into the contract, even if it has not been expressly included in a written contract or agreed to by the parties***…[W]e would reach [this conclusion] even in the absence of any oral or written agreements to particular terms[.]
>
> *U.S. v. New Orleans Pub. Surv., Inc.*, 553 F.2d 459, 469 (5th Cir. 1977)

(emphasis added) (*vacated on other grounds*, *New Orleans Public Service, Inc. v. U.S.*, 436 U.S. 942 (1978)); *see also Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186, 188 (5th Cir. 1984) (federal form was "part of the

[government] contract because it was required by valid regulation."); *Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993) (applying the *Christian* Doctrine to hold federal regulation "was properly incorporated into the present contract in fact and in law," even though the written contract did not reference or contain it, and observing, "Federal regulations which are based upon a grant of statutory authority have the force and effect of law, and, if they are applicable, they must be deemed terms of the contract even if not specifically set out therein, knowledge of which is charged to the contractor."); *Dingle v. Halliburton Co.*, Civil Action No. H-05-3719, 2006 WL 2729286, at * 5 (S.D. Tex. Sept. 25, 2006) (not reported) ("when a regulation requires a government contract to contain a term, courts read that contract as if it included the mandatory term, even though the final document that both parties executed omitted it.").

Dig Tech failed to offer any evidence of why constructive knowledge of federal procurement regulations is not imputed to subcontractors who undertake to provide services that support a federally funded project. *UPMC Braddock v. Harris*, 934 F.Supp.2d 238, 258 (USDC 2013) *vacated on other grounds as moot* 584 Fed.Appx.1 (D.C. Cir. 2014) (subcontractor who helped to fulfill prime contractor's agreement with the government was charged with constructive knowledge of required contract provisions under federal law pursuant to *Christian* Doctrine).

Pursuant to the *Supremacy Clause* of the United States Constitution, federal law applicable to the Project governs. *NAFTA Traders, Inc. v. Quinn*, 339 S.W.3d 84, 97-98 (Tex. 2011). State courts "must follow" applicable federal law. *NAFTA Traders, Inc. v. Quinn*, 339 S.W.3d 84, 91 (Tex. 2011). The United States Supreme Court has made clear that even in state-law breach of contract claims, if federal law is involved, the federal law requirements are incorporated into the state-law based breach of contract cause of action. *American Tel. and Tel. Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 222 (1998). If the state-law based breach of contract action cannot be sustained in the event federal law is properly applied, then the state-law breach of contract claim fails as a matter of law. *Id.*

In *American Tel. and Tel. Co.*, the plaintiff brought a state-law breach of contract claim. Defendants argued that because federal law applied, the breach of contract claim failed. The United States Supreme Court ruled that by applying the applicable federal law, the state-law breach of contract claim could not be sustained, since it depended upon facts and circumstances that were precluded by the applicable federal law. The Supreme Court reached this decision despite the plaintiff's contention that it was pursuing claims solely based upon a state-law breach of contract theory. Just as in *American Tel. & Tel. Co.*, Star Operations consistently argued that the SH130 Project involved the use of federal funds and

therefore a written subcontract was required by applicable federal law. (CR 1346-1358 at Pars. 4, 7).

Moreover, in addition to federal requirements being included in the contracts by operation of law pursuant to the *Christian* Doctrine, the federal contract requirements were also ***expressly*** incorporated into any and all contracts on the Project, including any purported subcontract between Dig Tech and Star. Specifically, the Facility Concession Agreement ("FCA") between TxDOT and SH 130 Concession Company provides:

> Developer shall comply and require its Contractors to comply with ***all federal requirements applicable to transportation projects that receive federal credit or funds***, including those set forth in Exhibit 8.

(Appx Item 17, RR Vol. 34: DX119 at p.175) (emphasis added). The FCA also provides:

> [E]ach Contract shall include terms and conditions sufficient to ensure compliance by that Contractor with the requirements of the FCA Documents, and shall include those terms that are specifically required by the FCA Documents to be included therein including, to the extent applicable, those set forth in Exhibit 8.

(Appx Item 18A: DX119 at p. 69 (Art. 10.2.3); Appx Item 18B, Rule 11 Agreement). Exhibit 8, entitled "FEDERAL REQUIREMENTS FOR FEDERAL-AID CONSTRUCTION PROJECTS," was included in each subcontract pursuant to the "flow-down" provisions of the FCA, discussed *infra*. (Appx Item 14, RR Vol. 16: DX1 at pp. 69, 73, 86, 88-90, 98-99, 102-103; Appx Item 15, RR Vol. 18:

DX2 p. 117, 135-139, 148-154; <u>Appx Item 16</u>, RR Vol. 19: DX3 at p. 69, 84-87, 94-95, 98-100).

The following provision, found in both of Star's subcontracts with Central Texas and in Dig Tech's subcontract with Central Texas, incorporates the entirety of the FCA—including both the above clauses—into all three written subcontracts:

> <u>Facility Concession Agreement (FCA)</u> is the agreement between the developer and the Texas Department of Transportation. The FCA and related FCA documents are incorporated by reference into this Subcontract Agreement.

(<u>Appx Item 14</u>, RR Vol. 15: DX1 at p. 30; <u>Appx Item 16</u>, RR Vol. 18: DX3 at p. 30; <u>Appx Item 15</u>, RR Vol. 17: DX2 at p. 29).

The federal contract requirements were further incorporated into any and all potential downstream agreements (purported or actual) between Star and its subcontractors pursuant to the "flow-down" provisions of Star Operations' contracts with Central Texas:

> All lower-tier subcontracts must contain the terms and conditions that are incorporated into this Agreement.
> *****
> Written consent will be given only after the SHA[9] has assured that each subcontract is evidenced in writing and that it contains all pertinent provisions and requirements of the prime contract.

(<u>Appx Item 14</u>, RR Vol. 15: DX1 at p. 11 (Art. 9.4); RR Vol. 16: DX1 at p. 90 (Art. VII(e)); <u>Appx Item 16</u>, RR Vol. 18: DX3 at p. 11 (Art. 9.4); RR Vol. 19:

---

[9] "SHA" stands for "State Highway Administration. In this case, the SHA is TxDOT.

DX3 at p. 87 (Art. VII(e))). Further, these provisions were incorporated into Dig Tech's own written contract with Central Texas (Appx Item 15, RR Vol. 17: DX2 at p. 11), which imputed actual knowledge to Dig Tech of their applicability. *In re Bank One, N.A.*, 216 S.W.3d 825, 827 (Tex. 2007, orig. proceeding) (holding arbitration clause in a contract incorporated by reference into a signature card signed by account holder was binding on account holder). Therefore, Dig Tech is conclusively presumed to have knowledge that any enforceable contract on a federally funded highway project must be in writing, as a mandatory provision of any procurement of Dig Tech's services. *Id.*

Pursuant to *Christian* and its progeny, and in light of the express provisions of the written contracts applicable to the Project, all actual and potential contracts for work on the Project incorporated all applicable federal laws, statutes, rules, and regulations. Therefore, they became part of any purported contract between Star Operations and Dig Tech on the SH 130 Project. *G.L. Christian and Assocs. v. U.S.*, 312 F.2d 418, 427 (Ct. Cl. 1963); *In re Bank One, N.A.*, 216 S.W.3d 825, 826 (Tex. 2007); *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010).

Having established that federal contract requirements applied to this Project, the next inquiry is determining what those requirements were and whether they were met.

A.   **Issues 2 and 3**: The trial court erred in refusing to submit proposed jury question(s) on: (1) Dig Tech's failure to procure a written contract with Star;

and (2) Dig Tech's failure to procure TxDOT approval to the purported verbal contract with Star, both of which were federally mandated conditions precedent to formation and/or enforceability of any purported contract between Star and Dig Tech

Federal law mandates that any contract between Star and Dig Tech on the Project must be both (1) in writing, and (2) approved by TxDOT to be enforceable. Specifically, 23 CFR § 635.116(b), one of the applicable federal contract regulations, provides:

> (b) the STD [TxDOT][10] shall not permit any of the contract work to be performed under a subcontract, unless such arrangement has been authorized by the STD in writing. Prior to authorizing a subcontract, the STD shall assure that each subcontract is evidenced in writing and that it contains all pertinent provisions and requirements of the prime contract.

(Emphasis added). This federal regulation forbids any performance of any subcontract on the project unless TxDOT approves the subcontract first. It further forbids TxDOT from approving any such contract not in writing. As a result, a written, TxDOT-approved subcontract was a condition precedent to the formation of any enforceable contract between Star Operations and Dig Tech on this project. Any contrary reading would render the applicable regulation meaningless.

Dig Tech not only failed to offer proof of a written agreement and proof of TxDOT approval (which was its burden), but also readily admitted there was no

---

[10] "STD" stands for "State transportation department," and means "that department, commission, board, or official of any State charged by laws with the responsibility for highway construction. In this case, the STD is TxDOT. 23 CFR § 635.102.

such written, TxDOT-approved agreement. In paragraphs 4 and 7 of their live pleading Appellants specifically denied the performance of all conditions precedent and specifically raised the applicability of federal law to the Project and any contract claims of Dig Tech. (CR 1346-1358). Specific denials included the failure of Dig Tech to comply with the condition precedent of a written contract as required by applicable federal law. As such, Dig Tech bore, but could not meet, the burden of proving that it had an enforceable agreement, since its alleged agreement was admittedly verbal and in violation of applicable federal law.

"A party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998). A condition precedent may either be a condition to the *formation* of a contract or to an obligation to *perform* an existing agreement. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976); *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992); *Fitzgibbons v. Hughes, Id.* A condition precedent will be implied when there is "obvious necessity" or—as here—there are "public policy reasons" for it. *Snyder v. Eanes ISD*, 860 S.W.2d 692, 696 (Tex. App. – Austin 1993, writ denied.).

Dig Tech will no doubt urge that it was unfamiliar with or unaware of these legal requirements. This argument fails factually and legally. Dig Tech's own

written subcontract with Central Texas (<u>Appx Item 15</u>, RR Vol. 17: DX2) contained these requirements, imputing actual and constructive knowledge of their applicability. "As a matter of law, it is conclusively presumed parties know the law and contracted with reference to it." *Snyder,* 860 S.W.2d at 697. A party who signs a contract is charged by law with knowledge of its contents. *Nat'l Prop. Holdings, LP v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015) (*per curiam*) (holding that "the law presumes that a party knows and accepts the terms of a contract the party signs, and it is not the Court's role to protect the parties from their own agreements."). This is particularly true with respect to federal rules, regulations, and contract requirements. *General Engineering & Machine Works v. O'Keefe*, 991 F.2d 775, 780 (Fed. Cir. 1993); *Century Marine, Inc. v. United States*, 153 F.3d 225, 228 (5th Cir. 1998); *Worthen v. Fidelity Nat. Prop. & Cas. Ins. Co.*, 463 Fed.Appx.422 (5th Cir. 2012); *UPMC Braddock v. Harris*, 934 F. Supp. 2d 238, 259 (USDC 2013) ) *vacated on other grounds as moot* 584 Fed.Appx.1 (D.C. Cir. 2014); *Federal Crop Ins. Corp. v. Merrill*, 332 US 380 (1947).

The trial court must ***render*** judgment against the party who had the burden of proof on a missing element when (1) the opposing party objected to the missing element, (2) an affirmative finding on the missing element is essential to the claim or defense, and (3) the missing element is not established as a matter of law in

favor of the party with the burden of proof. *McKinley v. Stripling*, 763 S.W.2d 407, 410 (Tex. 1989) (rendition by Court of Appeals affirmed where trial court failed to submit jury issue on proximate cause and defendant objected to absence of such issue); *Physicians & Surgeons Gen. Hosp. v. Koblizek*, 752 S.W.2d 657, 660 (Tex. App.—Corpus Christi 1988, writ denied) (rendition against plaintiff where trial court improperly failed to submit questions on essential elements of premises liability claim and defendant objected and submitted questions on issue). When the opposing party objects to a missing element, a court cannot deem the missing element in favor of the party with the burden of proof on that element. *See Physicians & Surgeons*, 752 S.W.2d at 660. In such a case, the party with the burden of proof did not secure a finding on the omitted element, which forecloses that claim or defense. *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529 (Tex. 1997); *Dallas Cty. Med. Coc'y v. Ubinas-Brache*, 68 S.W.3d 31, 40 (Tex. App.—Dallas 2001, pet. denied).

Appellants properly preserved error by objecting to the court's refusal to submit jury questions on failure of contract formation for lack of compliance with federal requirements and failure of conditions precedent. The trial court improperly denied submission of these various jury questions. (RR Vol. 9 at 136:10-17; 142:19–144:24).

B.   **Issue 4**: The trial court erred in refusing to submit proposed jury question(s) on Dig Tech's failure to provide statutorily compliant "certified payroll" to

Star, which was a federally mandated condition precedent to any payment obligation arising against Star on any purported contract between Star and Dig Tech

Similarly, it is undisputed and uncontroverted that Dig Tech's certified payroll failed to comply with applicable federal law which was a condition precedent to payment pursuant to Article 10.3(d) of the various subcontracts – itself an independent federally mandated requirement. (Appx Item 14, RR Vol. 15: DX1 at p. 15 (Art. 10); Appx Item 15, RR Vol. 17: DX2 at p. 15 (Art. 10); Appx Item 16, RR Vol. 18: DX3 at p. 15 (Art. 10)). Even if there were a fact question on this issue, Dig Tech bore the burden of proving it met all conditions precedent. Dig Tech failed to submit issues on compliance with this condition precedent, which Star and GAIC had specifically denied. Appellants objected to the failure of the charge to include questions on the existence of and performance of these conditions precedent. (RR Vol. 9 at 143:17-144:7). The court improperly denied Appellants' proposed jury questions on these issues, notwithstanding the fact that Appellants were not required to submit questions on this issue because Dig Tech had the burden of proof. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998). Appellants are entitled to a reversal and rendition of a take nothing judgment in their favor on these grounds as well. *McKinley v. Stripling*, 763 S.W.2d 407, 410 (Tex. 1989); *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2nd 523, 529 (Tex. 1997); *Physicians & Surgeons Gen. Hosp. v.*

*Koblizek*,752 S.W.2d 657, 660 (Tex. App. – Corpus Christi 1988, writ denied); *Dallas Cty. Med. Co'y v. Ubinas-Brache*, 68 S.W.3d 31, 40 (Tex. App. – Dallas 2001, pet. denied).

C. **Issues 5-7**: The trial court erred in awarding Dig Tech contract damages because it was undisputed that Dig Tech failed to: (1) obtain a written contract with Star; (2) obtain TxDOT approval to its purported verbal contract with Star; or (3) provide statutorily compliant "certified payroll" to Star

Since applicable federal law renders the oral agreement Dig Tech sued upon unenforceable as a matter of law, Appellants are entitled to reversal and rendition of a take nothing judgment in their favor. *McKinley v. Stripling*, 763 S.W.2d 407, 410 (Tex. 1989); *Physicians & Surgeons Gen. Hosp. v. Koblizek*, 752 S.W.2d 657, 660 (Tex. App. – Corpus Christi 1988, writ denied); *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2nd 523, 529 (Tex. 1997); *Dallas Cty. Med. Co'y v. Ubinas-Brache*, 68 S.W.3d 31, 40 (Tex. App. – Dallas 2001, pet. denied).

The uncontroverted evidence at trial showed that Dig Tech's purported contract with Star was verbal and unapproved by TxDOT. The uncontroverted evidence also showed Dig Tech failed to provide Star statutorily compliant "certified payroll." As set out above, as a matter of law, these facts prevented formation of an enforceable contract upon which Dig Tech could recover payment. Star raised these issues repeatedly at trial and in its Motion for Judgment Notwithstanding the Verdict. The trial court erred in overruling such motion and in

ultimately awarding Dig Tech contract damages because the uncontroverted evidence conclusively negated Dig Tech's contract cause of action.

II.      **Issues 8-11**: The trial court erred in applying the law to Dig Tech's claim(s) against the GAIC payment bonds

Star and GAIC asserted at trial and continue to contend that the federal Miller Act applies to this federally funded public works project, which places exclusive subject matter jurisdiction over the bond dispute in federal court. However, if the Texas McGregor Act applies, the uncontroverted evidence at trial showed that Dig Tech failed to comply with its notice requirements and therefore failed to perfect any bond claims as a matter of law.

A.      **Issue 8**: The trial court erred in refusing to dismiss Dig Tech's claim(s) against the GAIC payment bonds for lack of jurisdiction because the federal Miller Act applied to the claim(s)

The federal Miller Act requires contractors on "public work" projects to provide performance and payment bonds. 40 U.S.C. § 3131. "[A] public work within the Miller Act is any work in which the United States is interested and which is done for the public and for which the United States is authorized to expend funds." *Continental Cas. Co. v. C.O. Brand, Inc.*, 355 F.2d 969, 974 (5th Cir. 1966). The Project is admittedly a federally funded project for the purpose of creating a roadway for public use, triggering the Miller Act analysis.

When the Miller Act applies, the McGregor Act does not. TEX. GOV'T. CODE § 2253.001, *et seq.*; *see Ex rel. United Rentals, Inc. v. Hartford Fire Ins. Co.*, 339 F. Supp.2d 799, 801-02 (W.D. Tex. 2004). Dig Tech had the burden of pleading facts showing the trial court had subject-matter jurisdiction. Appellants properly preserved this issue by asserting in their live pleading a Plea to the Jurisdiction (CR 1352-1353 at Par. 10). *See Tex. Dep't. of Parks & Wildlife v. Miranda*, 133 S.W.3d 174, 176 (Tex. 2004).

Exclusive jurisdiction of the Miller Act claims lies in federal court. *See Ex rel. United Rentals*, 339 F. Supp. 2d at 803. Accordingly, if the Miller Act applied, Dig Tech could not meet its burden to properly establish the trial court's subject-matter jurisdiction over the bond claims against GAIC.

B.  **Issue 9**: If the Texas McGregor Act applied to Dig Tech's payment bond claim(s), the trial court erred in ruling as a matter of law that Dig Tech perfected any claim against the bonds

Assuming the Miller Act did not apply, as the trial court ruled (RR Vol. 5 at 223:23–227:19; 229:14–230:3; 232: 9-15), the McGregor Act *would* apply. Because the evidence showed that Dig Tech failed to perfect any bond claim against GAIC under the McGregor Act, the trial court erred in holding Dig Tech perfected any claim.

It is undisputed that there were two separate subcontracts between Star and Central Texas with two separate surety bonds. Dig Tech claimed it performed work

under each subcontract. In order to perfect a bond claim on each of the bonds (or either of them) under the McGregor Act, Dig Tech was required to comply with the terms of the McGregor Act. This included a requirement that Dig Tech:

> …mail to the *prime contractor* written notice of a claim for any unpaid public work, labor performed, or public work material delivered … on or before the 15th day of the second month after each month in which the labor was performed or the material was delivered.

TEX. GOV'T. CODE § 2253.047(c). Dig Tech was also required to mail to <u>both</u> the surety (GAIC) and the prime contractor:

> …written notice of the claim…on or before the 15th day of the third month after each month in which any such claimed labor was performed or any of the claimed material was delivered [and a] **sworn** statement of account that states in substance: (1) the amount claimed is just and correct; [and] (2) all just and lawful offsets, payments, and credits known to the affiant have been allowed.

TEX. GOV'T. CODE § 2253.041 (emphasis added). All notices to the prime contractor and the surety were required to be sent by Registered or Certified Mail. TEX. GOV'T CODE § 2253.048(a). Because Dig Tech claims work under each of Star's subcontracts, it was required to provide notice on *each* bond and produce evidence on the value of work claimed on *each* Star subcontract (and GAIC bond).

For purposes of compliance with the McGregor Act, the "prime contractor" is the "person, firm, or corporation that makes a public work contract with a government entity." TEX. GOV'T. CODE § 2253.001(3). As reflected in the FCA admitted into evidence (<u>Appx Item 17</u>, RR Vol. 32: DX119), SH130 Concession

Company, LLC was the sole entity with a direct contract with TxDOT. Neither Central Texas, nor Star, nor Dig Tech had a contract with any government entity. Thus, only SH130 Concession Company qualifies as the "prime contractor" for purpose of complying with the McGregor Act.

The uncontroverted and undisputed evidence established that Dig Tech provided no notice to SH130 Concession Company (the prime contractor) at any time, in any format, on either bond. The evidence also conclusively shows Dig Tech provided no sworn statement of account to GAIC complying with the mandatory provisions of TEX. GOV'T. CODE § 2253.041. Instead Dig Tech argued that it "substantially complied" by sending an email to Central Texas—not the "prime contractor"—dated March 16, 2012 (Appx Item 20, RR Vol. 12: PX63) and a single letter to GAIC dated May 1, 2012 that did not contain the statutorily-mandated sworn statement of account (Appx Item 21, RR Vol. 15: PX 183). As to the latter notice, it only referenced CSUB-140 (Appx Item 16, RR Vol. 18: DX3). It did not reference CSUB-116 (Appx Item 14, RR Vol. 15: DX1). It did not meet the sworn statement requirement. Clearly, Dig Tech did not provide the statutorily-mandated notices required to perfect a claim for any work in October, 2011 through April, 2012. Accordingly, Dig Tech failed to prove that it perfected its claims on the GAIC bonds.

At trial, Dig Tech claimed that even though it did not provide timely and compliant notices properly accompanied by sworn statements of account, it nevertheless "substantially complied" with the McGregor Act's notice requirements. It is true that a claimant may maintain a McGregor Act bond claim despite semantic variances from the statutory notice language under the doctrine of "substantial compliance." *See, e.g. Featherlite Bldg. Products Corp. v. Constructors Unlimited, Inc.*, 714 S.W.2d 68, 69 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (substantial compliance held where sworn statement of account stated amounts were "due and unpaid" instead of "just and correct."); *Capitol Indemn. Corp. v. Kirby Restaurant Equipment and Chemical Supply Co., Inc.*, 170 SW.3d 144, 148 (Tex. App.—San Antonio 2005, pet. denied) (substantial compliance held where sworn statement of account stated the claim was "currently unpaid and owing," "now due," and represented the "current payment due," instead of "just and correct.").

However, Texas courts require *strict*—not merely "substantial" compliance with the Act's notice <u>deadlines</u>. *Suretec Ins. Co. v. Myrex Industries*, 232 S.W.3d 811, 816 (Tex. App.—Beaumont 2007, pet. denied) (distinguishing failure to provide timely notice from "substantial compliance" cases involving semantic variances from statutory language; holding "substantial compliance" will not satisfy requirement that bond notices be made timely; concluding that untimely

notice barred claim even though it was only one day late and the deadline fell on a Sunday.); *see also Laboratory Design & Equipment, Inc. v. Brooks Development Authority*, No. 04-07-00284-CV, 2008 WL 36614 at *3 (Tex. App.—San Antonio Jan. 2, 2008, no pet.) (Claimant failed to perfect bond claim under McGregor Act where notices were untimely). Moreover, when the claimant fails to provide the required sworn statement of account, the claimant does not substantially comply with the Act and fails to perfect its bond claim. *See Laboratory Design & Equipment, Inc.*, 2008 WL at *3 (Claimant failed to perfect bond claim where it failed to provide any sworn statement of account as required; specifically rejecting argument that notice efforts constituted "substantial compliance.").

Dig Tech's lone notice to GAIC was unaccompanied by any sworn statement of account, and therefore did not substantially comply with the Act. *Id.*; TEX. GOV'T. CODE § 2253.041. Dig Tech offered no evidence that it ever provided any notice at all to the prime contractor (SH130 Concession Company) as required by TEX. GOV'T. CODE §§ 2253.001, 2253.041, and 2253.047. Accordingly, Dig Tech failed to prove it perfected its bond claims.

Despite failing to prove claim perfection and instead of submitting jury questions on compliance, Dig Tech requested that the Court rule as a matter of law that it had "substantially complied with the notice provisions such that GAIC has

notice of our bond claim." (RR Vol. 9 at 136:16–137:7). The trial court erred in granting this motion. (RR Vol. 5 at 228:23–232:14; Vol. 9 at 136:18–137:7).

C.   **Issue 10**: If the McGregor Act applied to Dig Tech's payment bond claim(s), the trial court erred in denying GAIC's Motion for Instructed Verdict and its Motion for Judgment Notwithstanding the Verdict because Dig Tech failed as a matter of law to perfect any payment bond claim under the McGregor Act

In fact, the evidence at trial (Appx Item 20, RR Vol. 12: PX63; Appx Item 21, RR Vol. 15: PX 183) (only evidence of "notices" to Central Texas and GAIC) conclusively proved the exact opposite of the court's ruling, specifically that Dig Tech *did not* perfect its bond claim(s) under the McGregor Act. GAIC was properly entitled to an instructed verdict and to a judgment notwithstanding the verdict for noncompliance with the McGregor Act's notice requirements. GAIC properly moved for directed verdict (RR Vol. 5 at 223:1–227:19) and for judgment notwithstanding the verdict (CR 1748) on these grounds, and the trial court erred in denying both motions.

D.   **Issue 11**: If the McGregor Act applied to Dig Tech's payment bond claim(s) and a fact issue existed as to whether Dig Tech perfected any claim against the bonds, the trial court erred in refusing to submit GAIC's proposed jury questions on whether Dig Tech substantially complied with the McGregor Act's notice requirements

GAIC preserved error by objecting to the failure of the Court to submit questions to the jury on Dig Tech's compliance with the McGregor Act notice

requirements and by requesting jury questions on this issue. (RR Vol. 9 at 136:18–137:7; 141:1–142:18). To the extent the evidence did not conclusively prove Dig Tech failed to provide the required notices, these questions were required to go to the jury and the court erred in refusing to include them in the charge.

In light of the fact that Dig Tech failed to obtain jury findings of compliance with its condition precedent to perfect its claim(s) on the bonds, GAIC is entitled to a reversal and the rendition of a take nothing judgment in its favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998); *McKinley v. Stripling*, 763 S.W.2d 407, 410 (Tex. 1989); *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2nd 523, 529 (Tex. 1997).

III.     **Issue 12**: The trial court erred in awarding damages to Dig Tech without any evidence of Dig Tech's actual damages as net loss after reduction of income tax payments or unpaid income tax liability as required by TEX. CIV. PRAC. & REM. CODE § 18.091

As a precondition to recovering its damages, Dig Tech was required to present evidence of such damages in the form of "net loss after reduction of income tax payments or unpaid income tax liability pursuant to any federal income tax law." TEX. CIV. PRAC. & REM. CODE § 18.091. The case law is clear. Contrary to Dig Tech's arguments at trial, this statute does not apply "only to personal injury claims." *See Interconex, Inc. v. Ugarov*, 224 S.W.3d 523 (Tex. App.—Houston [1st

Dist.] 2007, no pet.); *Big Bird Tree Service v. Gallegos*, 365 S.W.3d 173, 179 (Tex. App. – Dallas 2012, pet denied).

A court may not judicially amend a statute and add words that are not explicitly contained in the language of the statute. *Jones v. Liberty Mutual Ins. Co.*, 745 S.W.2d 901, 902 (Tex. 1988). As the Supreme Court stated recently, "the bar for reworking the words of our Legislature passed into law is high and should be." *Combs v. Healthcare Services, Corp.*, 401 S.W.3d 623, 630 (Tex. 2013). Stated differently, the Supreme Court has said that in matters of statutory construction, the Court takes the Legislature "at its word." *Christus Health Gulf Coast v. Aetna, Inc.*, 397 S.W.3d 651, 654 (Tex. 2013). The Court's analysis begins (and often ends) with the Legislature's chosen language. *Id.* at 653. This voted-on language is what constitutes the law; "the Judge's inquiry is at an end." *Id.* at 653-654.

The language of the statute is clear. As a precondition to recovery of its damages, Dig Tech was required to present evidence of such lost earnings <u>after</u> reduction for any income tax payments made or unpaid tax liability that would have accrued as a result of such recovery. Since the invoices would be ordinary revenue, they would constitute "earnings" within the meaning of the Internal Revenue Code and federal income tax would be due and owing. Dig Tech's failure to present evidence net of the unpaid tax liability precludes Dig Tech's recovery.

Appellants objected to the failure of the charge – specifically Jury Questions Nos. 4 and 8 – on the grounds that they failed to comply with § 18.091. (RR Vol. 9 at 144:25–145:15). Accordingly, Appellants are entitled to reversal and rendition of a take nothing judgment in their favor as to actual damages in light of Dig Tech's failure to present the evidence in the statutorily required manner and its failure to secure a jury finding of damages in compliance with § 18.091.

IV.     **Issue 13**: The trial court erred in awarding attorney's fees to Dig Tech because Dig Tech failed to segregate recoverable attorney's fees from unrecoverable attorney's fees

Dig Tech readily admitted that in order to recovery attorney's fees, it was required to segregate incurred attorney's fees relating solely to a claim for which attorney's fees are unrecoverable pursuant to the Supreme Court decision of *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2006).  (RR Vol. 5 at 191:21–192:2 (Dig Tech attorney David Pfeuffer)).  Simply because the facts are "intertwined" does not make fees incurred on an unrecoverable claim – such as Star's tort counterclaim – recoverable.  Failure to segregate such fees precludes recovery.

In cross-examination Dig Tech's sole witness on the issue of attorney's fees – David Pfeuffer – freely admitted that he made no attempt to look at the discovery submitted by Star to Dig Tech on its counterclaims. Instead he concluded that the unrecoverable attorney's fees Dig Tech incurred in drafting and responding to

discovery dealing solely with Star's counterclaim were simply "intertwined" with attorney's fees that would have been incurred by Dig Tech in relation to its own breach of contract claim. (RR Vol. 5 at 217:2–218:21) (David Pfeuffer). Mr. Pfeuffer admitted that – **without looking at the discovery –** he merely assumed that the discovery would have been attributable to both Dig Tech's breach of contract claim and Star's counterclaim. In other words, Dig Tech made no attempt to segregate the recoverable attorney's fees attributable to responding to discovery pertaining to its breach of contract claim from unrecoverable attorney's fees incurred in drafting or responding to discovery that was attributable solely to Star Operations' counterclaim.

Dig Tech's sole expert witness on attorney's fees failed to properly investigate and analyze the discovery at issue to determine if it was in fact "intertwined" between Dig Tech's claims and the counterclaims or if it was attributable only to the counterclaims. It was Dig Tech's burden to segregate the fees that were not recoverable. It chose not to do so. By virtue of Dig Tech's failure to segregate the discreet attorney's fees, Dig Tech was precluded from recovering the attorney's fees it incurred at the trial of this case. Accordingly, Appellants are entitled to reversal and rendition of judgment in their favor eliminating any claim for attorney's fees incurred at the trial of the case.

V.       **Issue 14**: The trial court erred in awarding Dig Tech costs for copies of deposition transcripts as "taxable costs" when Dig Tech did not notice or initiate the depositions

Dig Tech moved for entry of final judgment on March 13, 2015, submitting its original bill of costs totaling $8,666.16. Subsequently, Dig Tech amended its bill of costs three times: (1) on March 16, 2015 Dig Tech submitted its First Amended Bill of Costs totaling $25,845.85; (2) on March 23, 2015 Dig Tech submitted its Second Amended Bill of Costs totaling $29,149.48; and (3) on April 16, 2015 Dig Tech submitted its Third Amended Bill of Costs totaling $5,556.61. With each amendment Dig Tech added additional unreasonable and unrecoverable costs until its Third Amended Bill of Costs when Dig Tech removed certain improper costs. (CR 1826-1861).

However, even in its Third Amended Bill of Costs it continued to seek amounts for deposition transcript photocopies for depositions Dig Tech neither noticed nor initiated. These specifically included the depositions of Mike Kiehnau, Eric Salazar, Ana Garcia, Gaylon Chapman, Michael Furry, Tracy Lambert, and Bodie Leslie. The total amount of these improper costs that were requested by Dig Tech and awarded by the trial court is the sum of $3,573.21.

"Costs are not recoverable unless they are expressly provided for by statute, rule, or under principles of equity." *Bundren v. Holly Oaks Townhomes Ass'n, Inc.*, 347 S.W.3d 421, 440 (Tex. App.—Dallas 2011, pet. denied); *Gumpert v. ABF*

*Freight System, Inc.*, 312 S.W.3d 237, 241 (Tex. App.—Dallas 2010, no pet.). "A court may include the following items in awarding costs: (1) fees of the clerk and service fees due the county; (2) fees of the court reporter for the original stenographic transcripts necessarily obtained for use in the suit; (3) masters, interpreters, and guardians ad litem appointed pursuant to these rules and state statutes; and (4) such other costs and fees as may be permitted by these rules and state statutes." TEX. CIV. PRAC. & REM. CODE § 31.007(b).

Regardless, "the power to allocate costs does not encompass the power to tax as costs items that are not allowed as taxable court costs." *Hatfield v. Solomon,* 316 S.W.3d 50, 67 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Moreover, the courts have specifically rejected certain proposed costs as ***not recoverable***:

(1) copy or reproduction fees;[11]
(2) travel related expenses;[12]
(3) delivery services (*Id.*);
(4) binding of briefs (*Id.*);
(5) transcripts of testimony not elicited (*Id.*);
(6) legal support (*Id.*);
(7) secretarial overtime (*Id.*); and
(8) expert fees.[13]

---

[11] TEX. R. CIV. P. 141 ("[n]o fee for a copy of a paper not required by law or these rules to be copied shall be taxed in the bill of costs.").

[12] *Wallace v. Briggs*, 348 S.W.2d 523, 527 (Tex. 1961); *Shenandoah Assocs. v. J& K Properties, Inc.*, 741 S.W.2d 470, 487 (Tex. App.—Dallas 1987, writ denied) (incidental litigation expenses are not recoverable as taxable court costs).

[13] *May v. Ticor Title Ins.*, 422 S.W.3d 93, 106 (Tex. App.—Houston [14th Dist.] 2014, rehearing overruled) ("Generally, in Texas, expert fees are not recoverable as court costs.") (citing *Bundren*, 347 S.W.3d at 421) (citations omitted).

Costs for copies or reproductions of deposition transcripts that do not represent the original stenographic recording (*e.g.*, copies of depositions not initiated by a party) are not recoverable. *Gumpert v. ABF Freight System, Inc.*, 312 S.W.3d 237 at 241 (Tex. App.—Dallas 2010, no pet.) ("because no statute or rule authorizes the recovery of the costs to videotape a deposition or obtain a copy of a deposition transcript, we conclude that the trial court erred by awarding [prevailing party] those costs.") (distinguishing cases including *Crescendo Inv., Inc. v. Brice*, 61 S.W.3d 465 (Tex. App.—San Antonio 2001, pet. denied) and *Fasken Land & Minerals, Ltd. v. Occidental Permian Ltd.*, 225 S.W.3d 577 (Tex. App.—El Paso 2005, pet. denied) cited by Dig Tech in its motion for entry to judgment and award of costs); TEX. R. CIV. P. 140 (no fee for copy); TEX. CIV. PRAC. & REM. CODE § 31.007(b) (costs for "original stenographic transcripts"). Thus, deposition transcript copy costs for depositions of witnesses other than Lana Lewis (the only deposition noticed and initiated by Dig Tech) are ***not recoverable***.

### Conclusion

As reflected in Issue Nos. 1-7, Dig Tech failed to comply with mandatory federal requirements: (1) that any agreement for work on the Project be in writing and approved by TxDOT; and (2) that it provide compliant certified payroll to Star as a precondition of payment. As reflected in Issue Nos. 8-11, Dig Tech failed to perfect its bond claims against the surety GAIC in compliance with either the

federal Miller Act or TEX. GOV'T. CODE § 2253, *et. seq.* (McGregor Act). As reflected in Issue No.12, Dig Tech failed to present damages in compliance with TEX. CIV. PRAC. & REM. CODE § 18.091. As reflected in Issue No. 13, Dig Tech failed to properly segregate pre-trial attorney's fees to only seek those that were recoverable. Finally, as reflected in Issue No. 14, the taxable costs awarded by the trial court to Dig Tech were excessive, including recovery for photocopies of deposition transcripts neither noticed nor initiated by Dig Tech. Star and GAIC are each entitled to reversal and rendition of take nothing judgments in their favor.

## Prayer

FOR ALL OF THE FOREGOING REASONS, Appellants request that this Court reverse the judgment of the trial court and render a take nothing judgment in favor of Appellants, and grant Appellants such further relief to which they may be entitled.

Respectfully submitted,

BRANSCOMB|PC
802 N. Carancahua, Suite 1900
Corpus Christi, TX 78401-0036
Telephone: 361/886-3800
Telecopier: 361/886-3805

*/s/ James H. Robichaux*
James H. Robichaux
SBN 17083000
jrobichaux@branscombpc.com
Clinton W. Twaddell, III

SBN 24071537
ctwaddell@branscombpc.com

ATTORNEYS FOR APPELLANTS STAR OPERATIONS, INC. AND GREAT AMERICAN INSURANCE COMPANY OF NEW YORK

## CERTIFICATE OF COMPLIANCE

I certify that this document was produced on a computer using Microsoft Word and contains **9,749** words, as determined by the computer software's word-count function, excluding the sections of the document listed in Texas Rule of Appellate Procedure 9.4(i)(1).

*/s/ James H. Robichaux*
James H. Robichaux

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been forwarded to counsel of record in accordance with the applicable Tex. R. Civ. P. as listed below on this the 20th day of November, 2015.

Brian Melton
Chanler A. Langham
SUSMAN GODFREY L.L.P.
1000 Louisiana Street Suite 5100
Houston, TX 77002-5096

*/s/ James H. Robichaux*
James H. Robichaux

# INDEX TO APPENDIX

- Item 1 ...........................................................................Final Judgment
- Item 2 ................................................................. Jury Charge and Verdict
- Item 3 ..................................................................................TEX. R. CIV. P. 140
- Item 4 ..................................................................................TEX. R. CIV. P. 141
- Item 5 ..............................................................................23 C.F.R. § 635.102
- Item 6 ..............................................................................23 C.F.R. § 635.103
- Item 7 ..............................................................................23C.F.R. § 635.116
- Item 8A...................................................... TEX. CIV. PRAC. & REM. CODE § 18.091
- Item 8B...................................................... TEX. CIV. PRAC. & REM. CODE § 31.007
- Item 9 ..............................................................................40 U.S.C. § 3131
- Item 10 ................................................................. TEX. GOV'T CODE § 2253.001
- Item 11 ................................................................. TEX. GOV'T CODE § 2253.041
- Item 12 ................................................................. TEX. GOV'T CODE § 2253.047
- Item 13 ................................................................. TEX. GOV'T CODE § 2253.048
- Item 14 ...........................**DX1**: Star/Central Texas Subcontract CSUB116 Excerpts
- Item 15 ...................**DX2**: Dig Tech/Central Texas Subcontract CSUB122 Excerpts
- Item 16 ...........................**DX3**: Star/Central Texas Subcontract CSUB140 Excerpts
- Item 17 ........................**DX119**: Facility Concession Agreement Excerpt (page 175)
- Item 18A.......................**DX119**: Facility Concession Agreement Excerpt (page 69)
- Item 18B..........................................Rule 11 Regarding Supplementation of Record
- Item 19 ..................................................**DX9**: Dig Tech Certified Payroll Excerpts
- Item 20 ......**PX63**: Mike Kiehnau Email Regarding Communication from Dig Tech
- Item 21 ...............................................................**PX183**: Dig Tech Letter to GAIC

| | | |
|---|---|---|
| DIG TECH, INC. | § | |
| | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | 22ND JUDICIAL DISTRICT |
| STAR OPERATIONS, INC. | § | |
| GREAT AMERICAN INSURANCE | § | |
| COMPANY OF NEW YORK | § | |
| | § | CALDWELL COUNTY, |
| | § | TEXAS |
| Defendants. | § | |

## FINAL JUDGMENT

On February 20, 2015, the Court entered a traditional summary judgment against Defendant Star Operations, Inc.'s ("Star Operations") counterclaim for fraud.

On February 23, 2015, the Court called this case for trial. The Plaintiff Dig Tech, Inc. ("Dig Tech") appeared in person and through its attorneys and announced ready for trial. The Defendants Star Operations, Inc. ("Star Operations") and Great American Insurance Company of New York ("GAIC") appeared in person and through their attorneys and announced ready for trial. The Court then empanelled and swore in a jury consisting of twelve jurors, and the case proceeded to trial.

On February 26 and March 4, the Court ruled that Dig Tech substantially complied with the notice provisions of the McGregor Act and that the Miller Act does not apply to Dig Tech's claims.

On March 4, 2015, the Court submitted questions, definitions, and instructions to the jury. On March 5, 2015, the jury returned a unanimous Verdict. The jury's unanimous Verdict was received, filed, and entered of record.

1

# Appendix Item 1

The Court, having considered the pleadings, the evidence, the jury Verdict, and the applicable law, hereby renders Judgment in favor of Plaintiff Dig Tech and against Star Operations and GAIC on all claims asserted.

Accordingly, it is ORDERED that Dig Tech have and recover from Star Operations and GAIC, jointly and severally:

1. Actual damages in the amount of $228,524.

2. Reasonable and necessary attorneys' fees in the amount of $330,950 for the prosecution of this case through Judgment.

3. Reasonable and necessary attorneys' fees in the amount of $60,030 for representation through appeal to the court of appeals; $8,625 for representation at the petition for review stage in the Supreme Court of Texas; $8,625 for representation at the merits briefing stage in the Supreme Court of Texas; and $34,500 for representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

4. All Court costs, pursuant to Texas rule of Civil Procedure 131, including the cost of deposition transcripts and subpoenas necessarily obtained for use in this suit, in the amount of ~~$25,845.85.~~ $5,556.61 as reflected in. Plaintiffs' Third Amended Bill of Costs.

5. Prejudgment interest, ~~pursuant to Texas Property Code § 28.003~~, on the unpaid invoice amounts at the rate of ~~18%~~ 5% in the amount of ~~$68,407~~ $30,490.74 up to ~~March 6, 2015, and accruing daily in the amount of $112.70 until the date of this Judgment.~~ April 16, 2016

6. Post judgment interest on all of the above amounts at the rate of 5% compounded annually, from the date of this Judgment is entered until all mounts are paid in full.

It is further ORDERED that Star Operations take nothing on its fraud and tortious interference counterclaims against Dig Tech.

2

3619506v1/014338

It is further ORDERED that Dig Tech substantially complied with the notice provisions of the McGregor Act in order to perfect its bond claim against GAIC. Accordingly, GAIC is obligated under the terms of its bond to make the payments that Star Operations failed to make.

This Judgment finally disposes of all claims and all parties and is an appealable Final Judgment.

The Court ORDERS Execution to issue for this Final Judgment.

SIGNED this 16 day of April 2015.

THE HONORABLE TODD BLOMERTH

FILED this 16th day of Apr 20 15
10:40 A M
TINA MORGAN FREEMAN
CLERK DISTRICT COURT, CALDWELL CO., TX
By _____ Deputy

Agreed as to form only

Dig Tech Brian Metten

Star Operations _____

GAIC _____

3

ORIGINAL

CAUSE 12-O-337

| | | |
|---|---|---|
| DIG TECH, INC. | § | |
| | § | **IN THE DISTRICT COURT** |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | **22ND JUDICIAL DISTRICT** |
| STAR OPERATIONS, INC. | § | |
| GREAT AMERICAN INSURANCE | § | |
| COMPANY OF NEW YORK | § | |
| | § | **CALDWELL COUNTY,** |
| | § | **TEXAS** |
| Defendants. | § | |

### CORRECTED CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

Here are the instructions for answering the questions.

1.    Do not let bias, prejudice, or sympathy play any part in your decision.

2.    Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

2

# Appendix Item 2

3.     You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight you give their testimony. But on matters of law, you must follow all of my instructions.

4.     If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.     All the questions and answers are important. No one should say that any question or answer is not important.

6.     Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

A fact may be established by direct evidence or circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

7.     Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.     Do not answer questions by drawing straws or by any method of chance.

9.     Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10.     Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11.     Unless otherwise instructed, the answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for

3

another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

## DEFINITIONS AND GENERAL INSTRUCTIONS

You are instructed to use the following definitions when the defined words appear in specific questions

"Dig Tech" shall refer to Plaintiff Dig Tech, Inc.

"Star Operations" shall collectively refer to Defendant Star Operations, Inc.

"Central Texas" shall refer to Central Texas Highway Constructors, LLC.

4

<u>Question 1</u>

Did Dig Tech and Star Operations agree that Dig Tech would conduct boring work for Star Operations, and that Star Operations would pay Dig Tech for such boring work?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

A party's conduct includes conduct of others that the party has ratified. Ratification may be express or implied.

Implied ratification occurs if a party, though he may have been unaware of unauthorized conduct taken on his behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after he acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction.

Answer:     "Yes" or "No".

Answer:     ___Yes___

5

If you answered Question 1 "Yes", then answer the following question. Otherwise, do not answer the following question.

## Question 2

Did Star Operations fail to comply with the agreement?

Answer:     "Yes" or "No.

Answer:     _Yes_

6

If you answered <u>Question 2</u> "Yes", then answer the following question. Otherwise, do not answer the following question.

Question 3

Was Star Operations' failure to comply excused?

Failure to comply by Star Operations is excused by Dig Tech's previous failure to comply with a material obligation of the same agreement.

The circumstances to consider in determining whether a failure to comply is material include:

1. the extent to which the injured party will be deprived of the benefit which he reasonably expected;

2. the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

3. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

4. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;

5. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Failure to comply by Dig Tech is excused if compliance is waived by Star Operations. Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

Answer:      "Yes" or "No".

Answer:      No

7

If you answered Question 3 "Yes", do not answer the following question.

## Question 4

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Dig Tech for its damages, if any, that resulted from Star Operations' failure to comply?

Consider the following elements of damages, if any, and none other.

The reasonable value of the work performed by Dig Tech at the time and place it was performed.

Answer in Dollars and Cents, if any.

Answer:    $228,524.00

8

If you answered Question 1 "Yes", do not answer the following question.

## Question 5

Did Dig Tech perform compensable work for Star Operations?

> One party performs compensable work if valuable services are rendered or materials furnished for another party who knowingly accepts and uses them and if the party accepting them should know that the performing party expects to be paid for the work.

Answer:      "Yes" or "No.

Answer:      _____

9

If you answered Question 5 "Yes", then answer the following question. Otherwise, do not answer the following question.

## Question 6

Do you find that Star Operations has been unjustly enriched with respect to the work you have found Dig Tech performed?

Answer:     "Yes" or "No.

Answer:     _____

10

If you answered <u>Question 5</u> "Yes", then answer the following question. Otherwise, do not answer the following question.

## Question 7

Do you find that Dig Tech would be unjustly penalized if Star Operations were permitted to retain the benefits of Dig Tech's work without paying anything in return?

Answer:    "Yes" or "No.

Answer:    _____

11

If you answered <u>Questions 5, 6, and 7</u> "Yes", then answer the following question. Otherwise, do not answer the following question.

## <u>Question 8</u>

What is the reasonable value of such compensable work at the time and place that it was performed?

Answer in Dollars and Cents, if any.

Answer:                    _____

12

If you answered <u>Question 4</u> or <u>Question 8</u>, then answer the following question. Otherwise, do not answer the following question.

<u>Question 9</u>

What are the reasonable fees for the necessary services of Dig Tech's attorneys, stated in dollars and cents?

Answer with an amount for each of the following:

1. For representation in the trial court.

Answer: $330,950.00

2. For representation through appeal to the court of appeals.

Answer: $60,030.00

3. For representation at the petition for review stage in the Supreme Court of Texas.

Answer: $8,625.00

4. For representation at the merits briefing stage in the Supreme Court of Texas.

Answer: $8,625.00

5. For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: $34,500

13

## Question 10

Did Dig Tech, Inc. intentionally interfere with the contract between Star Operations, Inc. and Central Texas Highway Constructors, LLC?

Interference is intentional if committed with the desire to interfere with the contract or with the belief that interference is substantially certain to result.

Answer:      "Yes" or "No".

Answer:      _Yes_____

14

If you answered Question 10 "Yes", then answer the following question. Otherwise, do not answer the following question.

## Question 11

Did Dig Tech, Inc. interfere because it had a good-faith belief that it had a right to threaten garnishment for the work it performed?

Answer:      "Yes" or "No".

Answer:      Yes

15

If you answered Question 11 "No", then answer the following question. Otherwise, do not answer the following question.

## Question 12

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Star Operations for its damages, if any, proximately caused by Dig Tech's interference?

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other.

- the difference, if any, in the reasonable and necessary attorneys' fees incurred for the "Dig Tech Claim," and the fees awarded by the arbitration tribunal for the "Dig Tech Claim," if any

Do not add any amount for interest on damages, if any.

Answer in Dollars and Cents, if any:

Answer: _____

16

Answer the following question only if you answered "Yes" to Question 10. Otherwise, do not answer the following Question.

To answer "Yes" to the following Question, your answer must be unanimous. Otherwise, you must not answer the Question.

## Question 13

Do you find by clear and convincing evidence that the harm to Star Operations resulted from malice on the part of Dig Tech?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Dig Tech to cause substantial injury or harm to Star Operations.

Answer:      "Yes" or "No".

Answer:      ___No___

17

1698

Answer the following question only if you unanimously answered "Yes" to Question 13. Otherwise, do not answer the following Question.

You must unanimously agree on the amount of any award of exemplary damages.

## Question 14

What sum of money, if any, if paid now in cash, should be assessed against Dig Tech and awarded to Star Operations as exemplary damages, if any, for the conduct of Dig Tech found in response to Question 13.

"Exemplary damages" means an amount that you may in your discretion award as a penalty of by way of punishment.

Factors to consider in awarding exemplary damages, if any, are –

1. The nature of the wrong.

2. The character of the conduct involved.

3. The degree of culpability of Dig Tech.

4. The situation and sensibilities of the parties concerned.

5. The extent to which such conduct offends a public sense of justice and propriety.

6. The net worth of Dig Tech in dollars and cents, if any.

Answer in dollars and cents, if any.

Answer: _____

18

## Question 15

Do either of the parties have "unclean hands"?

> A party has "unclean hands" if its own conduct in connection with the same matter or transaction has been unconscientious, unjust, or marked by a want of good faith, or if it has violated the principles of equity and righteous dealing, which injured the other party.

Answer "Yes" or "No" for each of the following:

a.  Dig Tech

Answer:  __No__

b.  Star Operations

Answer:  __Yes__

19

**Presiding Juror:**

     1.     When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

     2.     The presiding juror has these duties:

          a.     have the complete charge read aloud if it will be helpful to your deliberations;

          b.     preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

          c.     give written questions or comments to the bailiff who will give them to the judge;

          d.     write down the answers you agree on;

          e.     get the signatures for the verdict certificate; and

          f.     notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

20

## Instructions for Signing the Verdict Certificate:

1. You may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2. If 10 jurors agree on every answer, those 10 jurors sign the verdict.

If 11 jurors agree on every answer, those 11 jurors sign the verdict.

If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

4. There are some special instructions some Questions explaining how to answer those questions. Please follow the instructions. If all twelve of you answer those questions, you will need to complete a second verdict certificate for those questions.

Do you understand these instructions? If you do not, please tell me now.

_____
JUDGE PRESIDING

FILED this 5th day of March 2015
2:30 P M
TINA MORGAN FREEMAN
CLERK DISTRICT COURT, CALDWELL CO., TX
By _Debra R McGonagill_ Deputy

21

**VERDICT CERTIFICATE**

Check one:

X    Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

_Daisy Diane Baker_                              _Daisy Diane Baker_
Signature of Presiding Juror                    Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

|  | SIGNATURE | NAME PRINTED |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |

22

## ADDITIONAL CERTIFICATE

I certify that the jury was unanimous in answering the following questions. All twelve of us have agreed to each of the answers. The presiding juror has signed the certificate for all twelve of us.

Question Nos. 13 and 14.

_Daisy Diane Baker_
Signature of Presiding Juror

_Daisy Diane Baker_
Printed Name of Presiding Juror

23

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 6. Costs and Security Therefor

TX Rules of Civil Procedure, Rule 140

Rule 140. No Fee for Copy

Currentness

No fee for a copy of a paper not required by law or these rules to be copied shall be taxed in the bill of costs.

**Credits**
Oct. 29, 1940, eff. Sept. 1, 1941.

Notes of Decisions (4)

Vernon's Ann. Texas Rules Civ. Proc., Rule 140, TX R RCP Rule 140
Current with amendments received through 6/1/2015

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix Item 3

Vernon's Texas Rules Annotated
 Texas Rules of Civil Procedure
  Part II. Rules of Practice in District and County Courts
   Section 6. Costs and Security Therefor

TX Rules of Civil Procedure, Rule 141

Rule 141. Court May Otherwise Adjudge Costs

Currentness

The court may, for good cause, to be stated on the record, adjudge the costs otherwise than as provided by law or these rules.

**Credits**
Oct. 29, 1940, eff. Sept. 1, 1941.

Notes of Decisions (211)

Vernon's Ann. Texas Rules Civ. Proc., Rule 141, TX R RCP Rule 141
Current with amendments received through 6/1/2015

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix Item 4

KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
  Title 23. Highways
    Chapter I. Federal Highway Administration, Department of Transportation
      Subchapter G. Engineering and Traffic Operations
        Part 635. Construction and Maintenance (Refs & Annos)
          Subpart A. Contract Procedures (Refs & Annos)

23 C.F.R. § 635.102

§ 635.102 Definitions.

Currentness

As used in this subpart:

Administrator means the Federal Highway Administrator.

Calendar day means each day shown on the calendar but, if another definition is set forth in the State contract specifications, that definition will apply.

Contract time means the number of workdays or calendar days specified in a contract for completion of the contract work. The term includes authorized time extensions.

Design-build project means a project to be developed using one or more design-build contracts.

Division Administrator means the chief FHWA official assigned to conduct business in a particular State. A State is as defined in 23 U.S.C. 101.

Force account means a basis of payment for the direct performance of highway construction work with payment based on the actual cost of labor, equipment, and materials furnished and consideration for overhead and profit.

Formal approval means approval in writing or the electronic transmission of such approval.

Incentive/disincentive for early completion as used in this subpart, describes a contract provision which compensates the contractor a certain amount of money for each day identified critical work is completed ahead of schedule and assesses a deduction for each day the contractor overruns the incentive/disincentive time. Its use is primarily intended for those critical projects where traffic inconvenience and delays are to be held to a minimum. The amounts are based upon estimates of such items as traffic safety, traffic maintenance, and road user delay costs.

Liquidated damages means the daily amount set forth in the contract to be deducted from the contract price to cover additional costs incurred by a State transportation department because of the contractor's failure to complete the contract work within the number of calendar days or workdays specified. The term may also mean the total of all daily amounts deducted under the terms of a particular contract.

# Appendix Item 5

Local public agency means any city, county, township, municipality, or other political subdivision that may be empowered to cooperate with the State transportation department in highway matters.

Major change or major extra work means a change which will significantly affect the cost of the project to the Federal Government or alter the termini, character or scope of the work.

Materially unbalanced bid means a bid which generates a reasonable doubt that award to the bidder submitting a mathematically unbalanced bid will result in the lowest ultimate cost to the Federal Government.

Mathematically unbalanced bid means a bid containing lump sum or unit bid items which do not reflect reasonable actual costs plus a reasonable proportionate share of the bidder's anticipated profit, overhead costs, and other indirect costs.

Public agency means any organization with administrative or functioual responsibilities which are directly or indirectly affiliated with a governmental body of any nation, State, or local jurisdiction.

Publicly owned equipment means equipment previously purchased or otherwise acquired by the public agency involved primarily for use in its own operations.

Specialty items means work items identified in the contract which are not normally associated with highway construction and require highly specialized knowledge, abilities or equipment not ordinarily available in the type of contractiug organizations qualified and expected to bid on the contract; in general, these items are to be limited to minor components of the overall contract.

State transportation department (STD) means that department, commission, board, or official of any State charged by its laws with the responsibility for highway construction. The term "State" should be considered equivalent to "State transportation department" if the context so implies.

Workday means a calendar day during which construction operations could proceed for a major part of a shift, normally excluding Saturdays, Sundays, and State-recognized legal holidays.


**Credits**
[62 FR 6873, Feb. 14, 1997; 67 FR 75924, Dec. 10, 2002]

SOURCE: 51 FR 27534, Aug. 1, 1986; 52 FR 36921, Oct. 2, 1987; 53 FR 1922, Jan. 25, 1988; 56 FR 37004, Aug. 2, 1991; 58 FR 38975, July 21, 1993; 60 FR 44273, Aug. 25, 1995; 62 FR 6872, Feb. 14, 1997; 64 FR 71289, Dec. 21, 1999; 67 FR 75924, Dec. 10, 2002; 71 FR 66454, Nov. 15, 2006; 72 FR 45336, Aug. 14, 2007; 78 FR 5717, Jan. 28, 2013, uuless otherwise noted.


AUTHORITY: Sec. 1525 of Pub.L. 112–141, Sec. 1503 of Pub.L. 109–59, 119 Stat. 1144; 23 U.S.C. 101 (uote), 109, 112, 113, 114, 116, 119, 128, and 315; 31 U.S.C. 6505; 42 U.S.C. 3334, 4601 et seq.; Sec. 1041(a), Pub.L. 102–240, 105 Stat. 1914; 23 CFR 1.32; 49 CFR 1.85(a)(1).


Current through Oct. 15, 2015; 80 FR 62427.

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
  Title 23. Highways
    Chapter I. Federal Highway Administration, Department of Transportation
      Subchapter G. Engineering and Traffic Operations
        Part 635. Construction and Maintenance (Refs & Annos)
          Subpart A. Contract Procedures (Refs & Annos)

23 C.F.R. § 635.103

§ 635.103 Applicability.

Currentness

The policies, requirements, and procedures prescribed in this subpart shall apply to all Federal-aid highway projects.

**Credits**
[62 FR 6873, Feb. 14, 1997; 69 FR 7118, Feb. 13, 2004]

SOURCE: 51 FR 27534, Aug. 1, 1986; 52 FR 36921, Oct. 2, 1987; 53 FR 1922, Jan. 25, 1988; 56 FR 37004, Aug. 2, 1991; 58 FR 38975, July 21, 1993; 60 FR 44273, Aug. 25, 1995; 62 FR 6872, Feb. 14, 1997; 64 FR 71289, Dec. 21, 1999; 67 FR 75924, Dec. 10, 2002; 71 FR 66454, Nov. 15, 2006; 72 FR 45336, Aug. 14, 2007; 78 FR 5717, Jan. 28, 2013, unless otherwise noted.

AUTHORITY: Sec. 1525 of Pub.L. 112–141, Sec. 1503 of Pub.L. 109–59, 119 Stat. 1144; 23 U.S.C. 101 (note), 109, 112, 113, 114, 116, 119, 128, and 315; 31 U.S.C. 6505; 42 U.S.C. 3334, 4601 et seq.; Sec. 1041(a), Pub.L. 102–240, 105 Stat. 1914; 23 CFR 1.32; 49 CFR 1.85(a)(1).

Current through Oct. 15, 2015; 80 FR 62427.

---

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix Item 6

Code of Federal Regulations
    Title 23. Highways
        Chapter I. Federal Highway Administration, Department of Transportation
            Subchapter G. Engineering and Traffic Operations
                Part 635. Construction and Maintenance (Refs & Annos)
                    Subpart A. Contract Procedures (Refs & Annos)

23 C.F.R. § 635.116

§ 635.116 Subcontracting and contractor responsibilities.

Currentness

(a) Contracts for projects shall specify the minimum percentage of work that a contractor must perform with its own organization. This percentage shall be not less than 30 percent of the total original contract price excluding any identified specialty items. Specialty items may be performed by subcontract and the amount of any such specialty items so performed may be deducted from the total original contract before computing the amount of work required to be performed by the contractor's own organization. The contract amount upon which the above requirement is computed includes the cost of materials and manufactured products which are to be purchased or produced by the contractor under the contract provisions.

(b) The STD shall not permit any of the contract work to be performed under a subcontract, unless such arrangement has been authorized by the STD in writing. Prior to authorizing a subcontract, the STD shall assure that each subcontract is evidenced in writing and that it contains all pertinent provisions and requirements of the prime contract. The Division Administrator may permit the STD to satisfy the subcontract assurance requirements by concurrence in a STD process which requires the contractor to certify that each subcontract arrangement will be in the form of a written agreement containing all the requirements and pertinent provisions of the prime contract. Prior to the Division Administrator's concurrence, the STD must demonstrate that it has an acceptable plan for monitoring such certifications.

(c) To assure that all work (including subcontract work) is performed in accordance with the contract requirements, the contractor shall be required to furnish:

(1) A competent superintendent or supervisor who is employed by the firm, has full authority to direct performance of the work in accordance with the contract requirements, and is in charge of all construction operations (regardless of who performs the work), and;

(2) Such other of its own organizational resources (supervision, management, and engineering services) as the STD contracting officer determines are necessary to assure the performance of the contract.

(d) In the case of a design-build project, the following requirements apply:

(1) The provisions of paragraph (a) of this section are not applicable to design-build contracts;

# Appendix Item 7

(2) At their discretion, the STDs may establish a minimum percentage of work that must be done by the design-builder. For the purpose of this section, the term design-builder may include any firms that are equity participants in the design-builder, their sister and parent companies, and their wholly owned subsidiaries;

(3) No procedure, requirement or preference shall be imposed which prescribes minimum subcontracting requirements or goals (other than those necessary to meet the Disadvantaged Business Enterprise program requirements of 49 CFR part 26).

**Credits**
[67 FR 75925, Dec. 10, 2002]

SOURCE: 51 FR 27534, Aug. 1, 1986; 52 FR 36921, Oct. 2, 1987; 53 FR 1922, Jan. 25, 1988; 56 FR 37004, Aug. 2, 1991; 58 FR 38975, July 21, 1993; 60 FR 44273, Aug. 25, 1995; 62 FR 6872, Feb. 14, 1997; 64 FR 71289, Dec. 21, 1999; 67 FR 75924, Dec. 10, 2002; 71 FR 66454, Nov. 15, 2006; 72 FR 45336, Aug. 14, 2007; 78 FR 5717, Jan. 28, 2013, unless otherwise noted.

AUTHORITY: Sec. 1525 of Pub.L. 112–141, Sec. 1503 of Pub.L. 109–59, 119 Stat. 1144; 23 U.S.C. 101 (note), 109, 112, 113, 114, 116, 119, 128, and 315; 31 U.S.C. 6505; 42 U.S.C. 3334, 4601 et seq.; Sec. 1041(a), Pub.L. 102–240, 105 Stat. 1914; 23 CFR 1.32; 49 CFR 1.85(a)(1).

Current through Oct. 15, 2015; 80 FR 62427.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 2. Trial, Judgment, and Appeal
      Subtitle B. Trial Matters
        Chapter 18. Evidence
          Subchapter D. Certain Losses

V.T.C.A., Civil Practice & Remedies Code § 18.091

§ 18.091. Proof of Certain Losses; Jury Instruction

Effective: September 1, 2003
Currentness

(a) Notwithstanding any other law, if any claimant seeks recovery for loss of earnings, loss of earning capacity, loss of contributions of a pecuniary value, or loss of inheritance, evidence to prove the loss must be presented in the form of a net loss after reduction for income tax payments or unpaid tax liability pursuant to any federal income tax law.

(b) If any claimant seeks recovery for loss of earnings, loss of earning capacity, loss of contributions of a pecuniary value, or loss of inheritance, the court shall instruct the jury as to whether any recovery for compensatory damages sought by the claimant is subject to federal or state income taxes.

**Credits**
Added by Acts 2003, 78th Leg., ch. 204, § 13.09, eff. Sept. 1, 2003.

Notes of Decisions (3)

V. T. C. A., Civil Practice & Remedies Code § 18.091, TX CIV PRAC & REM § 18.091
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix Item 8A

Vernon's Texas Statutes and Codes Annotated
    Civil Practice and Remedies Code (Refs & Annos)
        Title 2. Trial, Judgment, and Appeal
            Subtitle C. Judgments
                Chapter 31. Judgments (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 31.007

§ 31.007. Parties Responsible for Accounting of Own Costs

Currentness

(a) Each party to a suit shall be responsible for accurately recording all costs and fees incurred during the course of a lawsuit, if the judgment is to provide for the adjudication of such costs. If the judgment provides that costs are to be borne by the party by whom such costs were incurred, it shall not be necessary for any of the parties to present a record of court costs to the court in connection with the entry of a judgment.

(b) A judge of any court may include in any order or judgment all costs, including the following:

  (1) fees of the clerk and service fees due the county;

  (2) fees of the court reporter for the original of stenographic transcripts necessarily obtained for use in the suit;

  (3) masters, interpreters, and guardians ad litem appointed pursuant to these rules and state statutes; and

  (4) such other costs and fees as may be permitted by these rules and state statutes.

**Credits**
Added by Acts 1987, 70th Leg., ch. 663, § 3, eff. Sept. 1, 1987.

Notes of Decisions (20)

V. T. C. A., Civil Practice & Remedies Code § 31.007, TX CIV PRAC & REM § 31.007
Current through the end of the 2015 Regular Session of the 84th Legislature

End of Document                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Appendix Item 8B

United States Code Annotated
   Title 40. Public Buildings, Property, and Works (Refs & Annos)
      Subtitle II. Public Buildings and Works
         Part A. General
            Chapter 31. General
               Subchapter III. Bonds

40 U.S.C.A. § 3131
Formerly cited as 40 USCA § 270a; 40 USCA § 270d; 40 USCA § 270d-1

§ 3131. Bonds of contractors of public buildings or works

Effective: September 27, 2006
Currentness

(a) **Definition.**--In this subchapter, the term "contractor" means a person awarded a contract described in subsection (b).

(b) **Type of bonds required.**--Before any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government the following bonds, which become binding when the contract is awarded:

   (1) **Performance bond.**--A performance bond with a surety satisfactory to the officer awarding the contract, and in an amount the officer considers adequate, for the protection of the Government.

   (2) **Payment bond.**--A payment bond with a surety satisfactory to the officer for the protection of all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person. The amount of the payment bond shall equal the total amount payable by the terms of the contract unless the officer awarding the contract determines, in a writing supported by specific findings, that a payment bond in that amount is impractical, in which case the contracting officer shall set the amount of the payment bond. The amount of the payment bond shall not be less than the amount of the performance bond.

(c) **Coverage for taxes in performance bond.**--

   (1) **In general.**--Every performance bond required under this section specifically shall provide coverage for taxes the Government imposes which are collected, deducted, or withheld from wages the contractor pays in carrying out the contract with respect to which the bond is furnished.

   (2) **Notice.**--The Government shall give the surety on the bond written notice, with respect to any unpaid taxes attributable to any period, within 90 days after the date when the contractor files a return for the period, except that notice must be given no later than 180 days from the date when a return for the period was required to be filed under the Internal Revenue Code of 1986 (26 U.S.C. 1 et seq.).

   (3) **Civil action.**--The Government may not bring a civil action on the bond for the taxes--

# Appendix Item 9

(A) unless notice is given as provided in this subsection; and

(B) more than one year after the day on which notice is given.

(d) **Waiver of bonds for contracts performed in foreign countries.**--A contracting officer may waive the requirement of a performance bond and payment bond for work under a contract that is to be performed in a foreign country if the officer finds that it is impracticable for the contractor to furnish the bonds.

(e) **Authority to require additional bonds.**--This section does not limit the authority of a contracting officer to require a performance bond or other security in addition to those, or in cases other than the cases, specified in subsection (b).

**CREDIT(S)**

(Pub.L. 107-217, § 1, Aug. 21, 2002, 116 Stat. 1147; Pub.L. 109-284, § 6(8), Sept. 27, 2006, 120 Stat. 1213.)

Notes of Decisions (500)

40 U.S.C.A. § 3131, 40 USCA § 3131
Current through P.L. 114-51 approved 9-24-2015

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| :--- |
|   Government Code (Refs & Annos) |
|     Title 10. General Government (Refs & Annos) |
|       Subtitle F. State and Local Contracts and Fund Management |
|         Chapter 2253. Public Work Performance and Payment Bonds (Refs & Annos) |
|           Subchapter A. General Provisions |

V.T.C.A., Government Code § 2253.001

§ 2253.001. Definitions

Currentness

In this chapter:

(1) "Governmental entity" means a governmental or quasi-governmental authority authorized by state law to make a public work contract, including:

  (A) the state, a county, or a municipality;

  (B) a department, board, or agency of the state, a county, or a municipality; and

  (C) a school district or a subdivision of a school district.

(2) "Payment bond beneficiary" means a person for whose protection and use this chapter requires a payment bond.

(3) "Prime contractor" means a person, firm, or corporation that makes a public work contract with a governmental entity.

(4) "Public work contract" means a contract for constructing, altering, or repairing a public building or carrying out or completing any public work.

(5) "Public work labor" means labor used directly to carry out a public work.

(6) "Public work material" means:

  (A) material used, or ordered and delivered for use, directly to carry out a public work;

  (B) specially fabricated material;

**Appendix Item 10**

(C) reasonable rental and actual running repair costs for construction equipment used, or reasonably required and delivered for use, directly to carry out work at the project site; or

(D) power, water, fuel, and lubricants used, or ordered and delivered for use, directly to carry out a public work.

(7) "Retainage" means the part of the payments under a public work contract that are not required to be paid within the month after the month in which the public work labor is performed or public work material is delivered under the contract.

(8) "Specially fabricated material" means material ordered by a prime contractor or subcontractor that is:

(A) specially fabricated for use in a public work; and

(B) reasonably unsuitable for another use.

(9) "Subcontractor" means a person, firm, or corporation that provides public work labor or material to fulfill an obligation to a prime contractor or to a subcontractor for the performance and installation of any of the work required by a public work contract.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993. Amended by Acts 1999, 76th Leg., ch. 62, § 8.20, eff. Sept. 1, 1999.

**Editors' Notes**

### REVISOR'S NOTE

#### 2008 Main Volume

(1) The definitions of "governmental entity," "payment bond beneficiary," "public work contract," and "specially fabricated material" are added to the revised law for drafting convenience and to eliminate frequent, unnecessary repetitions of the substance of the definitions.

(2) In the definitions of "public work contract," "public work labor," and "public work material," the revised law substitutes the phrases "carrying out" and "to carry out" for the source law term "prosecution" because the terms are synonymous and the former is more commonly used.

(3) In the definition of "prime contractor," the revised law substitutes the term "public work contract" for the source law term "formal contract" because this section defines "public work contract" to mean "a contract for constructing, altering, or repairing a public building or carrying out or completing any public work" and it is clear from the coutext of the source law that "formal contract" is intended to refer to a "public work contract."

(4) In the definition of "prime contractor," the revised law substitutes the term "governmental entity" for the source law list of governmental entities with whom the prime coutractor may contract because the revised law defines "governmental entity" to mean those entities.

Notes of Decisions (42)

V. T. C. A., Government Code § 2253.001, TX GOVT § 2253.001
Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document**                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

§ 2253.001. Definitions, TX GOVT § 2253.001

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle F. State and Local Contracts and Fund Management
        Chapter 2253. Public Work Performance and Payment Bonds (Refs & Annos)
          Subchapter C. Notice Requirements

V.T.C.A., Government Code § 2253.041

§ 2253.041. Notice Required for Claim for Payment for Labor or Material

Currentness

(a) To recover in a suit under Section 2253.073 on a payment bond for a claim for payment for public work labor performed or public work material delivered, a payment bond beneficiary must mail to the prime contractor and the surety written notice of the claim.

(b) The notice must be mailed on or before the 15th day of the third month after each month in which any of the claimed labor was performed or any of the claimed material was delivered.

(c) The notice must be accompanied by a sworn statement of account that states in substance:

  (1) the amount claimed is just and correct; and

  (2) all just and lawful offsets, payments, and credits known to the affiant have been allowed.

(d) The statement of account shall include the amount of any retainage applicable to the account that has not become due under the terms of the public work contract between the payment bond beneficiary and the prime contractor or between the payment bond beneficiary and a subcontractor.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

**Editors' Notes**

REVISOR'S NOTE

2008 Main Volume

(1) The revised law substitutes the term "payment bond beneficiary" for the source law term "claimant" for the reason stated in Revisor's Note (3) under Section 2253.021 of this chapter.

(2) The revised law substitutes the terms "public work labor" and "public work material" for the source law terms "labor" and "material" for the reason stated in Revisor's Note (4) under Section 2253.021 of this chapter.

# Appendix Item 11

Notes of Decisions (80)

V. T. C. A., Government Code § 2253.041, TX GOVT § 2253.041
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

§ 2253.041. Notice Required for Claim for Payment for Labor..., TX GOVT § 2253.041

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle F. State and Local Contracts and Fund Management
        Chapter 2253. Public Work Performance and Payment Bonds (Refs & Annos)
          Subchapter C. Notice Requirements

V.T.C.A., Government Code § 2253.047

§ 2253.047. Additional Notice Required for Payment Bond Beneficiary
Without Direct Contractual Relationship With Prime Contractor

Currentness

(a) To recover in a suit under Section 2253.073 on a payment bond, a payment bond beneficiary who does not have a direct contractual relationship with the prime contractor for public work labor or material must mail notice as required by this section.

(b) A payment bond beneficiary who contracts with a subcontractor for retainage must mail, on or before the 15th day of the second month after the date of the beginning of the delivery of public work material or the performance of public work labor, written notice to the prime contractor that:

  (1) the contract provides for retainage; and

  (2) generally indicates the nature of the retainage.

(c) The payment bond beneficiary must mail to the prime contractor written notice of a claim for any unpaid public work labor performed or public work material delivered. The notice must be mailed on or before the 15th day of the second month after each month in which the labor was performed or the material was delivered. A copy of the statement sent to a subcontractor is sufficient as notice under this subsection.

(d) The payment bond beneficiary must mail to the prime contractor, on or before the 15th day of the second month after the receipt and acceptance of an order for specially fabricated material, written notice that the order has been received and accepted.

(e) This section applies only to a payment bond beneficiary who is not an individual mechanic or laborer and who makes a claim for wages.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

**Editors' Notes**

**REVISOR'S NOTE**

**Appendix Item 12**

## 2008 Main Volume

(1) The revised law substitutes the term "payment bond beneficiary," for the source law term "claimant" for the reason stated in Revisor's Note (3) under Section 2253.021 of this chapter.

(2) The revised law substitutes the term "retainage" for the source law phrase "agreements ... by which payments are not to be made in full therefor in the month next following each month in which the labor was performed or the materials were delivered" because Section 2253.001 of this chapter defines "retainage" to mean "the part of the payments under a public work contract that are not required to be paid within the month after the month in which the public work labor is performed or public work material is delivered under the contract."

(3) The revised law substitutes the terms "public work labor," "public work material," and "public work labor or material" for the source law terms "labor" and "material" for the reason stated in Revisor's Note (4) under Section 2253.021 of this chapter.

(4) The revised law substitutes the term "specially fabricated material" for the source law phrase "specially fabricated item or items as described in paragraph C(b)(2)"because the description in the referenced paragraph is codified in Section 2253.001(8) of this code as the definition of "specially fabricated material."

Notes of Decisions (2)

V. T. C. A., Government Code § 2253.047, TX GOVT § 2253.047
Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle F. State and Local Contracts and Fund Management
        Chapter 2253. Public Work Performance and Payment Bonds (Refs & Annos)
          Subchapter C. Notice Requirements

V.T.C.A., Government Code § 2253.048

§ 2253.048. Mailing Notice

Effective: September 1, 2001
Currentness

(a) A notice required by this subchapter to be mailed must be sent by certified or registered mail.

(b) A notice required by this subchapter to be mailed to a prime contractor must be addressed to the prime contractor at the contractor's residence or last known business address.

(c) A person satisfies the requirements of this subchapter relating to providing notice to the surety if the person mails the notice by certified or registered mail to the surety:

(1) at the address stated on the bond or on an attachment to the bond;

(2) at the address on file with the Texas Department of Insurance; or

(3) at any other address allowed by law.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993. Amended by Acts 2001, 77th Leg., ch. 380, § 4, eff. Sept. 1, 2001.

V. T. C. A., Government Code § 2253.048, TX GOVT § 2253.048
Current through the end of the 2015 Regular Session of the 84th Legislature

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix Item 13

92



DEFENDANT'S EXHIBIT 1
SUBCONTRACT AGREEMENT NO. CSUB116

(Back to index)

**Appendix Item 14**



Central Texas Highway Constructors LLC
1914 Borchert Drive
Lockhart, Texas 78644

23 June 2010

Star Operations, Inc.
Attention: Lana Huff
1622 Saratoga Boulevard
Corpus Christi, Texas 78417

Telephone: 361.852.2120

VIA OVERNIGHT MAIL

Reference:    Subcontract Agreement No. CSUB116—Illumination and Signal
              SH 130 Segments 5 and 6

Dear Ms. Huff:

Find enclosed one (1) fully executed Subcontract Agreement (with DVDs) for the
referenced Scope of Work.

1. This letter will serve as a <u>Full Notice to Proceed</u> and commences the
   Performance Period as defined in Article 8 of the Agreement.
2. Promptly provide payment and performance bonds compliant with Article 7 of
   the Agreement.
3. Your representative was provided the latest set of Issued for Construction
   (IFC) drawings on 16 June 2010. A courtesy copy of that DVD is enclosed for
   your reference and use.
4. Your principal points of contact for this Work are Gary Doty (V.P.
   Construction), Bobby Massingill (Segment 5.1 Manager), Javier Garcia
   (Segment 5.2 Manager), Scott Cromack (Segment 6.1 Manager), and Felix
   Marques (Segment 6.2 Manager), 512-462-7500.
5. Please contact Ms. Sonia Malilo, CFO, 512-462-7506, to discuss
   administrative interface, e.g. invoicing, sales tax, and so forth.
6. Please contact Ms. Evelyn Calonge, DBE Coordinator, 512-462-7617, to
   discuss any DBE-related issues.
7. Please contact Mr. Esteban Trigueros, Quality Manager, 512-462-7604, to
   discuss quality control and quality assurance of the Work.
8. Your point of contact for environmental compliance is Ms. Jennifer Oshel,
   CTxHC Environmental Manager, 512-462-7505.
9. Your point of contact for health and safety compliance is Mr. Jerry Watley,
   Health and Safety Manager, 512-801-2572.

Contact me if you have any questions, 512-462-7510. Thank you.



EXHIBIT

_____

S/P C0853884.PDF

days to correct its failure. If Seller has not corrected its failure or made arrangements acceptable to D&C Contractor to do so within such time period or if Seller fails to perform in accordance with an acceptable plan for corrective action, then, in addition to its other rights and remedies, D&C Contractor may require Seller to increase its construction equipment and workers, increase working hours or otherwise accelerate its performance until the Work is back on Schedule, all without additional cost to D&C Contractor. D&C Contractor reserves the right to perform some or all of the Work with its own forces and to contract with others for same, back-charging excess costs to the Seller. Upon request, Seller shall promptly provide D&C Contractor with adequate assurance satisfactory to D&C Contractor of Seller's ability to fully perform its obligations under the Agreement Documents in the time and manner provided.

9.3     PROGRESS REPORTS.   Seller shall furnish D&C Contractor weekly progress reports and such other reports as D&C Contractor may reasonably request to verify actual progress and to predict future progress.   Work product will be transmitted as noted in Exhibit A-1.

9.4     SUBCONTRACTS.   Seller shall not subcontract any Work, or use a third party or broker to furnish any labor for the Work, without the prior written consent of D&C Contractor, which consent shall not be unreasonably withheld or delayed. Seller shall be solely responsible for the engagement and management of its Subcontractors in the performance of the Work, for the performance of Work by its Subcontractors and for all acts or omissions of Subcontractors. Seller shall insure that all Work furnished or performed by Subcontractors conforms to the requirements of the Agreement Documents. Neither the consent by D&C Contractor, nor anything contained herein, shall create any contractual relationship between any lower tier Subcontractor and D&C Contractor.  All lower-tier subcontracts must contain the terms and conditions that are incorporated in this Agreement.

No Subcontractor is intended to be or shall be deemed to be a third party beneficiary of the Agreement.  Each agreement between Seller and any Subcontractor shall be in writing, and shall be assignable to D&C Contractor upon the completion or termination of the Work. A copy of each such agreement with pricing removed shall be provided to D&C Contractor upon request.

In no event shall the right of the Seller hereunder to subcontract relieve the Seller from any of its obligations and responsibilities to achieve Substantial Completion and Final Acceptance of the Work, as required under the terms of the D&C Contract, for payment of wages of laborers and for equipment and materials furnished for the D&C Work, as well as for satisfaction of all indemnities of Seller contained herein. The Seller agrees that it is fully responsible to the D&C Contractor for the acts and omissions of its subcontractors and of persons either directly or indirectly employed by them as it is for the acts and omissions of persons directly employed by the Seller. The Seller shall obtain all necessary information from its subcontractors engaged in the D&C Work, in order to ensure that their work conforms with the Seller's work. The Seller is responsible for and shall check the correctness of any portion of the D&C Work performed by its subcontractors.

9.5     SITE CONDITIONS.   Other than for a Relief Event, Seller shall have the sole responsibility to establish that the nature and location of the Work, the Site, and the general and local conditions are such that the Work can be performed on the Site, including but not limited to, the following:

(a)     Transportation, access, disposal, handling and storage of materials;
(b)     Availability and quality of labor, water, electric power and road conditions;
(c)     Climatic conditions and seasons;
(d)     Physical conditions at the Site and the Project as a whole;
(e)     Topography, subsurface and ground surface conditions; and
(f)     Construction equipment and facilities needed preliminary to and during the performance of Seller's Work.

The failure of Seller to acquaint itself with any applicable conditions will not relieve Seller of the responsibility for properly estimating the difficulties or for the cost of successfully performing Seller's obligations in the time and manner provided under the Agreement Documents.

9.6     COMPLIANCE WITH LAWS.   Seller shall fully comply with all Laws applicable to Seller and to the Work. See Attachment P for additional project specific requirements.

### 9.6.1   PREVAILING WAGES

a)    Seller shall pay or cause to be paid to all applicable workers employed by it or its Contractors to perform the Work not less than the prevailing rates of wages, as provided in Attachment P, in the statutes and regulations applicable to public work contracts, including Chapter 2258 of the Texas Government Code. TxDOT, Seller and its Contractors shall comply with all Laws pertaining to prevailing wages. For the purpose of applying such Laws, the Facility shall be treated as a public work paid for in whole or in part with public funds (regardless of whether public funds are actually used to pay for the Facility).

b)    It is Seller's sole responsibility to determine the wage rates required to be paid. In the event rates of wages and benefits change while this Agreement is in effect, Seller shall bear the cost of such changes and shall have no Claim against D&C Contractor on account of such changes. Without limiting the foregoing, no Claim will be allowed which is based upon Seller's lack of knowledge or a misunderstanding of any such requirements or Seller's failure to include in the Base Case Financial Model or Base Case Financial Model Updates adequate increases in such wages over the duration of this Agreement and the Lease.

c)    Any issue between Seller or a subcontractor and any affected worker relating to any alleged violation of Section 2258.023 of the Texas Government Code that is not resolved before the 15th day after the date TxDOT makes its initial determination under Section 2258.052 of the Texas Government Code (as to whether good cause exists to believe that a violation occurred) shall be submitted to binding arbitration in accordance with the Texas General Arbitration Act, Chapter 171 of the Civil Practice and Remedies Code.

d)    Seller shall comply and cause its subcontractors to comply with all Laws regarding notice and posting of intent to pay prevailing wages, and any other notice or posting of prevailing wage requirements and prevailing wage rates.

### 9.7   HAZARDOUS SUBSTANCES.
Seller shall immediately Notify D&C Contractor if Seller encounters pre-existing Hazardous Substances at the Site. The D&C Contractor has a separate contract with a Hazardous Materials Contractor to remediate Hazardous Substances. The Seller shall not remediate pre-existing Hazardous Substances under this Agreement. However, Seller is responsible for any of its releases of Hazardous Substances.

In accordance with the FCA, applicable Laws (including specifically Environmental Laws) and all Environmental Approvals, the Contractor shall take all reasonable steps to protect the environment on and off the planned Facility Right of Way on which it performs any of the D&C Work and to avoid damage or nuisance to persons or to property of the public or others, resulting from pollution, noise or other causes arising as a consequence of its performance of the D&C Work, subject to the allocation of responsibility therefore as provided in the D&C Agreement.

### 9.8   CLEANING UP.
Seller shall at all times keep the Site and surrounding area clean and free from rubbish caused by Seller's operations. Prior to completing its Work in an area, Seller shall remove all accumulated rubbish caused by Seller's operations and Seller's equipment, tools, machinery and materials. Seller shall dispose of all rubbish caused by Seller's operations at a site and by the means designated at the sole discretion of Seller in a manner that is in compliance with all Laws.

### 9.9   LABOR, MATERIAL, AND HAULING

#### 9.9.1   LABOR.
Seller will provide only skilled, competent workers and supervision for the performance of its Work and will be responsible for assuring harmonious labor relationships on the Project among its workers at the Site. All individuals performing the Work shall have the skill and experience and any licenses or certifications required to perform the Work assigned to them. Seller shall immediately remove from the Project, when requested to do so by D&C Contractor, any person to whom D&C Contractor reasonably objects, and such person may not thereafter reenter the Site without D&C Contractor's prior consent.

Any uniforms worn by personnel of Seller-Related Entities shall bear colors, lettering, badges or other identifiers to assure clear differentiation from uniforms worn by TxDOT employees.

12

9.17 STANDARD OF CARE. The standard of care for all services/work performed by Seller and its subcontractors pursuant to this Agreement shall be the care and skill ordinarily used by members of the profession/trade practicing under similar conditions at the same time and locality of the Project. Seller agrees to investigate and remedy promptly, and without cost to D&C Contractor or Developer, any Defective Services of which it receives Notice within the longer of twelve (12) months from D&C Contractor's Final Acceptance of the Services or the period during which any Developer Party or any third party may make a claim against D&C Contractor related to the Services or any negligent act or omission of the Seller Party or a Seller subcontractor (each as defined below). In addition, Seller through the insurance provided for in Article 6 shall reimburse D&C Contractor for all reasonable costs incurred to accomplish needed repairs, additions, replacements or corrections to Seller's work which result from the Seller's Defective Services. For this Article 9.17, Defective Services are defined as any Work that fails to satisfy the following: (a) in compliance with Laws; (b) in accordance with all applicable standards and codes; (c) in accordance with the provisions of this Agreement and the Facility Concession Agreement, Technical Requirements, Technical Documents, and Reference Information Documents (all FCA-related documents are incorporated by reference); and (d) be performed in accordance with the standard of care, skill and diligence ordinarily used by members of the design profession performing services of a similar type and nature at the same time and in the locale of the Project.

9.18 ETHICAL STANDARDS. Within 30 days after the Effective Date, Seller shall adopt written policies specific to this project establishing ethical standards of conduct for Seller and all Seller-Related Entities, including Seller's supervisory and management personnel in dealing with (a) the D&C Contractor, (b) the Developer (c) TxDOT and the Independent Engineer and (d) employment relations. Such policy shall be subject to review and comment by the D&C Contractor prior to adoption and shall include the ethical standards listed in Attachment Q.

## ARTICLE 10. PAYMENT

Undisputed Invoices shall be due and payable seven (7) days after D&C Contractor receives payment from Developer, but not more than NET 60 days from the date of receipt of the undisputed Invoice. Payment is subject to complying with items 10.1 – 10.11 below.

10.1 PAYMENT. D&C Contractor and Seller have agreed to a payment amount for Seller's Work activities to serve as a basis for computing partial payments.

10.2 PARTIAL PAYMENTS. On the 25th calendar day of each month, Seller will furnish D&C Contractor an invoice meeting the requirements in Item 10.3.

10.3 INVOICE REQUIREMENTS:

(a) A detailed invoice per Segment (5.1, 5.2, 6.1, 6.2), in a form and content acceptable to D&C Contractor, setting out the portion of the Agreement Price allocable to the Work actually performed to date by Seller to accomplish each of the activities shown in the Scope of Work and Schedule, along with supporting documentation as D&C Contractor may reasonably require to substantiate Seller's right to payment of the invoiced amounts, especially sales and use tax (see Article 2, re: Texas sales and use tax);

(b) A progress report of Seller's Work including the Texas sales and use taxes paid by Seller and Seller's Subcontractors (see Article 2) and supporting documents;

(c) Seller's Partial Waiver and Release of Liens, Affidavit of Bills Paid and Indemnification, completed and executed in accordance with the form attached hereto as Attachment F;

(d) Certified payrolls, for the invoice period, if required by the Agreement Documents; and

(e) Three (3) copies of Seller's invoice

Submit invoice and documents to the following address:

Central Texas Highway Constructors, LLC
Accounts Payable
P.O. Box 1110
Lockhart, TX 78644

15

during the progress of the Work, and (e) drawings and engineering data submitted by Seller during the progress of the Work, provided such drawings and data are acceptable to D&C Contractor.

Effective Date shall mean the date given in paragraph one of this Agreement.

Excusable Delay is one caused by an Excusable Delay Event. For the Seller to obtain a time extension, the delay must affect overall completion of the Seller's Scope of Work, i.e. the delay must cause a day-for-day extension to the critical path.

Excusable Delay Events with respect to Seller's timely performance of the Work shall be defined as a Relief Event or as a D&C Contractor-caused event to the extent that the event results in a delay that prevents Seller from completing its overall Scope of Work, provided that such events are not due to any act, omission, negligence, recklessness, willful misconduct, breach of contract or Law by Seller or by any parties for which Seller is responsible, and, further provided, that such events (or the effects of such events) could not have been avoided by the exercise of caution, due diligence, or reasonable efforts by Seller or by any parties for which Seller is responsible. D&C Contractor-caused Excusable Delay Events include, but are not limited to, D&C Contractor failures to (1) provide materials that the D&C Contractor is providing to Seller (e.g. retaining wall backfill, flexible base course material, lime material, retaining wall panels and hardware, retaining wall coping, precast beams, precast deck panels, precast concrete traffic barrier, concrete, rebar), or (2) perform Work provided by D&C Contractor or by D&C Contractor's Subcontractors (e.g. rebar assembly, fine grading prior to form work, drilled shafts, traffic control not within Seller's Scope of Work, redesign,) that directly impact the Seller's Work.

Facility Concession Agreement (FCA) is the agreement between the Developer and the Texas Department of Transportation. The FCA and related FCA documents are incorporated by reference into this Subcontract Agreement.

Force Majeure Event means the occurrence of any of the following events that materially and adversely affects performance of Developer's obligations, provided that such events (or the effects of such events) could not have been avoided by the exercise of caution, due diligence, or reasonable efforts by Developer: (a) war (including civil war and revolution), invasion, armed conflict, violent act of foreign enemy, military or armed blockade, or military or armed takeover of the Facility, in each case occurring within the State of Texas; (b) any act of terrorism or sabotage that causes direct physical damage to the Facility; and (c) nuclear explosion.

Hazardous Substances shall mean any substances, the release of which into, or the presence of which in, the environment gives rise to any liability or obligation to remove, clean up, encapsulate or otherwise remediate such release or presence thereof under any Laws.

Indemnified Party shall mean the State of Texas, Developer, and their respective officers, directors, agents and employees, D&C Contractor, their subsidiaries and Affiliates and their officers, directors, partners, agents, and employees.

Laws shall mean any law, code, statute, regulation, rule, ordinance, judgment, injunction, or other court order, or other requirement of a governmental authority having jurisdiction over the Work, or the Project or the construction or operation thereof or party, and which is valid and applicable thereto.

Materials shall mean all materials (direct and indirect), supplies, goods, and equipment, which are necessary for Seller to accomplish its Scope of Work.

Milestone Dates shall mean those dates stated in the Agreement.

Non-Excusable Delay Events shall mean any act or neglect of Seller or its Subcontractors or any other event or occurrence that may interfere with or delay the Work that is not specified as an Excusable Delay Event.

Notice or Notify shall mean a notice in writing given to the Party's designated representative deemed duly given on the date of receipt.

Party(ies) shall mean D&C Contractor and Seller, as defined in paragraph one of this Agreement.

30



ATTACHMENT P

## FEDERAL REQUIREMENTS

| Exhibit Description | No. of Pages |
|---|---|
| Attachment 1 – Federal Provisions | 2 |
| Attachment 2 – FHWA Form 1273 | 28 |
| Attachment 3 – Wage Determination of the Secretary of Labor | 1 |
| Attachment 4 – Equal Employment Opportunity | 6 |
| Attachment 5 – Affirmative Action | 5 |
| Attachment 6 – Debarment and Suspension Certification | 1 |
| Attachment 7 – Lobbying Certification | 1 |
| Attachment 8 – Compliance with 23 U.S.C. §129(a)(3) | 1 |
| Attachment 9 – Compliance with Buy America Requirements | 2 |

ATTACHMENT 1 TO EXHIBIT 8

## FEDERAL REQUIREMENTS FOR FEDERAL-AID CONSTRUCTION PROJECTS

GENERAL.—The work herein proposed will be financed in whole or in part with Federal funds, and therefore all of the statutes, rules and regulations promulgated by the Federal Government and applicable to work financed in whole or in part with Federal funds will apply to such work. The "Required Contract Provisions, Federal-Aid Construction Contracts, Form FHWA 1273," are included in this Exhibit 8. Whenever in said required contract provisions references are made to:

(a)     "SHA contracting officer", "SHA resident engineer", or "authorized representative of the SHA", such references shall be construed to mean TxDOT or its Authorized Representative;

(b)     "contractor", "prime contractor", "bidder" or "prospective primary participant", such references shall be construed to mean the Design-Build Contractor or its authorized representative;

(c)     "contract" or "prime contract", such references shall be construed to mean the Design-Build Contract; and

(d)     "subcontractor", "supplier", "vendor", "prospective lower tier participant" or "lower tier subcontractor", such references shall be construed to mean subcontractors, suppliers and vendors of the Design-Build Contractor, including lower tier subcontractors.

PERFORMANCE OF PREVIOUS CONTRACT.—In addition to the provisions in Section II, "Nondiscrimination," and Section VII, "Subletting or Assigning the Contract," of the Form 1273 required contract provisions, the Developer shall cause the contractor to comply with the following:

The bidder shall execute the CERTIFICATION WITH REGARD TO THE PERFORMANCE OF PREVIOUS CONTRACTS OR SUBCONTRACTS SUBJECT TO THE EQUAL OPPORTUNITY CLAUSE AND THE FILING OF REQUIRED REPORTS located in the proposal. No request for subletting or assigning any portion of the contract in excess of $10,000 will be considered under the provisions of Section VII of the required contract provisions unless such request is accompanied by the CERTIFICATION referred to above, executed by the proposed subcontractor.

NON-COLLUSION PROVISION.—The provisions in this section are applicable to all contracts except contracts for Federal Aid Secondary Projects. Title 23, United States Code, Section 112, requires as a condition precedent to approval by the Federal Highway Administrator of the contract for this work that each bidder file a sworn statement executed by, or on behalf of, the person, firm, association, or corporation to whom such contract is to be awarded, certifying that such person, firm, association, or corporation has not, either directly or indirectly, entered into any agreement, participated in any collusion, or otherwise taken any action in restraint of free competitive bidding in connection with the submitted bid. A form to make the non-collusion affidavit statement required by Section 112 as a certification under

69

I    GENERAL

1.    These contract provisions shall apply to all work performed on the contract by the contractor's own organization and with the assistance of workers under the contractor's immediate superintendence and to all work performed on the contract by piecework, station work, or by subcontract.

2.    Except as otherwise provided for in each section, the contractor shall insert in each subcontract all of the stipulations contained in these Required Contract Provisions, and further require their inclusion in any lower tier subcontract or purchase order that may in turn be made. The Required Contract Provisions shall not be incorporated by reference in any case. The prime contractor shall be responsible for compliance by any subcontractor or lower tier subcontractor with these Required Contract Provisions.

3.    A breach of any of the stipulations contained in these Required Contract Provisions shall be sufficient grounds for termination of the contract.

4.    A breach of the following clauses of the Required Contract Provisions may also be grounds for debarment as provided in 29 CFR 5.12:

         Section I, paragraph 2;

         Section IV, paragraphs 1, 2, 3, 4, and 7;

         Section V, paragraphs 1 and 2a through 2g.

5.    Disputes arising out of the labor standards provisions of Section IV (except paragraph 5) and Section V of these Required Contract Provisions shall not be subject to the general disputes clause of this contract. Such disputes shall be resolved in accordance with the procedures of the U.S. Department of Labor (DOL) as set forth in 29 CFR 5, 6, and 7. Disputes within the meaning of this clause include disputes between the contractor (or any of its subcontractors) and the contracting agency, the DOL, or the contractor's employees or their representatives.

6.    Selection of Labor: During the performance of this contract, the contractor shall not:

      a.    discriminate against labor from any other State, possession, or territory of the United States (except for employment preference for Appalachian contracts, when applicable, as specified in Attachment A), or

to such territory) for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer, mechanic, watchman, or guard employed in violation of the clause set forth in paragraph 7, in the sum of $10 for each calendar day on which such employee was required or permitted to work in excess of the standard work week of 40 hours without payment of the overtime wages required by the clause set forth in paragraph 7.

9. **Withholding for Unpaid Wages and Liquidated Damages:**

The SHA shall upon its own action or upon written request of any authorized representative of the DOL withhold, or cause to be withheld, from any monies payable on account of work performed by the contractor or subcontractor under any such contract or any other Federal contract with the same prime contractor, or any other Federally-assisted contract subject to the Contract Work Hours and Safety Standards Act, which is held by the same prime contractor, such sums as may be determined to be necessary to satisfy any liabilities of such contractor or subcontractor for unpaid wages and liquidated damages as provided in the clause set forth in paragraph 8 above.

V. **STATEMENTS AND PAYROLLS**

(Applicable to all Federal-aid construction contracts exceeding $2,000 and to all related subcontracts, except for Projects located on roadways classified as local roads or rural collectors, which are exempt.)

1. **Compliance with Copeland Regulations (29 CFR 3)**

The contractor shall comply with the Copeland Regulations of the Secretary of Labor which are herein incorporated by reference.

2. **Payrolls and Payroll Records:**

a. Payrolls and basic records relating thereto shall be maintained by the contractor and each subcontractor during the course of the work and preserved for a period of 3 years from the date of completion of the contract for all laborers, mechanics, apprentices, trainees, watchmen, helpers, and guards working at the site of the work.

b. The payroll records shall contain the name, social security number, and address of each such employee; his or her correct classification; hourly rates of wages paid (including rates of contributions or costs anticipated for bona fide fringe benefits or cash equivalent thereof the types described in Section 1(b)(2)(B) of the Davis Bacon Act); daily and weekly number of hours worked; deductions made; and actual wages paid. In addition, for

iii   that each laborer or mechanic has been paid not less that the applicable wage rate and fringe benefits or cash equivalent for the classification of worked performed, as specified in the applicable wage determination incorporated into the contract.

e.   The weekly submission of a properly executed certification set forth on the reverse side of Optional Form WH-347 shall satisfy the requirement for submission of the "Statement of Compliance" required by paragraph 2d of this Section V.

f.   The falsification of any of the above certifications may subject the contractor to civil or criminal prosecution under 18 U.S.C. 1001 and 31 U.S.C. 231.

g.   The contractor or subcontractor shall make the records required under paragraph 2b of this Section V available for inspection, copying, or transcription by authorized representatives of the SHA, the FHWA, or the DOL, and shall permit such representatives to interview employees during working hours on the job. If the contractor or subcontractor fails to submit the required records or to make them available, the SHA, the FHWA, the DOL, or all may, after written notice to the contractor, sponsor, applicant, or owner, take such actions as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds. Furthermore, failure to submit the required records upon request or to make such records available may be grounds for debarment action pursuant to 29 CFR 5.12.

## VI. RECORD OF MATERIALS, SUPPLIES, AND LABOR

1.   On all Federal-aid contracts on the National Highway System, except those which provide solely for the installation of protective devices at railroad grade crossings, those which are constructed on a force account or direct labor basis, highway beautification contracts, and contracts for which the total final construction cost for roadway and bridge is less than $1,000,000 (23 CFR 635) the contractor shall:

a.   Become familiar with the list of specific materials and supplies contained in Form FHWA-47, "Statement of Materials and Labor Used by Developer of Highway Construction Involving Federal Funds," prior to the commencement of work under this contract.

b.   Maintain a record of the total cost of all materials and supplies purchased for and incorporated in the work, and also of the quantities of those specific materials and supplies listed on Form FHWA-47, and in the units shown on Form FHWA-47.

c.  Furnish, upon the completion of the contract, to the SHA resident engineer on Form FHWA-47 together with the data required in paragraph 1b relative to materials and supplies, a final labor summary of all contract work indicating the total hours worked and the total amount earned.

2.  At the prime contractor's option, either a single report covering all contract work or separate reports for the contractor and for each subcontract shall be submitted.

## VII.  SUBLETTING OR ASSIGNING THE CONTRACT

1.  The contractor shall perform with its own organization contract work amounting to not less than 30 percent (or a greater percentage if specified elsewhere in the contract) of the total original contract price, excluding any specialty items designated by the State. Specialty items may be performed by subcontract and the amount of any such specialty items performed may be deducted from the total original contract price before computing the amount of work required to be performed by the contractor's own organization (23 CFR 635).

    a.  "Its own organization" shall be construed to include only workers employed and paid directly by the prime contractor and equipment owned or rented by the prime contractor, with or without operators. Such term does not include employees or equipment of a subcontractor, assignee, or agent of the prime contractor.

    b.  "Specialty items" shall be construed to be limited to work that requires highly specialized knowledge, abilities, or equipment not ordinarily available in the type of contracting organizations qualified and expected to bid on the contract as a whole and in general are to be limited to minor components of the overall contract.

    c.  The contract amount upon which the requirements set forth in paragraph 1 of Section VII is computed includes the cost of material and manufactured products which are to be purchased or produced by the contractor under the contract provisions.

    d.  The contractor shall furnish (a) a competent superintendent or supervisor who is employed by the firm, has full authority to direct performance of the work in accordance with the contract requirements, and is in charge of all construction operations (regardless of who performs the work) and (b) such other of its own organizational resources (supervision, management, and engineering services) as the SHA contracting officer determines is necessary to assure the performance of the contract.

Excerpt from Facility Concession Agreement

e. No portion of the contract shall be sublet, assigned or otherwise disposed of except with the written consent of the SHA contracting officer, or authorized representative, and such consent when given shall not be construed to relieve the contractor of any responsibility for the fulfillment of the contract. Written consent will be given only after the SHA has assured that each subcontract is evidenced in writing and that it contains all pertinent provisions and requirements of the prime contract.

## VIII. SAFETY: ACCIDENT PREVENTION

1. In the performance of this contract the contractor shall comply with all applicable Federal, State, and local laws governing safety, health, and sanitation (23 CFR 635). The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions as it determines, or as the SHA contracting officer may determine, to be reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract.

2. It is a condition of this contract, and shall be made a condition of each subcontract, which the contractor enters into pursuant to this contract, that the contractor and any subcontractor shall not permit any employee, in performance of the contract, to work in surroundings or under conditions which are unsanitary, hazardous or dangerous to his/her health or safety, as determined under construction safety and health standards (29 CFR 1926) promulgated by the Secretary of Labor, in accordance with Section 107 of the Contract Work Hours and Safety Standards Act (40 U.S.C. 333).

3. Pursuant to 29 CFR 1926.3, it is a condition of this contract that the Secretary of Labor or authorized representative thereof, shall have right of entry to any site of contract performance to inspect or investigate the matter of compliance with the construction safety and health standards and to carry out the duties of the Secretary under Section 107 of the Contract Work Hours and Safety Standards Act (40 U.S.C. 333).

## IX. FALSE STATEMENTS CONCERNING HIGHWAY PROJECTS

In order to assure high quality and durable construction in conformity with approved plans and specifications and a high degree of reliability on statements and representations made by engineers, contractors, suppliers, and workers on Federal-aid highway Projects, it is essential that all persons concerned with the Facility perform their functions as carefully, thoroughly, and honestly as possible. Willful falsification, distortion, or misrepresentation with respect to any facts related to the Facility is a violation of Federal law. To prevent any misunderstanding regarding the seriousness of these and similar acts, the

## ATTACHMENT 3 TO EXHIBIT 8

## FEDERAL PREVAILING WAGE RATE

GENERAL DECISION: TX20070043 02/09/2007 TX43

Date: February 9, 2007
General Decision Number: TX20070043 02/09/2007

Superseded General Decision Number: TX20030043

State: Texas

Construction Types: Heavy and Highway

Counties: Bell, Bexar, Brazos, Comal, Coryell, Guadalupe,
Hays, McLennan, Travis and Williamson Counties in Texas.

Heavy (excluding tunnels and dams) and Highway Construction
Projects (does not include building structures in rest area
projects). *NOT TO BE USED FOR WORK ON SEWAGE OR WATER
TREATMENT PLANTS OR LIFT/PUMP STATIONS IN BELL, CORYELL,
McLENNAN AND WILLIAMSON COUNTIES.

Modification Number    Publication Date
     0        02/09/2007

SUTX2005-001 01/03/2005

|                                        | Rates    | Fringes |
|----------------------------------------|----------|---------|
| Air Tool Operator............          | $ 16.00  | 0.00    |
| Asphalt Distributor Operator...        | $ 12.09  | 0.00    |
| Asphalt paving machine operator        | $ 11.82  | 0.00    |
| Asphalt Raker.................          | $ 9.96   | 0.00    |
| Asphalt Shoveler.............           | $ 10.56  | 0.00    |
| Broom or Sweeper Operator......        | $ 9.74   | 0.00    |
| Bulldozer operator ..........          | $ 11.04  | 0.00    |
| Carpenter.....................         | $ 12.25  | 0.00    |
| Concrete Finisher, Paving......        | $ 10.53  | 0.00    |
| Concrete Finisher, Structures..        | $ 10.95  | 0.00    |
| Concrete Paving Curbing                |          |         |
| Machine Operator...............        | $ 14.00  | 0.00    |
| Concrete Paving Finishing              |          |         |
| Machine Operator...............        | $ 12.00  | 0.00    |
| Concrete Rubber................        | $ 10.88  | 0.00    |
| Crane, Clamshell, Backhoe,             |          |         |
| Derrick, Dragline, Shovel              |          |         |
| Operator......................         | $ 13.66  | 0.00    |
| Electrician....................        | $ 24.11  | 0.00    |
| Flagger.......................         | $ 9.49   | 0.00    |
| Form Builder/Setter, Structures        | $ 10.88  | 0.00    |
| Form Setter, Paving & Curb.....        | $ 9.89   | 0.00    |
| Foundation Drill Operator,             |          |         |

| | | |
|---|---|---|
| Truck Mounted.................... | $ 15.00 | 0.00 |
| Front End Loader Operator...... | $ 11.36 | 0.00 |
| Laborer, common............... | $ 9.34 | 0.00 |
| Laborer, Utility............... | $ 10.12 | 0.00 |
| Mechanic....................... | $ 14.74 | 0.00 |
| Mixer operator, Concrete Paving | $ 15.25 | 0.00 |
| Mixer operator................ | $ 10.83 | 0.00 |
| Motor Grader Operator, Fine Grade......................... | $ 15.26 | 0.00 |
| Motor Grader Operator, Rough... | $ 12.96 | 0.00 |
| Oiler.......................... | $ 14.71 | 0.00 |
| Painter, Structures............ | $ 11.00 | 0.00 |
| Pavement Marking Machine Operator....................... | $ 11.52 | 0.00 |
| Pipelayer...................... | $ 10.49 | 0.00 |
| Planer Operator............... | $ 17.45 | 0.00 |
| Reinforcing Steel Setter, Paving........................ | $ 15.50 | 0.00 |
| Reinforcing Steel Setter, Structure...................... | $ 14.09 | 0.00 |
| Roller Operator, Pneumatic, Self-Propelled................. | $ 9.34 | 0.00 |
| Roller Operator, Steel Wheel, Flat Wheel/Tamping............ | $ 9.60 | 0.00 |
| Roller Operator, Steel Wheel, Plant Mix Pavement............ | $ 10.24 | 0.00 |
| Scraper Operator.............. | $ 9.93 | 0.00 |
| Servicer....................... | $ 11.41 | 0.00 |
| Sign Installer (PGM).......... | $ 14.85 | 0.00 |
| Slip Form Machine Operator..... | $ 15.17 | 0.00 |
| Spreader Box operator......... | $ 10.39 | 0.00 |
| Structural Steel Worker........ | $ 13.41 | 0.00 |
| Tractor operator, Crawler Type. | $ 11.10 | 0.00 |
| Traveling Mixer Operator....... | $ 10.04 | 0.00 |
| Trenching machine operator, Heavy.......................... | $ 14.22 | 0.00 |
| Truck Driver Tandem Axle Semi-Trailer....................... | $ 10.95 | 0.00 |
| Truck driver, lowboy-Float..... | $ 15.30 | 0.00 |
| Truck driver, Single Axle, Heavy.......................... | $ 11.88 | 0.00 |
| Truck driver, Single Axle, Light.......................... | $ 9.98 | 0.00 |
| Wagon Drill, Boring Machine, Post Hole Driller Operator..... | $ 14.65 | 0.00 |
| Welder......................... | $ 14.26 | 0.00 |
| Work Zone Barricade Servicer... | $ 11.15 | 0.00 |

Unlisted classifications needed for work not included within
the scope of the classifications listed may be added after
award only as provided in the labor standards contract clauses
(29CFR 5.5 (a) (1) (ii)).

GENERAL DECISION: TX20070129 02/09/2007 TX129

Date: February 9, 2007
General Decision Number: TX20070129 02/09/2007

Superseded General Decision Number: TX20030129

State: Texas

Construction Types: Heavy and Highway

Counties: Aransas, Atascosa, Austin, Bandera, Bastrop, Bee,
Blanco, Burnet, Caldwell, Calhoun, Colorado, De Witt, Fayette,
Frio, Gillespie, Goliad, Gonzales, Jackson, Jim Wells, Karnes,
Kendall, Kerr, Kleberg, Lavaca, Lee, Live Oak, Llano, Mason,
Matagorda, Medina, Refugio, Wharton and Wilson Counties in Texas.

HEAVY CONSTRUCTION PROJECTS (excluding dam
construction).HIGHWAY CONSTRUCTION PROJECTS (excluding tunnels,
building
structures in rest area projects & railroad construction;
bascule, suspension & spandrel arch bridges designed for
commercial navigation, bridges involving marine construction;
and other major bridges).

Modification Number      Publication Date
         0               02/09/2007

  SUTX2005-023 09/08/2005

HEAVY CONSTRUCTION PROJECTS HIGHWAY CONSTRUCTION PROJECTS

|  | Rates | Fringes |
|---|---|---|
| Carpenter | $ 11.70 | |
| Mechanic | $ 12.18 | |
| Asphalt Distributor Operator | $ 12.57 | |
| Asphalt paving machine operator | $ 11.60 | |
| Asphalt Raker | $ 10.63 | |
| Asphalt Shoveler | $ 9.23 | |
| Broom or Sweeper Operator | $ 9.32 | |
| Bulldozer operator | $ 11.69 | |
| Concrete Finisher, Paving | $ 11.64 | |
| Concrete Finisher, Structures | $ 10.23 | |
| Concrete Rubber | $ 9.00 | |
| Crane, Clamshell, Backhoe, Derrick, Dragline, Shovel Operator | $ 12.00 | |
| Flagger | $ 8.60 | |
| Form Builder/Setter, Structures | $ 10.51 | |
| Form Setter, Paving & Curb | $ 9.48 | |
| Foundation Drill Operator, Truck Mounted | $ 14.58 | |
| Front End Loader Operator | $ 10.62 | |
| Laborer, common | $ 8.91 | |
| Laborer, Utility | $ 9.21 | |
| Motor Grader Operator Fine Grade | $ 15.15 | |
| Motor Grader Operator Rough | $ 12.95 | |

Excerpt from Facility Concession Agreement

```
Pavement Marking Machine
Operator......................$ 13.32
Pipelayer.....................$  9.71
Roller Operator, Pneumatic,
Self-Propelled................$  8.90
Roller Operator, Steel Wheel,
Flat Wheel/Tamping............$  9.30
Roller Operator, Steel Wheel,
Plant Mix Pavement............$ 10.59
Scraper Operator..............$  9.05
Servicer......................$ 11.18
Spreader Box Operator.........$ 13.00
Traveling Mixer Operator......$ 12.67
Truck Driver Single Axle Heavy.$ 10.87
Truck Driver Single Axle, Light$ 10.85
Truck driver, lowboy-float.....$ 13.70
Truck Driver, Tandem Axle,
Semi-Trailer..................$ 10.05
Work Zone Barricade Servicer...$  9.63
```
---

WELDERS - Receive rate prescribed for craft performing
operation to which welding is incidental.
---

Unlisted classifications needed for work not included within
the scope of the
classifications listed may be added after award only as
provided in the labor
standards contract clauses (29 CFR 5.5(a)(1)(ii)).

---

In the listing above, the "SU" designation means that rates
listed under the
identifier do not reflect collectively bargained wage and
fringe benefit
rates.  Other designations indicate unions whose rates have
been determined
to be prevailing.

---

WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can
be:

*   an existing published wage determination
*   a survey underlying a wage determination
*   a Wage and Hour Division letter setting forth a position on
a wage
    determination matter
*   a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests
for summaries
of surveys, should be with the Wage and Hour Regional Office

DEFENDANT'S EXHIBIT 2
AGREEMENT NO. CSUB122

(Back to index)

**Appendix Item 15**



**Central Texas Highway Constructors LLC**
1914 Borchert Drive
Lockhart, Texas 78644

A π EXHIBIT 10
Deponent 72
Date 9/24 Rptr 8m J
www.depo.com

A π EXHIBIT 3
Deponent MF
Date _____ Rptr _____
www.depo.com

16 September 2010

Dig Tech, Inc.
Attention: Mike Furry
402 Technology Drive
Bastrop, Texas 78602

512.321.6644

VIA OVERNIGHT MAIL

Reference: Agreement No. CSUB122
Furnish and Install Electric Distribution Facilities—Bluebonnet Electric Cooperative
SH 130 Segments 5 and 6

Dear Mr. Furry:

Find enclosed the fully executed Subcontract Agreement with accompanying DVD.

1. This letter will serve as a Full Notice to Proceed and commences the Performance Period for all Segments as defined in Article 8 of the Agreement, effective 27 September 2010.
2. Deliver to CTxHC the revised letter of credit of credit as soon as practicable.
3. Ensure that all Dig Tech field personnel attend safety and environmental training prior to deployment.
4. Your principal points of contact for this Work are Wayne Karlik (Utility Manager), 817-819-3697, and Travis Isaacson (Utility Design Coordinator), 512-462-7522. Please contact them to coordinate performance of the work.
5. Please contact Ms. Sonia Maillo, CFO, 512-462-7506, to discuss administrative interface, e.g. invoicing, sales tax, and so forth.
6. Please contact Ms. Evelyn Calongo, DBE Coordinator, 512-462-7517, to discuss any DBE-related issues.
7. Please contact Mr. Esteban Trigueros, Quality Manager, 512-462-7504, to discuss quality control and quality assurance of the Work.
8. Your point of contact for environmental compliance is Ms. Jennifer Oshel, CTxHC Environmental Manager, 512-462-7505.
9. Your point of contact for health and safety compliance is Mr. Jerry Watley, Health and Safety Manager, 512-801-2572.

Contact me if you have any questions, 512-462-7510. Thank you.

Sincerely,
CENTRAL TEXAS HIGHWAY CONSTRUCTORS LLC

Michael Kiehnau
Project Controls Manager

cc: Document Control (DT-PC-1009-S3 113958)

EXHIBIT
2

C0670272.PDF

9.4    SUBCONTRACTS.  Seller shall not subcontract any Work, or use a third party or broker to furnish any labor for the Work, without the prior written consent of D&C Contractor, which consent shall not be unreasonably withheld or delayed. Seller shall be solely responsible for the engagement and management of its Subcontractors in the performance of the Work, for the performance of Work by its Subcontractors and for all acts or omissions of Subcontractors. Seller shall insure that all Work furnished or performed by Subcontractors conforms to the requirements of the Agreement Documents. Neither the consent by D&C Contractor, nor anything contained herein, shall create any contractual relationship between any lower tier Subcontractor and D&C Contractor. All lower-tier subcontracts must contain the terms and conditions that are incorporated in this Agreement.

No Subcontractor is intended to be or shall be deemed to be a third party beneficiary of the Agreement. Each agreement between Seller and any Subcontractor shall be in writing, and shall be assignable to D&C Contractor upon the completion or termination of the Work. A copy of each such agreement with pricing removed shall be provided to D&C Contractor upon request.

In no event shall the right of the Seller hereunder to subcontract relieve the Seller from any of its obligations and responsibilities to achieve Substantial Completion and Final Acceptance of the Work, as required under the terms of the D&C Contract, for payment of wages of laborers and for equipment and materials furnished for the D&C Work, as well as for satisfaction of all indemnities of Seller contained herein. The Seller agrees that it is fully responsible to the D&C Contractor for the acts and omissions of its subcontractors and of persons either directly or indirectly employed by them as it is for the acts and omissions of persons directly employed by the Seller. The Seller shall obtain all necessary information from its subcontractors engaged in the D&C Work, in order to ensure that their work conforms with the Seller's work. The Seller is responsible for and shall check the correctness of any portion of the D&C Work performed by its subcontractors.

9.5    SITE CONDITIONS.  Seller shall have the sole responsibility to establish that the nature and location of the Work, the Site, and the general and local conditions are such that the Work can be performed on the Site, including but not limited to, the following:

  (a)    Transportation, access, disposal, handling and storage of materials;
  (b)    Availability and quality of labor, water, electric power and road conditions;
  (c)    Climatic conditions and seasons;
  (d)    Physical conditions at the Site and the Project as a whole;
  (e)    Topography, subsurface and ground surface conditions; and
  (f)    Construction equipment and facilities needed preliminary to and during the performance of Seller's Work.

The failure of Seller to acquaint itself with any applicable conditions will not relieve Seller of the responsibility for properly estimating the difficulties or for the cost of successfully performing Seller's obligations in the time and manner provided under the Agreement Documents.

9.6    COMPLIANCE WITH LAWS.  Seller shall fully comply with all Laws applicable to Seller and to the Work. See Attachment P for additional project specific requirements.

9.6.1    PREVAILING WAGES

a)    Seller shall pay or cause to be paid to all applicable workers employed by it or its Contractors to perform the Work not less than the prevailing rates of wages, as provided in Attachment P, in the statutes and regulations applicable to public work contracts, including Chapter 2258 of the Texas Government Code. TxDOT, Seller and its Contractors shall comply with all Laws pertaining to prevailing wages.  For the purpose of applying such Laws, the Facility shall be treated as a public work paid for in whole or in part with public funds (regardless of whether public funds are actually used to pay for the Facility).

b)    It is Seller's sole responsibility to determine the wage rates required to be paid.  In the event rates of wages and benefits change while this Agreement is in effect, Seller shall bear the cost of such changes and shall have no Claim against D&C Contractor on account of such changes.  Without limiting the foregoing, no Claim will be allowed which is

11

based upon Seller's lack of knowledge or a misunderstanding of any such requirements or Seller's failure to include in the Base Case Financial Model or Base Case Financial Model Updates adequate increases in such wages over the duration of this Agreement and the Lease.

c)      Any issue between Seller or a subcontractor and any affected worker relating to any alleged violation of Section 2258.023 of the Texas Government Code that is not resolved before the 15th day after the date TxDOT makes its initial determination under Section 2258.052 of the Texas Government Code (as to whether good cause exists to believe that a violation occurred) shall be submitted to binding arbitration in accordance with the Texas General Arbitration Act, Chapter 171 of the Civil Practice and Remedies Code.

d)      Seller shall comply and cause its subcontractors to comply with all Laws regarding notice and posting of Intent to pay prevailing wages, and any other notice or posting of prevailing wage requirements and prevailing wage rates.

9.7      HAZARDOUS SUBSTANCES.  Seller shall immediately Notify D&C Contractor if Seller encounters pre-existing Hazardous Substances at the Site.  The D&C Contractor has a separate contract with a Hazardous Materials Contractor to remediate Hazardous Substances.  The Seller shall not remediate pre-existing Hazardous Substances under this Agreement.  However, Seller is responsible for any of its releases of Hazardous Substances.

In accordance with the FCA, applicable Laws (including specifically Environmental Laws) and all Environmental Approvals, the Contractor shall take all reasonable steps to protect the environment on and off the planned Facility Right of Way on which it performs any of the D&C Work and to avoid damage or nuisance to persons or to property of the public or others, resulting from pollution, noise or other causes arising as a consequence of its performance of the D&C Work, subject to the allocation of responsibility therefore as provided in the D&C Agreement.

9.8      CLEANING UP.  Seller shall at all times keep the Site and surrounding area clean and free from rubbish caused by Seller's operations. Prior to completing its Work in an area, Seller shall remove all accumulated rubbish caused by Seller's operations and Seller's equipment, tools, machinery and materials. Seller shall dispose of all rubbish caused by Seller's operations at a site and by the means designated at the sole discretion of Seller in a manner that is in compliance with all Laws.

9.9      LABOR, MATERIAL, AND HAULING

9.9.1      LABOR.  Seller will provide only skilled, competent workers and supervision for the performance of its Work and will be responsible for assuring harmonious labor relationships on the Project among its workers at the Site. All individuals performing the Work shall have the skill and experience and any licenses or certifications required to perform the Work assigned to them. Seller shall immediately remove from the Project, when requested to do so by D&C Contractor, any person to whom D&C Contractor reasonably objects, and such person may not thereafter reenter the Site without D&C Contractor's prior consent.

Any uniforms worn by personnel of Seller-Related Entities shall bear colors, lettering, badges or other identifiers to assure clear differentiation from uniforms worn by TxDOT employees.

9.9.2      MATERIAL. All steel and iron used and all products manufactured from steel and iron must be produced in the United States and all manufacturing processes, including application of a coating, for these materials must occur in the United States.  Coating includes all processes which protect or enhance the value of the material to which the coating is applied.

9.9.3      HAULING.  Seller agrees to pay any worker, laborer or mechanic for work performed on the Project site, and otherwise covered by the Davis-Bacon Act or any other applicable state or federal law, at a rate not less than the legally prescribed prevailing wage rate set forth in the Facility Concession Agreement (Attachment 3 to Exhibit 8), which rate schedule is incorporated by this reference for all purposes. The inclusion of such schedule does not relieve Seller from responsibility to comply with any applicable state or federal law.

9.10      INSPECTION OF THE WORK.  Seller alone is responsible for the quality of its Work and for the proper inspection of its Work. D&C Contractor and Developer have the right to inspect all or any portion of the Work designated by D&C

12

9.18    ETHICAL STANDARDS. Within 30 days after the Effective Date, Seller shall adopt written policies establishing ethical standards of conduct for Seller and all Seller-Related Entities, including Seller's supervisory and management personnel in dealing with (a) the D&C Contractor, (b) the Developer (c) TxDOT and the Independent Engineer and (d) employment relations. Such policy shall be subject to review and comment by the D&C Contractor prior to adoption and shall include the ethical standards listed in Attachment Q.

## ARTICLE 10.  PAYMENT

Undisputed invoices shall be due and payable seven (7) days after D&C Contractor receives payment from Developer, but not later than 45 days following receipt of such invoice.  Payment is subject to complying with items 10.1 – 10.11 below.

10.1    PAYMENT.  D&C Contractor and Seller have agreed to a payment amount for Seller's Work activities to serve as a basis for computing partial payments.  .

10.2    PARTIAL PAYMENTS.  On the 25th calendar day of each month, Seller will furnish D&C Contractor an invoice meeting the requirements in Item 10.3.

10.3    INVOICE REQUIREMENTS:

(a)    A detailed invoice, in a form and content acceptable to D&C Contractor, setting out the portion of the Agreement Price allocable to the Work actually performed to date by Seller to accomplish each of the activities shown in the Scope of Work and Schedule, along with supporting documentation as D&C Contractor may reasonably require to substantiate Seller's right to payment of the invoiced amounts (also see Article 2, re:  Texas sales and use tax);

(b)    A progress report of Seller's Work including the Texas sales and use taxes paid by Seller and Seller's Subcontractors (see Article 2) and supporting documents;

(c)    Seller's Partial Waiver and Release of Liens, Affidavit of Bills Paid and Indemnification, completed and executed in accordance with the form attached hereto as Attachment F;

(d)    Certified payrolls, for the invoice period, if required by the Agreement Documents; and

(e)    Three (3) copies of Seller's invoice

Submit invoice and documents to the following address:

Central Texas Highway Constructors, LLC
Accounts Payable
P.O. Box 1110
Lockhart, TX 78644

Or as directed by D&C Contractor

10.4    APPLICATION OF PAYMENT.  The Application for Payment shall constitute Seller's representation that (i) the Services have been performed consistent with the Contract Documents, (ii) Seller's subcontractors and material suppliers have been paid all amounts previously received by Seller on account of their services to the extent then due, and (iii) there are no claims, obligations or liens outstanding or unsatisfied for labor, services, taxes, or other items performed, furnished, or incurred for or in connection with the Services.

10.5    RETAINAGE.  Retainage will be withheld as follows:
(a)    Ten Percent (10%) retainage will be withheld on the total invoiced amount (including mobilization) until the Seller has invoiced at least $1.5 million;
(b)    When the $1.5 million invoice threshold has been achieved, as evidenced by the Seller's payment application, the D&C Contractor will release that portion of retainage withheld for Direct Materials;
(c)    After the $1.5 million invoice threshold has been achieved, as evidenced by the Seller's payment application, the D&C Contractor will continue to withhold ten percent (10%) retainage only on labor, equipment, and consumables (LEC).  This portion of retainage attributal to LEC will be released when the requirements of Special Provision 009-009 of FCA Exhibit 15 are satisfied.

15

D&C Contractor shall mean Central Texas Highway Constructors LLC

Day or day shall mean calendar days unless otherwise expressly specified.

DOL shall mean U.S. Department of Labor.

Defective Work shall mean Work, which fails to satisfy the requirements of Article 12, Warranty.

Developer shall mean the entity in which D&C Contractor has entered into a contract with to perform certain work and is identified in paragraph A of the Recitals in this Agreement.

Direct Materials shall mean materials, supplies and equipment to be incorporated as a permanent part of the Project, excluding any sales or use tax thereon.

Director may have more than one definition in this Agreement depending upon its use and context, e.g. Project Director shall mean the individual with direct responsibility for delivering the SH 130 Segments 5 and 6 to the Developer; Director may mean someone who serves on a corporate board of directors; In FHWA Form 1273, "Director" means Director, Office of Federal Contract Compliance Programs, United States Department of Labor, or any person to whom the Director delegates authority.

Drawings shall mean (a) drawings furnished by D&C Contractor as a basis for bids, (b) supplementary drawings furnished by D&C Contractor to clarify and to define in greater detail the intent of the Agreement, (c) drawings submitted by Seller with its bid, provided such drawings are acceptable to D&C Contractor, (d) drawings furnished by D&C Contractor to Seller during the progress of the Work, and (e) drawings and engineering data submitted by Seller during the progress of the Work, provided such drawings and data are acceptable to D&C Contractor.

Effective Date shall mean the date given in paragraph one of this Agreement.

Excusable Delay is one caused by an Excusable Delay Event. For the Seller to obtain a time extension, the delay must affect overall completion of the Seller's Scope of Work, i.e. the delay must cause a day-for-day extension to the critical path.

Excusable Delay Events with respect to Seller's timely performance of the Work shall be defined as a TxDOT-recognized Relief Event or as a D&C Contractor-caused event to the extent that the event results in a delay that prevents Seller from completing its overall Scope of Work, provided that such events are not due to any act, omission, negligence, recklessness, willful misconduct, breach of contract or Law, and, further provided, that such events (or the effects of such events) could not have been avoided by the exercise of caution, due diligence, or reasonable efforts by Seller. D&C Contractor-caused Excusable Delay Events include, but are not limited to, D&C Contractor failures to (1) provide materials that the D&C Contractor is providing to Seller, or (2) perform Work provided by D&C Contractor or by D&C Contractor's other Subcontractors that directly impact the Seller's Work.

Facility Concession Agreement (FCA) is the agreement between the Developer and the Texas Department of Transportation. The FCA and related FCA documents are incorporated by reference into this Subcontract Agreement.

Force Majeure Event means the occurrence of any of the following events that materially and adversely affects performance of Developer's obligations, provided that such events (or the effects of such events) could not have been avoided by the exercise of caution, due diligence, or reasonable efforts by Developer: (a) war (including civil war and revolution), invasion, armed conflict, violent act of foreign enemy, military or armed blockade, or military or armed takeover of the Facility, in each case occurring within the State of Texas; (b) any act of terrorism or sabotage that causes direct physical damage to the Facility; and (c) nuclear explosion.

Hazardous Substances shall mean any substances, the release of which into, or the presence of which in, the environment gives rise to any liability or obligation to remove, clean up, encapsulate or otherwise remediate such release or presence thereof under any Laws.

29

Indemnified Party shall mean the State of Texas, Developer, and their respective officers, directors, agents and employees, D&C Contractor, their subsidiaries and Affiliates and their officers, directors, partners, agents, and employees.

Laws shall mean any law, code, statute, regulation, rule, ordinance, judgment, injunction, or other court order, or other requirement of a governmental authority having jurisdiction over the Work, or the Project or the construction or operation thereof or party, and which is valid and applicable thereto.

Materials shall mean all materials (direct and indirect), supplies, goods, and equipment, which are necessary for Seller to accomplish its Scope of Work.

Milestone Dates shall mean those dates stated in the Agreement.

Non-Excusable Delay Events shall mean any act or neglect of Seller or its Subcontractors or any other event or occurrence that may interfere with or delay the Work that is not specified as an Excusable Delay Event.

Notice or Notify shall mean a notice in writing given to the Party's designated representative deemed duly given on the date of receipt.

Party(ies) shall mean D&C Contractor and Seller, as defined in paragraph one of this Agreement.

Person shall mean an individual, partnership, corporation, limited liability company, company, business trust, joint stock company, trust, unincorporated association, joint venture, Government Authority or other entity of whatever nature.

Performance Guarantees shall mean those guarantees stated in Section 7 or elsewhere in the Agreement.

Project shall mean the project described in paragraph A of the Recitals of this Agreement, which D&C Contractor will perform for the Developer.

Relief Event means any of the following events, to the extent they result in a material delay or interruption in performance of any obligation under the Agreement to the extent that TxDOT or Developer grant relief, and provided such events are beyond Seller's control and are not due to any act, omission, negligence, recklessness, willful misconduct, breach of contract or Law of any of the Seller, and further provided that such events (or the effects of such events) could not have been avoided by the exercise of caution, due diligence, or reasonable efforts by Seller:

    (a)    Force Majeure Event;

    (b)    Fire, explosion, flood, earthquake, hurricane, tornado, riot, national strike or act of terrorism;

    (c)    Change in Law;

    (d)    Discriminatory Action;

    (e)    TxDOT failure to perform or observe any of its material covenants or obligations under the Agreement or other FCA Documents, including failure to pay the Termination Compensation in accordance with the requirements, and within the time period, set forth in Section E5 of Exhibit 22;

    (f)    TxDOT Change;

    (g)    TxDOT-Caused Delay;

    (h)    Performance of works in the vicinity of the Facility Right of Way carried out by TxDOT or another Governmental Entity, excluding any Utility Adjustment Work by a Utility Owner, that disrupts Seller's onsite Work;

30

## ATTACHMENT P

## FEDERAL REQUIREMENTS

| Exhibit Description | No. of Pages |
|---|---|
| Attachment 1 – Federal Provisions | 2 |
| Attachment 2 – FHWA Form 1273 | 28 |
| Attachment 3 – Wage Determination of the Secretary of Labor | 1 |
| Attachment 4 – Equal Employment Opportunity | 6 |
| Attachment 5 – Affirmative Action | 5 |
| Attachment 6 – Debarment and Suspension Certification | 1 |
| Attachment 7 – Lobbying Certification | 1 |
| Attachment 8 – Compliance with 23 U.S.C. §129(a)(3) | 1 |
| Attachment 9 - Compliance with Buy America Requirements | 2 |

C0670272.PDF

## ATTACHMENT 1 TO EXHIBIT 8

## FEDERAL REQUIREMENTS FOR FEDERAL-AID CONSTRUCTION PROJECTS

GENERAL.—The work herein proposed will be financed in whole or in part with Federal funds, and therefore all of the statutes, rules and regulations promulgated by the Federal Government and applicable to work financed in whole or in part with Federal funds will apply to such work. The "Required Contract Provisions, Federal-Aid Construction Contracts, Form FHWA 1273," are included in this Exhibit 8. Whenever in said required contract provisions references are made to:

(a) "SHA contracting officer", "SHA resident engineer", or "authorized representative of the SHA", such references shall be construed to mean TxDOT or its Authorized Representative;

(b) "contractor", "prime contractor", "bidder" or "prospective primary participant", such references shall be construed to mean the Design-Build Contractor or its authorized representative;

(c) "contract" or "prime contract", such references shall be construed to mean the Design-Build Contract; and

(d) "subcontractor", "supplier", "vendor", "prospective lower tier participant" or "lower tier subcontractor", such references shall be construed to mean subcontractors, suppliers and vendors of the Design-Build Contractor, including lower tier subcontractors.

PERFORMANCE OF PREVIOUS CONTRACT.—In addition to the provisions in Section II, "Nondiscrimination," and Section VII, "Subletting or Assigning the Contract," of the Form 1273 required contract provisions, the Developer shall cause the contractor to comply with the following:

The bidder shall execute the CERTIFICATION WITH REGARD TO THE PERFORMANCE OF PREVIOUS CONTRACTS OR SUBCONTRACTS SUBJECT TO THE EQUAL OPPORTUNITY CLAUSE AND THE FILING OF REQUIRED REPORTS located in the proposal. No request for subletting or assigning any portion of the contract in excess of $10,000 will be considered under the provisions of Section VII of the required contract provisions unless such request is accompanied by the CERTIFICATION referred to above, executed by the proposed subcontractor.

NON-COLLUSION PROVISION.—The provisions in this section are applicable to all contracts except contracts for Federal Aid Secondary Projects. Title 23, United States Code, Section 112, requires as a condition precedent to approval by the Federal Highway Administrator of the contract for this work that each bidder file a sworn statement executed by, or on behalf of, the person, firm, association, or corporation to whom such contract is to be awarded, certifying that such person, firm, association, or corporation has not, either directly or

any subcontractor responsible thereof shall be liable to the affected employee for his/her unpaid wages. In addition, such contractor and subcontractor shall be liable to the United States (in the case of work done under contract for the District of Columbia or a territory, to such District or to such territory) for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer, mechanic, watchman, or guard employed in violation of the clause set forth in paragraph 7, in the sum of $10 for each calendar day on which such employee was required or permitted to work in excess of the standard work week of 40 hours without payment of the overtime wages required by the clause set forth in paragraph 7.

9. **Withholding for Unpaid Wages and Liquidated Damages:**

The SHA shall upon its own action or upon written request of any authorized representative of the DOL withhold, or cause to be withheld, from any monies payable on account of work performed by the contractor or subcontractor under any such contract or any other Federal contract with the same prime contractor, or any other Federally-assisted contract subject to the Contract Work Hours and Safety Standards Act, which is held by the same prime contractor, such sums as may be determined to be necessary to satisfy any liabilities of such contractor or subcontractor for unpaid wages and liquidated damages as provided in the clause set forth in paragraph 8 above.

## V. STATEMENTS AND PAYROLLS

(Applicable to all Federal-aid construction contracts exceeding $2,000 and to all related subcontracts, except for Projects located on roadways classified as local roads or rural collectors, which are exempt.)

1. **Compliance with Copeland Regulations (29 CFR 3)**

The contractor shall comply with the Copeland Regulations of the Secretary of Labor which are herein incorporated by reference.

2. **Payrolls and Payroll Records:**

a. Payrolls and basic records relating thereto shall be maintained by the contractor and each subcontractor during the course of the work and preserved for a period of 3 years from the date of completion of the contract for all laborers, mechanics, apprentices, trainees, watchmen, helpers, and guards working at the site of the work.

C0670272.PDF

b.  The payroll records shall contain the name, social security number, and address of each such employee; his or her correct classification; hourly rates of wages paid (including rates of contributions or costs anticipated for bona fide fringe benefits or cash equivalent thereof the types described in Section 1(b)(2)(B) of the Davis Bacon Act); daily and weekly number of hours worked; deductions made; and actual wages paid. In addition, for Appalachian contracts, the payroll records shall contain a notation indicating whether the employee does, or does not, normally reside in the labor area as defined in Attachment A, paragraph 1. Whenever the Secretary of Labor, pursuant to Section IV, paragraph 3b, has found that the wages of any laborer or mechanic include the amount of any costs reasonably anticipated in providing benefits under a plan or program described in Section 1(b)(2)(B) of the Davis Bacon Act, the contractor and each subcontractor shall maintain records which show that the commitment to provide such benefits is enforceable, that the plan or program is financially responsible, that the plan or program has been communicated in writing to the laborers or mechanics affected, and show the cost anticipated or the actual cost incurred in providing benefits. Developers or subcontractors employing apprentices or trainees under approved programs shall maintain written evidence of the registration of apprentices and trainees, and ratios and wage rates prescribed in the applicable programs.

c.  Each contractor and subcontractor shall furnish, each week in which any contract work is performed, to the SHA resident engineer a payroll of wages paid each of its employees (including apprentices, trainees, and helpers, described in Section IV, paragraphs 4 and 5, and watchmen and guards engaged on work during the preceding weekly payroll period). The payroll submitted shall set out accurately and completely all of the information required to be maintained under paragraph 2b of this Section V. This information may be submitted in any form desired. Optional Form WH-347 is available for this purpose and may be purchased from the Superintendent of Documents (Federal stock number 029-005-0014-1), U.S. Government Printing Office, Washington, D.C. 20402. The prime contractor is responsible for the submission of copies of payrolls by all subcontractors.

d.  Each payroll submitted shall be accompanied by a "Statement of Compliance," signed by the contractor or subcontractor or his/her

agent who pays or supervises the payment of the persons employed under the contract and shall certify the following:

i.     that the payroll for the payroll period contains the information required to be maintained under paragraph 2b of this Section V and that such information is correct and complete;

ii.    that such laborer or mechanic (including each helper, apprentice, and trainee) employed on the contract during the payroll period has been paid the full weekly wages earned, without rebate, either directly or indirectly, and that no deductions have been made either directly or indirectly from the full wages earned, other than permissible deductions as set forth in the Regulations, 29 CFR 3;

iii    that each laborer or mechanic has been paid not less that the applicable wage rate and fringe benefits or cash equivalent for the classification of worked performed, as specified in the applicable wage determination incorporated into the contract.

e.    The weekly submission of a properly executed certification set forth on the reverse side of Optional Form WH-347 shall satisfy the requirement for submission of the "Statement of Compliance" required by paragraph 2d of this Section V.

f.    The falsification of any of the above certifications may subject the contractor to civil or criminal prosecution under 18 U.S.C. 1001 and 31 U.S.C. 231.

g.    The contractor or subcontractor shall make the records required under paragraph 2b of this Section V available for inspection, copying, or transcription by authorized representatives of the SHA, the FHWA, or the DOL, and shall permit such representatives to interview employees during working hours on the job. If the contractor or subcontractor fails to submit the required records or to make them available, the SHA, the FHWA, the DOL, or all may, after written notice to the contractor, sponsor, applicant, or owner, take such actions as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds. Furthermore, failure to submit the required records upon request or to make such records available may be grounds for debarment action pursuant to 29 CFR 5.12.

## VI.    RECORD OF MATERIALS, SUPPLIES, AND LABOR

137

1. On all Federal-aid contracts on the National Highway System, except those which provide solely for the installation of protective devices at railroad grade crossings, those which are constructed on a force account or direct labor basis, highway beautification contracts, and contracts for which the total final construction cost for roadway and bridge is less than $1,000,000 (23 CFR 635) the contractor shall:

   a. Become familiar with the list of specific materials and supplies contained in Form FHWA-47, "Statement of Materials and Labor Used by Developer of Highway Construction Involving Federal Funds," prior to the commencement of work under this contract.

   b. Maintain a record of the total cost of all materials and supplies purchased for and incorporated in the work, and also of the quantities of those specific materials and supplies listed on Form FHWA-47, and in the units shown on Form FHWA-47.

   c. Furnish, upon the completion of the contract, to the SHA resident engineer on Form FHWA-47 together with the data required in paragraph 1b relative to materials and supplies, a final labor summary of all contract work indicating the total hours worked and the total amount earned.

2. At the prime contractor's option, either a single report covering all contract work or separate reports for the contractor and for each subcontract shall be submitted.

## VII. SUBLETTING OR ASSIGNING THE CONTRACT

1. The contractor shall perform with its own organization contract work amounting to not less than 30 percent (or a greater percentage if specified elsewhere in the contract) of the total original contract price, excluding any specialty items designated by the State. Specialty items may be performed by subcontract and the amount of any such specialty items performed may be deducted from the total original contract price before computing the amount of work required to be performed by the contractor's own organization (23 CFR 635).

   a. "Its own organization" shall be construed to include only workers employed and paid directly by the prime contractor and equipment owned or rented by the prime contractor, with or without operators. Such term does not include employees or equipment of a subcontractor, assignee, or agent of the prime contractor.

b. "Specialty Items" shall be construed to be limited to work that requires highly specialized knowledge, abilities, or equipment not ordinarily available in the type of contracting organizations qualified and expected to bid on the contract as a whole and in general are to be limited to minor components of the overall contract.

c. The contract amount upon which the requirements set forth in paragraph 1 of Section VII is computed includes the cost of material and manufactured products which are to be purchased or produced by the contractor under the contract provisions.

d. The contractor shall furnish (a) a competent superintendent or supervisor who is employed by the firm, has full authority to direct performance of the work in accordance with the contract requirements, and is in charge of all construction operations (regardless of who performs the work) and (b) such other of its own organizational resources (supervision, management, and engineering services) as the SHA contracting officer determines is necessary to assure the performance of the contract.

e. No portion of the contract shall be sublet, assigned or otherwise disposed of except with the written consent of the SHA contracting officer, or authorized representative, and such consent when given shall not be construed to relieve the contractor of any responsibility for the fulfillment of the contract. Written consent will be given only after the SHA has assured that each subcontract is evidenced in writing and that it contains all pertinent provisions and requirements of the prime contract.

## VIII. SAFETY: ACCIDENT PREVENTION

1. In the performance of this contract the contractor shall comply with all applicable Federal, State, and local laws governing safety, health, and sanitation (23 CFR 635). The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions as it determines, or as the SHA contracting officer may determine, to be reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract.

2. It is a condition of this contract, and shall be made a condition of each subcontract, which the contractor enters into pursuant to this contract, that the contractor and any subcontractor shall not permit any employee, in

## ATTACHMENT 3 TO EXHIBIT 8

## FEDERAL PREVAILING WAGE RATE

GENERAL DECISION: TX20070043 02/09/2007 TX43

Date: February 9, 2007
General Decision Number: TX20070043 02/09/2007

Superseded General Decision Number: TX20030043

State: Texas

Construction Types: Heavy and Highway

Counties: Bell, Bexar, Brazos, Comal, Coryell, Guadalupe,
Hays, McLennan, Travis and Williamson Counties in Texas.

Heavy (excluding tunnels and dams) and Highway Construction
Projects (does not include building structures in rest area
projects). *NOT TO BE USED FOR WORK ON SEWAGE OR WATER
TREATMENT PLANTS OR LIFT/PUMP STATIONS IN BELL, CORYELL,
McLENNAN AND WILLIAMSON COUNTIES.

Modification Number     Publication Date
       0            02/09/2007

SUTX2005-001 01/03/2005

|  | Rates | Fringes |
|---|---|---|
| Air Tool Operator............. | $ 16.00 | 0.00 |
| Asphalt Distributor Operator... | $ 12.09 | 0.00 |
| Asphalt paving machine operator | $ 11.82 | 0.00 |
| Asphalt Raker.................. | $ 9.96 | 0.00 |
| Asphalt Shoveler............... | $ 10.56 | 0.00 |
| Broom or Sweeper Operator...... | $ 9.74 | 0.00 |
| Bulldozer operator ........... | $ 11.04 | 0.00 |
| Carpenter...................... | $ 12.25 | 0.00 |
| Concrete Finisher, Paving...... | $ 10.53 | 0.00 |
| Concrete Finisher, Structures.. | $ 10.95 | 0.00 |
| Concrete Paving Curbing Machine Operator............... | $ 14.00 | 0.00 |
| Concrete Paving Finishing Machine Operator.............. | $ 12.00 | 0.00 |
| Concrete Rubber................ | $ 10.88 | 0.00 |
| Crane, Clamshell, Backhoe, Derrick, Dragline, Shovel Operator....................... | $ 13.66 | 0.00 |
| Electrician.................... | $ 24.11 | 0.00 |
| Flagger........................ | $ 9.49 | 0.00 |

148

| | | |
|---|---|---|
| Form Builder/Setter, Structures | $ 10.88 | 0.00 |
| Form Setter, Paving & Curb..... | $ 9.89 | 0.00 |
| Foundation Drill Operator, Truck Mounted.................. | $ 15.00 | 0.00 |
| Front End Loader Operator...... | $ 11.36 | 0.00 |
| Laborer, common............... | $ 9.34 | 0.00 |
| Laborer, Utility............... | $ 10.12 | 0.00 |
| Mechanic....................... | $ 14.74 | 0.00 |
| Mixer operator, Concrete Paving | $ 15.25 | 0.00 |
| Mixer operator................. | $ 10.83 | 0.00 |
| Motor Grader Operator, Fine Grade........................... | $ 15.26 | 0.00 |
| Motor Grader Operator, Rough... | $ 12.96 | 0.00 |
| Oiler........................... | $ 14.71 | 0.00 |
| Painter, Structures............ | $ 11.00 | 0.00 |
| Pavement Marking Machine Operator....................... | $ 11.52 | 0.00 |
| Pipelayer...................... | $ 10.49 | 0.00 |
| Planer Operator................ | $ 17.45 | 0.00 |
| Reinforcing Steel Setter, Paving.......................... | $ 15.50 | 0.00 |
| Reinforcing Steel Setter, Structure...................... | $ 14.00 | 0.00 |
| Roller Operator, Pneumatic, Self-Propelled................. | $ 9.34 | 0.00 |
| Roller Operator, Steel Wheel, Flat Wheel/Tamping............. | $ 9.60 | 0.00 |
| Roller Operator, Steel Wheel, Plant Mix Pavement.............. | $ 10.24 | 0.00 |
| Scraper Operator............... | $ 9.93 | 0.00 |
| Servicer....................... | $ 11.41 | 0.00 |
| Sign Installer (PGM)........... | $ 14.85 | 0.00 |
| Slip Form Machine Operator..... | $ 15.17 | 0.00 |
| Spreader Box operator.......... | $ 10.39 | 0.00 |
| Structural Steel Worker........ | $ 13.41 | 0.00 |
| Tractor operator, Crawler Type. | $ 11.10 | 0.00 |
| Traveling Mixer Operator....... | $ 10.04 | 0.00 |
| Trenching machine operator, Heavy........................... | $ 14.22 | 0.00 |
| Truck Driver Tandem Axle Semi-Trailer........................ | $ 10.95 | 0.00 |
| Truck driver, lowboy-Float..... | $ 15.30 | 0.00 |
| Truck driver, Single Axle, Heavy........................... | $ 11.88 | 0.00 |
| Truck driver, Single Axle, Light........................... | $ 9.98 | 0.00 |
| Wagon Drill, Boring Machine, Post Hole Driller Operator..... | $ 14.65 | 0.00 |
| Welder......................... | $ 14.26 | 0.00 |
| Work Zone Barricade Servicer... | $ 11.15 | 0.00 |

------------------------------------------------------------

C0670272.PDF

Unlisted classifications needed for work not included within
the scope of the classifications listed may be added after
award only as provided in the labor standards contract clauses
(29CFR 5.5 (a) (1) (ii)).

-----------------------------------------------------------

In the listing above, the "SU" designation means that rates
listed under the identifier do not reflect collectively
bargained wage and fringe benefit rates. Other designations
indicate unions whose rates have been determined to be
prevailing.

-----------------------------------------------------------

### WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can
be:

* an existing published wage determination
* a survey underlying a wage determination
* a Wage and Hour Division letter setting forth a position on
  a wage determination matter
* a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests
for summaries of surveys, should be with the Wage and Hour
Regional Office for the area in which the survey was conducted
because those Regional Offices have responsibility for the
Davis-Bacon survey program. If the response from this initial
contact is not satisfactory, then the process described in 2.)
and 3.) should be followed.

With regard to any other matter not yet ripe for the formal
process described here, initial contact should be with the
Branch of Construction Wage Determinations. Write to:

> Branch of Construction Wage Determinations
> Wage and Hour Division
> U.S. Department of Labor
> 200 Constitution Avenue, N.W.
> Washington, DC 20210

2.) If the answer to the question in 1.) is yes, then an
interested party (those affected by the action) can request
review and reconsideration from the Wage and Hour Administrator
(See 29 CFR Part 1.8 and 29 CFR Part 7). Write to:

> Wage and Hour Administrator
> U.S. Department of Labor

200 Constitution Avenue, N.W.
Washington, DC 20210

The request should be accompanied by a full statement of the interested party's position and by any information (wage payment data, project description, area practice material, etc.) that the requestor considers relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested party may appeal directly to the Administrative Review Board (formerly the Wage Appeals Board). Write to:

Administrative Review Board
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, DC 20210

4.) All decisions by the Administrative Review Board are final.

_____

END OF GENERAL DECISION

GENERAL DECISION: TX20070129 02/09/2007 TX129

Date: February 9, 2007
General Decision Number: TX20070129 02/09/2007

Superseded General Decision Number: TX20030129

State: Texas

Construction Types: Heavy and Highway

Counties: Aransas, Atascosa, Austin, Bandera, Bastrop, Bee,
Blanco, Burnet, Caldwell, Calhoun, Colorado, De Witt, Fayette,
Frio, Gillespie, Goliad, Gonzales, Jackson, Jim Wells, Karnes,
Kendall, Kerr, Kleberg, Lavaca, Lee, Live Oak, Llano, Mason,
Matagorda, Medina, Refugio, Wharton and Wilson Counties in Texas.

HEAVY CONSTRUCTION PROJECTS (excluding dam
construction).HIGHWAY CONSTRUCTION PROJECTS (excluding tunnels,
building
structures in rest area projects & railroad construction;
bascule, suspension & spandrel arch bridges designed for
commercial navigation, bridges involving marine construction;
and other major bridges).

Modification Number      Publication Date
        0                   02/09/2007

  SUTX2005-023 09/08/2005

HEAVY CONSTRUCTION PROJECTS HIGHWAY CONSTRUCTION PROJECTS

                              Rates          Fringes

    Carpenter.................... $ 11.70
    Mechanic..................... $ 12.18
    Asphalt Distributor Operator...$ 12.57
    Asphalt paving machine operator$ 11.60
    Asphalt Raker................$ 10.63
    Asphalt Shoveler.............$  9.23
    Broom or Sweeper Operator......$  9.32
    Bulldozer operator  ..........$ 11.69
    Concrete Finisher, Paving......$ 11.64
    Concrete Finisher, Structures..$ 10.23
    Concrete Rubber...............$  9.00
    Crane, Clamshell, Backhoe,
    Derrick, Dragline, Shovel
    Operator.....................$ 12.00
    Flagger......................$  8.60
    Form Builder/Setter, Structures$ 10.51
    Form Setter, Paving & Curb.....$  9.48
    Foundation Drill Operator,
    Truck Mounted.................$ 14.58
    Front End Loader Operator......$ 10.62
    Laborer, common...............$  8.91
    Laborer, Utility..............$  9.21

C0670272.PDF

```
Motor Grader Operator Fine
Grade..........................$ 15.15
Motor Grader Operator Rough....$ 12.95
Pavement Marking Machine
Operator.......................$ 13.32
Pipelayer......................$  9.71
Roller Operator, Pneumatic,
Self-Propelled.................$  8.90
Roller Operator, Steel Wheel,
Flat Wheel/Tamping.............$  9.30
Roller Operator, Steel Wheel,
Plant Mix Pavement.............$ 10.59
Scraper Operator...............$  9.85
Servicer.......................$ 11.18
Spreader Box Operator..........$ 13.00
Traveling Mixer Operator.......$ 12.67
Truck Driver Single Axle Heavy.$ 10.87
Truck Driver Single Axle, Light$ 10.85
Truck driver, lowboy-Float.....$ 13.70
Truck Driver, Tandem Axle,
Semi-Trailer...................$ 10.05
Work Zone Barricade Servicer...$  9.63
```
----------------------------------------------------------------

WELDERS - Receive rate prescribed for craft performing
operation to which welding is incidental.
================================================================

Unlisted classifications needed for work not included within
the scope of the
classifications listed may be added after award only as
provided in the labor
standards contract clauses (29 CFR 5.5(a)(1)(ii)).

----------------------------------------------------------------
--

In the listing above, the "SU" designation means that rates
listed under the
identifier do not reflect collectively bargained wage and
fringe benefit
rates.  Other designations indicate unions whose rates have
been determined
to be prevailing.

----------------------------------------------------------------
--

WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can
be:

*   an existing published wage determination
*   a survey underlying a wage determination
*   a Wage and Hour Division letter setting forth a position on
a wage

determination matter
*   a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests for summaries
of surveys, should be with the Wage and Hour Regional Office for the area in
which the survey was conducted because those Regional Offices have
responsibility for the Davis-Bacon survey program. If the response from this
initial contact is not satisfactory, then the process described in 2.) and
3.) should be followed.

With regard to any other matter not yet ripe for the formal process
described here, initial contact should be with the Branch of Construction
Wage Determinations.  Write to:

>   Branch of Construction Wage Determinations
>   Wage and Hour Division
>   U.S. Department of Labor
>   200 Constitution Avenue, N.W.
>   Washington, DC 20210

2.) If the answer to the question in 1.) is yes, then an interested party
(those affected by the action) can request review and reconsideration from
the Wage and Hour Administrator (See 29 CFR Part 1.8 and 29 CFR Part 7).
Write to:

>   Wage and Hour Administrator
>   U.S. Department of Labor
>   200 Constitution Avenue, N.W.
>   Washington, DC 20210

The request should be accompanied by a full statement of the interested
party's position and by any information (wage payment data, project
description, area practice material, etc.) that the requestor considers
relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested
party may appeal directly to  the Administrative Review Board (formerly the
Wage Appeals Board).  Write to:

>   Administrative Review Board
>   U.S. Department of Labor
>   200 Constitution Avenue, N.W.

DEFENDANT'S EXHIBIT 3
SUBCONTRACT AGREEMENT CSUB140

(Back to index)

**Appendix Item 16**

# SUBCONTRACT AGREEMENT
# TABLE OF CONTENTS

Recitals
Article 1. Scope of Work
Article 2. Agreement Price
Article 3. Schedule
Article 4. Indemnity
    4.1    Indemnification
    4.2    General Indemnity
    4.3    Patent Indemnity
    4.4    Indemnity for Borrowed Construction Equipment
    4.5    Indemnity for Safety Violations
Article 5. Insurance
    5.1    General Insurance Requirements
    5.2    Required Coverage
Article 6. Agreement Documents
Article 7. Security for Performance
Article 8. Liquidated Damages
Article 9. Performance of the Work
    9.1    Scheduling the Work
    9.2    Timeliness
    9.3    Progress Reports
    9.4    Subcontracts
    9.5    Site Conditions
    9.6    Compliance with Laws
    9.7    Hazardous Substances
    9.8    Cleaning Up
    9.9    Labor, Materials, Hauling
    9.10    Inspection of the Work
    9.11    Occupancy
    9.12    Taxes, Licenses, Permits and Fees
    9.13    Furnished Material
    9.14    Representatives
    9.15    Stop Work Orders
    9.16    Quality Control
    9.17    Standard of Care
    9.18    Ethical Standards
Article 10. Payment
    10.1    Schedule of Values
    10.2    Partial Payments
    10.3    Invoice Requirements
    10.4    Application for Payment
    10.5    Retainage
    10.6    Payment Not Acceptance
    10.7    Payments Withheld
    10.8    Payment Offset
    10.9    Final Payment
    10.10    Seller's Payment Obligations

EXHIBIT

3

workers, increase working hours or otherwise accelerate its performance until the Work is back on Schedule, all without additional cost to D&C Contractor. D&C Contractor reserves the right to perform some or all of the Work with its own forces and to contract with others for same, back-charging excess costs to the Seller. Upon request, Seller shall promptly provide D&C Contractor with adequate assurance satisfactory to D&C Contractor of Seller's ability to fully perform its obligations under the Agreement Documents in the time and manner provided.

9.3    PROGRESS REPORTS.    Seller shall furnish D&C Contractor weekly progress reports and such other reports as D&C Contractor may reasonably request to verify actual progress and to predict future progress.    Work product will be transmitted as noted in Exhibit A-1.

9.4    SUBCONTRACTS.    Seller shall not subcontract any Work, or use a third party or broker to furnish any labor for the Work, without the prior written consent of D&C Contractor, which consent shall not be unreasonably withheld or delayed. Seller shall be solely responsible for the engagement and management of its Subcontractors in the performance of the Work, for the performance of Work by its Subcontractors and for all acts or omissions of Subcontractors. Seller shall insure that all Work furnished or performed by Subcontractors conforms to the requirements of the Agreement Documents. Neither the consent by D&C Contractor, nor anything contained herein, shall create any contractual relationship between any lower tier Subcontractor and D&C Contractor.    All lower-tier subcontracts must contain the terms and conditions that are incorporated in this Agreement.

No Subcontractor is intended to be or shall be deemed to be a third party beneficiary of the Agreement.    Each agreement between Seller and any Subcontractor shall be in writing, and shall be assignable to D&C Contractor upon the completion or termination of the Work. A copy of each such agreement with pricing removed shall be provided to D&C Contractor upon request.

In no event shall the right of the Seller hereunder to subcontract relieve the Seller from any of its obligations and responsibilities to achieve Substantial Completion and Final Acceptance of the Work, as required under the terms of the D&C Contract, for payment of wages of laborers and for equipment and materials furnished for the D&C Work, as well as for satisfaction of all indemnities of Seller contained herein. The Seller agrees that it is fully responsible to the D&C Contractor for the acts and omissions of its subcontractors and of persons either directly or indirectly employed by them as it is for the acts and omissions of persons directly employed by the Seller. The Seller shall obtain all necessary information from its subcontractors engaged in the D&C Work, in order to ensure that their work conforms with the Seller's work. The Seller is responsible for and shall check the correctness of any portion of the D&C Work performed by its subcontractors.

9.5    SITE CONDITIONS.    Other than for a Relief Event, Seller shall have the sole responsibility to establish that the nature and location of the Work, the Site, and the general and local conditions are such that the Work can be performed on the Site, including but not limited to, the following:

(a)    Transportation, access, disposal, handling and storage of materials;
(b)    Availability and quality of labor, water, electric power and road conditions;
(c)    Climatic conditions and seasons;
(d)    Physical conditions at the Site and the Project as a whole;
(e)    Topography, subsurface and ground surface conditions; and
(f)    Construction equipment and facilities needed preliminary to and during the performance of Seller's Work.

The failure of Seller to acquaint itself with any applicable conditions will not relieve Seller of the responsibility for properly estimating the difficulties or for the cost of successfully performing Seller's obligations in the time and manner provided under the Agreement Documents.

9.6    COMPLIANCE WITH LAWS.    Seller shall fully comply with all Laws applicable to Seller and to the Work. See Attachment P for additional project specific requirements.

9.6.1    PREVAILING WAGES

a)      Seller shall pay or cause to be paid to all applicable workers employed by it or its Contractors to perform the Work not less than the prevailing rates of wages, as provided in Attachment P, in the statutes and regulations applicable to public work contracts, including Chapter 2258 of the Texas Government Code. TxDOT, Seller and its Contractors shall comply with all Laws pertaining to prevailing wages. For the purpose of applying such Laws, the Facility shall be treated as a public work paid for in whole or in part with public funds (regardless of whether public funds are actually used to pay for the Facility).

b)      It is Seller's sole responsibility to determine the wage rates required to be paid. In the event rates of wages and benefits change while this Agreement is in effect, Seller shall bear the cost of such changes and shall have no Claim against D&C Contractor on account of such changes. Without limiting the foregoing, no Claim will be allowed which is based upon Seller's lack of knowledge or a misunderstanding of any such requirements or Seller's failure to include in the Base Case Financial Model or Base Case Financial Model Updates adequate increases in such wages over the duration of this Agreement and the Lease.

c)      Any issue between Seller or a subcontractor and any affected worker relating to any alleged violation of Section 2258.023 of the Texas Government Code that is not resolved before the 15th day after the date TxDOT makes its initial determination under Section 2258.052 of the Texas Government Code (as to whether good cause exists to believe that a violation occurred) shall be submitted to binding arbitration in accordance with the Texas General Arbitration Act, Chapter 171 of the Civil Practice and Remedies Code.

d)      Seller shall comply and cause its subcontractors to comply with all Laws regarding notice and posting of intent to pay prevailing wages, and any other notice or posting of prevailing wage requirements and prevailing wage rates.

9.7     HAZARDOUS SUBSTANCES.  Seller shall immediately Notify D&C Contractor if Seller encounters pre-existing Hazardous Substances at the Site. The D&C Contractor has a separate contract with a Hazardous Materials Contractor to remediate Hazardous Substances.  The Seller shall not remediate pre-existing Hazardous Substances under this Agreement. However, Seller is responsible for any of its releases of Hazardous Substances.

In accordance with the FCA, applicable Laws (including specifically Environmental Laws) and all Environmental Approvals, the Contractor shall take all reasonable steps to protect the environment on and off the planned Facility Right of Way on which it performs any of the D&C Work and to avoid damage or nuisance to persons or to property of the public or others, resulting from pollution, noise or other causes arising as a consequence of its performance of the D&C Work, subject to the allocation of responsibility therefore as provided in the D&C Agreement.

9.8     CLEANING UP.  Seller shall at all times keep the Site and surrounding area clean and free from rubbish caused by Seller's operations. Prior to completing its Work in an area, Seller shall remove all accumulated rubbish caused by Seller's operations and Seller's equipment, tools, machinery and materials. Seller shall dispose of all rubbish caused by Seller's operations at a site and by the means designated at the sole discretion of Seller in a manner that is in compliance with all Laws.

9.9     LABOR, MATERIAL, AND HAULING

9.9.1   LABOR.  Seller will provide only skilled, competent workers and supervision for the performance of its Work and will be responsible for assuring harmonious labor relationships on the Project among its workers at the Site. All individuals performing the Work shall have the skill and experience and any licenses or certifications required to perform the Work assigned to them. Seller shall immediately remove from the Project, when requested to do so by D&C Contractor, any person to whom D&C Contractor reasonably objects, and such person may not thereafter reenter the Site without D&C Contractor's prior consent.

Any uniforms worn by personnel of Seller-Related Entities shall bear colors, lettering, badges or other identifiers to assure clear differentiation from uniforms worn by TxDOT employees.

9.9.2   MATERIAL. All steel and iron used and all products manufactured from steel and iron must be produced in the United States and all manufacturing processes, including application of a coating, for these materials must occur in the

similar conditions at the same time and locality of the Project. Seller agrees to investigate and remedy promptly, and without cost to D&C Contractor or Developer, any Defective Services of which it receives Notice within the longer of twelve (12) months from D&C Contractor's Final Acceptance of the Services or the period during which any Developer Party or any third party may make a claim against D&C Contractor related to the Services or any negligent act or omission of the Seller Party or a Seller subcontractor (each as defined below). In addition, Seller through the insurance provided for in Article 5 shall reimburse D&C Contractor for all reasonable costs incurred to accomplish needed repairs, additions, replacements or corrections to Seller's work which result from the Seller's Defective Services. For this Article 9.17, Defective Services are defined as any Work that fails to satisfy the following: (a) in compliance with Laws; (b) in accordance with all applicable standards and codes; (c) in accordance with the provisions of this Agreement and the Facility Concession Agreement, Technical Requirements, Technical Documents, and Reference Information Documents (all FCA-related documents are incorporated by reference); and (d) be performed in accordance with the standard of care, skill and diligence ordinarily used by members of the design profession performing services of a similar type and nature at the same time and in the locale of the Project.

9.18    ETHICAL STANDARDS. Within 30 days after the Effective Date, Seller shall adopt written policies specific to this project establishing ethical standards of conduct for Seller and all Seller-Related Entities, including Seller's supervisory and management personnel in dealing with (a) the D&C Contractor, (b) the Developer (c) TxDOT and the Independent Engineer and (d) employment relations. Such policy shall be subject to review and comment by the D&C Contractor prior to adoption and shall include the ethical standards listed in Attachment Q.

## ARTICLE 10.    PAYMENT

Invoices shall be due and payable compliant with Prompt Payment criteria (i.e. 10-days after receipt of payment from Developer), but not more than NET 60 days after receipt of an undisputed invoice.  Payment is subject to complying with items 10.1 – 10.11 below.

10.1    PAYMENT.  D&C Contractor and Seller have agreed to a payment amount for Seller's Work activities to serve as a basis for computing partial payments. .

10.2    PARTIAL PAYMENTS.   On the 25th calendar day of each month, Seller will furnish D&C Contractor an invoice meeting the requirements in Item 10.3.

10.3    INVOICE REQUIREMENTS:

(a)    A detailed invoice per Segment (5.1, 5.2, 6.1, 6.2), in a form and content acceptable to D&C Contractor, setting out the portion of the Agreement Price allocable to the Work actually performed to date by Seller to accomplish each of the activities shown in the Scope of Work and Schedule, along with supporting documentation as D&C Contractor may reasonably require to substantiate Seller's right to payment of the invoiced amounts, especially sales and use tax (see Article 2, re: Texas sales and use tax);

(b)    Seller's updated Schedule per Agreement Exhibit A1;

(c)    A progress report of Seller's Work including the Texas sales and use taxes paid by Seller and Seller's Subcontractors (see Article 2) and supporting documents;

(d)    Seller's Partial Waiver and Release of Liens, Affidavit of Bills Paid and Indemnification, completed and executed in accordance with the form attached hereto as Attachment F;

(e)    Certified payrolls, for the invoice period, if required by the Agreement Documents; and

(f)    One (1) copy of Seller's Invoice

Submit invoice and documents to the following address:

Central Texas Highway Constructors, LLC
Accounts Payable
1914 Borchert Drive
Lockhart, TX 78644

Or as directed by D&C Contractor

CTxHC shall mean Central Texas Highway Constructors LLC.

D&C Contractor shall mean Central Texas Highway Constructors LLC

Day or day shall mean calendar days unless otherwise expressly specified.

DOL shall mean U.S. Department of Labor.

Defective Services are defined as any Work that fails to satisfy the following: (a) in compliance with Laws; (b) in accordance with all applicable standards and codes; (c) in accordance with the provisions of this Agreement and the Facility Concession Agreement, Technical Requirements, Technical Documents, and Reference Information Documents (as they pertain to the Seller's Scope of Work all FCA-related documents are incorporated by reference); and (d) be performed in accordance with the standard of care, skill and diligence ordinarily used by members of the trade performing services of a similar type and nature at the same time and in the locale of the Project.

Defective Work shall mean Work, which fails to satisfy the requirements of Article 12, Warranty.

Developer shall mean the entity in which D&C Contractor has entered into a contract with to perform certain work and is identified in paragraph A of the Recitals in this Agreement.

Direct Materials shall mean materials, supplies and equipment to be incorporated as a permanent part of the Project, excluding any sales or use tax thereon.

Director may have more than one definition in this Agreement depending upon its use and context, e.g. Project Director shall mean the individual with direct responsibility for delivering the SH 130 Segments 5 and 6 to the Developer; Director may mean someone who serves on a corporate board of directors; In FHWA Form 1273, "Director" means Director, Office of Federal Contract Compliance Programs, United States Department of Labor, or any person to whom the Director delegates authority.

Drawings shall mean (a) drawings furnished by D&C Contractor as a basis for bids, (b) supplementary drawings furnished by D&C Contractor to clarify and to define in greater detail the intent of the Agreement, (c) drawings submitted by Seller with its bid, provided such drawings are acceptable to D&C Contractor, (d) drawings furnished by D&C Contractor to Seller during the progress of the Work, and (e) drawings and engineering data submitted by Seller during the progress of the Work, provided such drawings and data are acceptable to D&C Contractor.

Effective Date shall mean the date given in paragraph one of this Agreement.

Excusable Delay is one caused by an Excusable Delay Event. For the Seller to obtain a time extension, the delay must affect overall completion of the Seller's Scope of Work, i.e. the delay must cause a day-for-day extension to the critical path.

Excusable Delay Events with respect to Seller's timely performance of the Work shall be defined as a Relief Event or as a D&C Contractor-caused event to the extent that the event results in a delay that prevents Seller from completing its overall Scope of Work, provided that such events are not due to any act, omission, negligence, recklessness, willful misconduct, breach of contract or Law by Seller or by any parties for which Seller is responsible, and, further provided, that such events (or the effects of such events) could not have been avoided by the exercise of caution, due diligence, or reasonable efforts by Seller or by any parties for which Seller is responsible. D&C Contractor-caused Excusable Delay Events include, but are not limited to, D&C Contractor failures to (1) provide materials that the D&C Contractor is providing to Seller or (2) perform Work provided by D&C Contractor or by D&C Contractor's Subcontractors that directly impact the Seller's Work.

Facility Concession Agreement (FCA) is the agreement between the Developer and the Texas Department of Transportation. The FCA and related FCA documents are incorporated by reference into this Subcontract Agreement.

ATTACHMENT P

## FEDERAL REQUIREMENTS

| Exhibit Description | No. of Pages |
|---|---|
| Attachment 1 – Federal Provisions | 2 |
| Attachment 2 – FHWA Form 1273 | 28 |
| Attachment 3 – Wage Determination of the Secretary of Labor | 1 |
| Attachment 4 – Equal Employment Opportunity | 6 |
| Attachment 5 – Affirmative Action | 5 |
| Attachment 6 – Debarment and Suspension Certification | 1 |
| Attachment 7 – Lobbying Certification | 1 |
| Attachment 8 – Compliance with 23 U.S.C. §129(a)(3) | 1 |
| Attachment 9 - Compliance with Buy America Requirements | 2 |

ATTACHMENT 1 TO EXHIBIT 8

FEDERAL REQUIREMENTS FOR FEDERAL-AID CONSTRUCTION PROJECTS

GENERAL.—The work herein proposed will be financed in whole or in part with Federal funds, and therefore all of the statutes, rules and regulations promulgated by the Federal Government and applicable to work financed in whole or in part with Federal funds will apply to such work. The "Required Contract Provisions, Federal-Aid Construction Contracts, Form FHWA 1273," are included in this Exhibit 8. Whenever in said required contract provisions references are made to:

(a) "SHA contracting officer", "SHA resident engineer", or "authorized representative of the SHA", such references shall be construed to mean TxDOT or its Authorized Representative;

(b) "contractor", "prime contractor", "bidder" or "prospective primary participant", such references shall be construed to mean the Design-Build Contractor or its authorized representative;

(c) "contract" or "prime contract", such references shall be construed to mean the Design-Build Contract; and

(d) "subcontractor", "supplier", "vendor", "prospective lower tier participant" or "lower tier subcontractor", such references shall be construed to mean subcontractors, suppliers and vendors of the Design-Build Contractor, including lower tier subcontractors.

PERFORMANCE OF PREVIOUS CONTRACT.—In addition to the provisions in Section II, "Nondiscrimination," and Section VII, "Subletting or Assigning the Contract," of the Form 1273 required contract provisions, the Developer shall cause the contractor to comply with the following:

The bidder shall execute the CERTIFICATION WITH REGARD TO THE PERFORMANCE OF PREVIOUS CONTRACTS OR SUBCONTRACTS SUBJECT TO THE EQUAL OPPORTUNITY CLAUSE AND THE FILING OF REQUIRED REPORTS located in the proposal. No request for subletting or assigning any portion of the contract in excess of $10,000 will be considered under the provisions of Section VII of the required contract provisions unless such request is accompanied by the CERTIFICATION referred to above, executed by the proposed subcontractor.

NON-COLLUSION PROVISION.—The provisions in this section are applicable to all contracts except contracts for Federal Aid Secondary Projects. Title 23, United States Code, Section 112, requires as a condition precedent to approval by the Federal Highway Administrator of the contract for this work that each bidder file a sworn statement executed by, or on behalf of, the person, firm, association, or corporation to whom such contract is to be awarded, certifying that such person, firm, association, or corporation has not, either directly or indirectly, entered into any agreement, participated in any collusion, or otherwise taken any action in restraint of free competitive bidding in connection with the submitted bid. A form to make the non-collusion affidavit statement required by Section 112 as a certification under penalty of perjury rather than as a sworn statement as permitted by 28 U.S.C., Sec. 1746, is included in the Proposal.

PARTICIPATION BY DISADVANTAGED BUSINESS ENTERPRISES IN SUBCONTRACTING.—Part 26, Title 49, Code of Federal Regulations applies to this Facility. Pertinent sections of said Code are incorporated within other sections of the Contract and the TxDOT DBE Program.

CONVICT PRODUCED MATERIALS

a. FHWA Federal-aid Projects are subject to 23 CFR § 635.417, Convict produced materials.

satisfy any liabilities of such contractor or subcontractor for unpaid wages and liquidated damages as provided in the clause set forth in paragraph 8 above.

V.   STATEMENTS AND PAYROLLS

(Applicable to all Federal-aid construction contracts exceeding $2,000 and to all related subcontracts, except for Projects located on roadways classified as local roads or rural collectors, which are exempt.)

1.   Compliance with Copeland Regulations (29 CFR 3)

The contractor shall comply with the Copeland Regulations of the Secretary of Labor which are herein incorporated by reference.

2.   Payrolls and Payroll Records:

a.   Payrolls and basic records relating thereto shall be maintained by the contractor and each subcontractor during the course of the work and preserved for a period of 3 years from the date of completion of the contract for all laborers, mechanics, apprentices, trainees, watchmen, helpers, and guards working at the site of the work.

b.   The payroll records shall contain the name, social security number, and address of each such employee; his or her correct classification; hourly rates of wages paid (including rates of contributions or costs anticipated for bona fide fringe benefits or cash equivalent thereof the types described in Section 1(b)(2)(B) of the Davis Bacon Act); daily and weekly number of hours worked; deductions made; and actual wages paid. In addition, for Appalachian contracts, the payroll records shall contain a notation indicating whether the employee does, or does not, normally reside in the labor area as defined in Attachment A, paragraph 1. Whenever the Secretary of Labor, pursuant to Section IV, paragraph 3b, has found that the wages of any laborer or mechanic include the amount of any costs reasonably anticipated in providing benefits under a plan or program described in Section 1(b)(2)(B) of the Davis Bacon Act, the contractor and each subcontractor shall maintain records which show that the commitment to provide such benefits is enforceable, that the plan or program is financially responsible, that the plan or program has been communicated in writing to the laborers or mechanics affected, and show the cost anticipated or the actual cost incurred in providing benefits. Developers or subcontractors employing apprentices or trainees under approved programs shall maintain written evidence of the registration of apprentices and trainees, and ratios and wage rates prescribed in the applicable programs.

c.   Each contractor and subcontractor shall furnish, each week in which any contract work is performed, to the SHA resident engineer a payroll of wages paid each of its employees (including apprentices, trainees, and helpers, described in Section IV, paragraphs 4 and 5, and watchmen and guards engaged on work during the preceding weekly payroll period). The payroll submitted shall set out accurately and completely all of the information required to be maintained under paragraph 2b of this Section V. This information may be submitted in any form desired.

Optional Form WH-347 is available for this purpose and may be purchased from the Superintendent of Documents (Federal stock number 029-005-0014-1), U.S. Government Printing Office, Washington, D.C. 20402. The prime contractor is responsible for the submission of copies of payrolls by all subcontractors.

d.  Each payroll submitted shall be accompanied by a "Statement of Compliance," signed by the contractor or subcontractor or his/her agent who pays or supervises the payment of the persons employed under the contract and shall certify the following:

   i.  that the payroll for the payroll period contains the information required to be maintained under paragraph 2b of this Section V and that such information is correct and complete;

   ii.  that such laborer or mechanic (including each helper, apprentice, and trainee) employed on the contract during the payroll period has been paid the full weekly wages earned, without rebate, either directly or indirectly, and that no deductions have been made either directly or indirectly from the full wages earned, other than permissible deductions as set forth in the Regulations, 29 CFR 3;

   iii  that each laborer or mechanic has been paid not less that the applicable wage rate and fringe benefits or cash equivalent for the classification of worked performed, as specified in the applicable wage determination incorporated into the contract.

e.  The weekly submission of a properly executed certification set forth on the reverse side of Optional Form WH-347 shall satisfy the requirement for submission of the "Statement of Compliance" required by paragraph 2d of this Section V.

f.  The falsification of any of the above certifications may subject the contractor to civil or criminal prosecution under 18 U.S.C. 1001 and 31 U.S.C. 231.

g.  The contractor or subcontractor shall make the records required under paragraph 2b of this Section V available for inspection, copying, or transcription by authorized representatives of the SHA, the FHWA, or the DOL, and shall permit such representatives to interview employees during working hours on the job. If the contractor or subcontractor fails to submit the required records or to make them available, the SHA, the FHWA, the DOL, or all may, after written notice to the contractor, sponsor, applicant, or owner, take such actions as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds. Furthermore, failure to submit the required records upon request or to make such records available may be grounds for debarment action pursuant to 29 CFR 5.12.

## VI.  RECORD OF MATERIALS, SUPPLIES, AND LABOR

1.  On all Federal-aid contracts on the National Highway System, except those which provide solely for the installation of protective devices at railroad grade crossings, those which are constructed on a force account or direct labor basis, highway beautification contracts, and contracts for which the total final construction cost for roadway and bridge is less than $1,000,000 (23 CFR 635) the contractor shall:

a. Become familiar with the list of specific materials and supplies contained in Form FHWA-47, "Statement of Materials and Labor Used by Developer of Highway Construction Involving Federal Funds," prior to the commencement of work under this contract.

b. Maintain a record of the total cost of all materials and supplies purchased for and incorporated in the work, and also of the quantities of those specific materials and supplies listed on Form FHWA-47, and in the units shown on Form FHWA-47.

c. Furnish, upon the completion of the contract, to the SHA resident engineer on Form FHWA-47 together with the data required in paragraph 1b relative to materials and supplies, a final labor summary of all contract work indicating the total hours worked and the total amount earned.

2. At the prime contractor's option, either a single report covering all contract work or separate reports for the contractor and for each subcontract shall be submitted.

## VII. SUBLETTING OR ASSIGNING THE CONTRACT

1. The contractor shall perform with its own organization contract work amounting to not less than 30 percent (or a greater percentage if specified elsewhere in the contract) of the total original contract price, excluding any specialty items designated by the State. Specialty items may be performed by subcontract and the amount of any such specialty items performed may be deducted from the total original contract price before computing the amount of work required to be performed by the contractor's own organization (23 CFR 635).

a. "Its own organization" shall be construed to include only workers employed and paid directly by the prime contractor and equipment owned or rented by the prime contractor, with or without operators. Such term does not include employees or equipment of a subcontractor, assignee, or agent of the prime contractor.

b. "Specialty Items" shall be construed to be limited to work that requires highly specialized knowledge, abilities, or equipment not ordinarily available in the type of contracting organizations qualified and expected to bid on the contract as a whole and in general are to be limited to minor components of the overall contract.

c. The contract amount upon which the requirements set forth in paragraph 1 of Section VII is computed includes the cost of material and manufactured products which are to be purchased or produced by the contractor under the contract provisions.

d. The contractor shall furnish (a) a competent superintendent or supervisor who is employed by the firm, has full authority to direct performance of the work in accordance with the contract requirements, and is in charge of all construction operations (regardless of who performs the work) and (b) such other of its own organizational resources (supervision, management, and engineering services) as the SHA contracting officer determines is necessary to assure the performance of the contract.

e.    No portion of the contract shall be sublet, assigned or otherwise disposed of except with the written consent of the SHA contracting officer, or authorized representative, and such consent when given shall not be construed to relieve the contractor of any responsibility for the fulfillment of the contract. Written consent will be given only after the SHA has assured that each subcontract is evidenced in writing and that it contains all pertinent provisions and requirements of the prime contract.

## VIII.   SAFETY: ACCIDENT PREVENTION

1.    In the performance of this contract the contractor shall comply with all applicable Federal, State, and local laws governing safety, health, and sanitation (23 CFR 635). The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions as it determines, or as the SHA contracting officer may determine, to be reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract.

2.    It is a condition of this contract, and shall be made a condition of each subcontract, which the contractor enters into pursuant to this contract, that the contractor and any subcontractor shall not permit any employee, in performance of the contract, to work in surroundings or under conditions which are unsanitary, hazardous or dangerous to his/her health or safety, as determined under construction safety and health standards (29 CFR 1926) promulgated by the Secretary of Labor, in accordance with Section 107 of the Contract Work Hours and Safety Standards Act (40 U.S.C. 333).

3.    Pursuant to 29 CFR 1926.3, it is a condition of this contract that the Secretary of Labor or authorized representative thereof, shall have right of entry to any site of contract performance to inspect or investigate the matter of compliance with the construction safety and health standards and to carry out the duties of the Secretary under Section 107 of the Contract Work Hours and Safety Standards Act (40 U.S.C. 333).

## IX.   FALSE STATEMENTS CONCERNING HIGHWAY PROJECTS

In order to assure high quality and durable construction in conformity with approved plans and specifications and a high degree of reliability on statements and representations made by engineers, contractors, suppliers, and workers on Federal-aid highway Projects, it is essential that all persons concerned with the Facility perform their functions as carefully, thoroughly, and honestly as possible. Willful falsification, distortion, or misrepresentation with respect to any facts related to the Facility is a violation of Federal law. To prevent any misunderstanding regarding the seriousness of these and similar acts, the following notice shall be posted on each Federal-aid highway Facility (23 CFR 635) in one or more places where it is readily available to all persons concerned with the Facility:

### NOTICE TO ALL PERSONNEL ENGAGED ON
### FEDERAL-AID HIGHWAY PROJECTS

18 U.S.C. 1020 reads as follows:

Excerpt from Facility Concession Agreement

## ATTACHMENT 3 TO EXHIBIT 8

## FEDERAL PREVAILING WAGE RATE

GENERAL DECISION: TX20070043 02/09/2007 TX43

Date: February 9, 2007
General Decision Number: TX20070043 02/09/2007

Superseded General Decision Number: TX20030043

State: Texas

Construction Types: Heavy and Highway

Counties: Bell, Bexar, Brazos, Comal, Coryell, Guadalupe,
Hays, McLennan, Travis and Williamson Counties in Texas.

Heavy (excluding tunnels and dams) and Highway Construction
Projects (does not include building structures in rest area
projects). *NOT TO BE USED FOR WORK ON SEWAGE OR WATER
TREATMENT PLANTS OR LIFT/PUMP STATIONS IN BELL, CORYELL,
McLENNAN AND WILLIAMSON COUNTIES.

Modification Number    Publication Date
        0        .   02/09/2007

SUTX2005-001 01/03/2005

|  | Rates | Fringes |
|---|---|---|
| Air Tool Operator............ | $ 16.00 | 0.00 |
| Asphalt Distributor Operator... | $ 12.09 | 0.00 |
| Asphalt paving machine operator | $ 11.82 | 0.00 |
| Asphalt Raker.................. | $ 9.96 | 0.00 |
| Asphalt Shoveler.............. | $ 10.56 | 0.00 |
| Broom or Sweeper Operator...... | $ 9.74 | 0.00 |
| Bulldozer operator ........... | $ 11.04 | 0.00 |
| Carpenter..................... | $ 12.25 | 0.00 |
| Concrete Finisher, Paving...... | $ 10.53 | 0.00 |
| Concrete Finisher, Structures.. | $ 10.95 | 0.00 |
| Concrete Paving Curbing | | |
| Machine Operator.............. | $ 14.00 | 0.00 |
| Concrete Paving Finishing | | |
| Machine Operator.............. | $ 12.00 | 0.00 |
| Concrete Rubber............... | $ 10.88 | 0.00 |
| Crane, Clamshell, Backhoe, | | |
| Derrick, Dragline, Shovel | | |
| Operator...................... | $ 13.66 | 0.00 |
| Electrician................... | $ 24.11 | 0.00 |
| Flagger....................... | $ 9.49 | 0.00 |
| Form Builder/Setter, Structures | $ 10.88 | 0.00 |
| Form Setter, Paving & Curb..... | $ 9.89 | 0.00 |
| Foundation Drill Operator, | | |
| Truck Mounted................. | $ 15.00 | 0.00 |
| Front End Loader Operator...... | $ 11.36 | 0.00 |
| Laborer, common............... | $ 9.34 | 0.00 |
| Laborer, Utility.............. | $ 10.12 | 0.00 |

Excerpt from Facility Concession Agreement

| | | |
|---|---|---|
| Mechanic......................... | $ 14.74 | 0.00 |
| Mixer operator, Concrete Paving | $ 15.25 | 0.00 |
| Mixer operator................ | $ 10.83 | 0.00 |
| Motor Grader Operator, Fine Grade......................... | $ 15.26 | 0.00 |
| Motor Grader Operator, Rough... | $ 12.96 | 0.00 |
| Oiler.......................... | $ 14.71 | 0.00 |
| Painter, Structures............ | $ 11.00 | 0.00 |
| Pavement Marking Machine Operator....................... | $ 11.52 | 0.00 |
| Pipelayer...................... | $ 10.49 | 0.00 |
| Planer Operator................ | $ 17.45 | 0.00 |
| Reinforcing Steel Setter, Paving........................ | $ 15.50 | 0.00 |
| Reinforcing Steel Setter, Structure...................... | $ 14.00 | 0.00 |
| Roller Operator, Pneumatic, Self-Propelled................. | $ 9.34 | 0.00 |
| Roller Operator, Steel Wheel, Flat Wheel/Tamping............. | $ 9.60 | 0.00 |
| Roller Operator, Steel Wheel, Plant Mix Pavement............ | $ 10.24 | 0.00 |
| Scraper Operator.............. | $ 9.93 | 0.00 |
| Servicer...................... | $ 11.41 | 0.00 |
| Sign Installer (PGM)........... | $ 14.85 | 0.00 |
| Slip Form Machine Operator..... | $ 15.17 | 0.00 |
| Spreader Box operator.......... | $ 10.39 | 0.00 |
| Structural Steel Worker........ | $ 13.41 | 0.00 |
| Tractor operator, Crawler Type. | $ 11.10 | 0.00 |
| Traveling Mixer Operator....... | $ 10.04 | 0.00 |
| Trenching machine operator, Heavy........................ | $ 14.22 | 0.00 |
| Truck Driver Tandem Axle Semi-Trailer...................... | $ 10.95 | 0.00 |
| Truck driver, lowboy-Float..... | $ 15.30 | 0.00 |
| Truck driver, Single Axle, Heavy......................... | $ 11.88 | 0.00 |
| Truck driver, Single Axle, Light......................... | $ 9.98 | 0.00 |
| Wagon Drill, Boring Machine, Post Hole Driller Operator..... | $ 14.65 | 0.00 |
| Welder........................ | $ 14.26 | 0.00 |
| Work Zone Barricade Servicer... | $ 11.15 | 0.00 |

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29CFR 5.5 (a) (1) (ii)).

In the listing above, the "SU" designation means that rates listed under the identifier do not reflect collectively bargained wage and fringe benefit rates. Other designations indicate unions whose rates have been determined to be prevailing.

Excerpt from Facility Concession Agreement

GENERAL DECISION: TX20070129 02/09/2007 TX129

Date: February 9, 2007
General Decision Number: TX20070129 02/09/2007

Superseded General Decision Number: TX20030129

State: Texas

Construction Types: Heavy and Highway

Counties: Aransas, Atascosa, Austin, Bandera, Bastrop, Bee,
Blanco, Burnet, Caldwell, Calhoun, Colorado, De Witt, Fayette,
Frio, Gillespie, Goliad, Gonzales, Jackson, Jim Wells, Karnes,
Kendall, Kerr, Kleberg, Lavaca, Lee, Live Oak, Llano, Mason,
Matagorda, Medina, Refugio, Wharton and Wilson Counties in Texas.

HEAVY CONSTRUCTION PROJECTS (excluding dam
construction).HIGHWAY CONSTRUCTION PROJECTS (excluding tunnels,
building
structures in rest area projects & railroad construction;
bascule, suspension & spandrel arch bridges designed for
commercial navigation, bridges involving marine construction;
and other major bridges).

Modification Number        Publication Date
        0                    02/09/2007

    SUTX2005-023 09/09/2005

HEAVY CONSTRUCTION PROJECTS HIGHWAY CONSTRUCTION PROJECTS

|                                            | Rates     | Fringes |
|--------------------------------------------|-----------|---------|
| Carpenter.....................             | $ 11.70   |         |
| Mechanic......................             | $ 12.18   |         |
| Asphalt Distributor Operator...            | $ 12.57   |         |
| Asphalt paving machine operator            | $ 11.60   |         |
| Asphalt Raker..................            | $ 10.63   |         |
| Asphalt Shoveler...............            | $  9.23   |         |
| Broom or Sweeper Operator......            | $  9.32   |         |
| Bulldozer operator ...........             | $ 11.69   |         |
| Concrete Finisher, Paving......            | $ 11.64   |         |
| Concrete Finisher, Structures..            | $ 10.23   |         |
| Concrete Rubber................            | $  9.00   |         |
| Crane, Clamshell, Backhoe, Derrick, Dragline, Shovel Operator...................... | $ 12.00 | |
| Flagger........................            | $  8.60   |         |
| Form Builder/Setter, Structures            | $ 10.51   |         |
| Form Setter, Paving & Curb.....            | $  9.48   |         |
| Foundation Drill Operator, Truck Mounted.................. | $ 14.58 | |
| Front End Loader Operator......            | $ 10.62   |         |
| Laborer, common................            | $  8.91   |         |
| Laborer, Utility...............            | $  9.21   |         |
| Motor Grader Operator Fine Grade........................... | $ 15.15 | |
| Motor Grader Operator Rough....            | $ 12.95   |         |
| Pavement Marking Machine Operator....................... | $ 13.32 | |
| Pipelayer......................            | $  9.71   |         |
| Roller Operator, Pneumatic,                |           |         |

```
Self-Propelled..................$  8.90
Roller Operator, Steel Wheel,
Flat Wheel/Tamping.............$  9.30
Roller Operator, Steel Wheel,
Plant Mix Pavement.............$ 10.59
Scraper Operator...............$  9.85
Servicer.......................$ 11.18
Spreader Box Operator..........$ 13.00
Traveling Mixer Operator.......$ 12.67
Truck Driver Single Axle Heavy.$ 10.87
Truck Driver Single Axle, Light$ 10.85
Truck driver, lowboy-Float.....$ 13.70
Truck Driver, Tandem Axle,
Semi-Trailer...................$ 10.05
Work Zone Barricade Servicer...$  9.63
```

WELDERS - Receive rate prescribed for craft performing
operation to which welding is incidental.

Unlisted classifications needed for work not included within
the scope of the
classifications listed may be added after award only as
provided in the labor
standards contract clauses (29 CFR 5.5(a)(1)(ii)).

In the listing above, the "SU" designation means that rates
listed under the
identifier do not reflect collectively bargained wage and
fringe benefit
rates.  Other designations indicate unions whose rates have
been determined
to be prevailing.

## WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can
be:

*  an existing published wage determination
*  a survey underlying a wage determination
*  a Wage and Hour Division letter setting forth a position on
a wage
   determination matter
*  a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests
for summaries
of surveys, should be with the Wage and Hour Regional Office
for the area in
which the survey was conducted because those Regional Offices
have
responsibility for the Davis-Bacon survey program. If the
response from this
initial contact is not satisfactory, then the process described
in 2.) and
3.) should be followed.

          Excerpt from Facility Concession Agreement

With regard to any other matter not yet ripe for the formal process
described here, initial contact should be with the Branch of Construction
Wage Determinations. Write to:

>       Branch of Construction Wage Determinations
>       Wage and Hour Division
>       U.S. Department of Labor
>       200 Constitution Avenue, N.W.
>       Washington, DC 20210

2.) If the answer to the question in 1.) is yes, then an interested party
(those affected by the action) can request review and reconsideration from
the Wage and Hour Administrator (See 29 CFR Part 1.8 and 29 CFR Part 7).
Write to:

>       Wage and Hour Administrator
>       U.S. Department of Labor
>       200 Constitution Avenue, N.W.
>       Washington, DC 20210

The request should be accompanied by a full statement of the interested
party's position and by any information (wage payment data, project
description, area practice material, etc.) that the requestor considers
relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested
party may appeal directly to the Administrative Review Board (formerly the
Wage Appeals Board). Write to:

>       Administrative Review Board
>       U.S. Department of Labor
>       200 Constitution Avenue, N.W.
>       Washington, DC 20210

4.) All decisions by the Administrative Review Board are final.

>       END OF GENERAL DECISION

DEFENDANT'S EXHIBIT 119
FACILITY CONCESSION AGREEMENT

(Back to index)

**Appendix Item 17**

# FACILITY CONCESSION AGREEMENT

# SH 130 SEGMENTS 5 AND 6 FACILITY

## Between

## Texas Department of Transportation

## and

## SH 130 Concession Company, LLC

Dated March 22, 2007



EXHIBIT
DX 119

22.5.3.   If Developer elects to deposit the Financial Model Formulas and Base Case Financial Model into an Intellectual Property Escrow rather than deliver them directly to TxDOT, Developer shall:

22.5.3.1   Include with the deposit of the Financial Model Formulas and Base Case Financial Model a complete set of the assumptions, traffic models, traffic data and other data that form part of the Base Case Financial Model, including projections and calculations with respect to revenues, expenses, the repayment of Facility Debt and Distributions to equity investors;

22.5.3.2   Also deposit, as and when prepared, each Base Case Financial Model Update and a complete set of the updated and revised assumptions, traffic models, traffic data and other data that form part of the Base Case Financial Model Update, including updated and revised projections and calculations with respect to revenues, expenses, the repayment of Facility Debt and Distributions to equity investors; and

22.5.3.3   Deposit them in a form or forms that are acceptable to TxDOT, that fully reveal their content on an Open Book Basis, and that will conveniently enable TxDOT at any time upon request to gain access thereto and to electronically operate and manipulate the same in order to run projections and scenarios respecting the Facility and to print out and examine such projections and scenarios.

22.5.4   The Intellectual Property Escrows shall survive expiration or earlier termination of this Agreement regardless of the reason.

## ARTICLE 23.  FEDERAL REQUIREMENTS

### 23.1   Compliance with Federal Requirements

Regardless of whether federal credit or funds are made available to Developer for the Facility, Developer shall comply and require its Contractors to comply with all federal requirements applicable to transportation projects that receive federal credit or funds, including those set forth in Exhibit 8. If Developer uses TIFIA credit or loans to finance the Facility or any portion thereof, Developer shall provide any compliance certifications and milestone payment schedules required in connection with TIFIA.

### 23.2   Role of and Cooperation with FHWA

Developer acknowledges and agrees that FHWA will have certain approval rights with respect to the Facility, including the right to provide certain oversight and technical services with respect to the Work, if federal credit or funds are made available to Developer for the Facility. Developer shall cooperate with FHWA in the reasonable exercise of FHWA's duties and responsibilities in connection with the Facility.

## ARTICLE 24.  MISCELLANEOUS

### 24.1   Replacement of Independent Engineer

24.1.1   The Parties recognize that from time to time it will be necessary to replace the Independent Engineer in the event any party to the Independent Engineer Agreement elects not to extend or renew it at expiration of its term, or in the event it is terminated in accordance with

## ARTICLE 10. CONTRACTING AND LABOR PRACTICES

### 10.1 Disclosure of Contracts and Contractors

10.1.1 Developer shall provide TxDOT and the Independent Engineer with a list of all Contracts, the Contractors thereunder, guarantees of Key Contracts and the guarantors thereunder with each monthly report required under this Agreement or the Technical Requirements. Developer shall allow TxDOT and the Independent Engineer ready access to all Contracts and records regarding Contracts, including amendments and supplements to Key Contracts and guarantees thereof; provided, however, that Developer may provide access thereto by depositing unredacted copies in the Intellectual Property Escrow as provided in Section 22.5.

10.1.2 Within five days after Developer enters into a definitive agreement with any Contractor, Developer shall notify TxDOT in writing of the name, address, phone number and authorized representative of such Contractor.

### 10.2 Responsibility for Work, Contractors and Employees

10.2.1 Developer shall retain or cause to be retained only Contractors that are qualified, experienced and capable in the performance of the portion of the Work assigned. Developer shall assure that each Contractor has at the time of execution of the Contract, and maintains at all times during performance of the assigned Work, all licenses required by applicable Laws.

10.2.2 The retention of Contractors by Developer will not relieve Developer of its responsibilities hereunder or for the quality of the Work or materials or services provided by it. Developer will at all times be held fully responsible to TxDOT for the actions, omissions, negligence, willful misconduct, or breach of applicable Law or contract by Contractors.

10.2.3 Each Contract shall include terms and conditions sufficient to ensure compliance by the Contractor with the requirements of the FCA Documents, and shall include those terms that are specifically required by the FCA Documents to be included therein including, to the extent applicable, those set forth in Exhibit 8.

10.2.4 Nothing in this Agreement will create any contractual relationship between TxDOT and any Contractor. No Contract entered into by or under Developer shall impose any obligation or liability upon TxDOT to any Contractor or any of its employees.

10.2.5 Developer shall supervise and be fully responsible for the actions, omissions, negligence, willful misconduct, or breach of applicable Law or contract by any member or employee of Developer or any Developer-Related Entity, as though all such individuals were directly employed by Developer.

### 10.3 Key Contracts; Contractor Qualifications

#### 10.3.1 Use of and Change in Key Contractors

Developer shall retain, employ and utilize the firms and organizations specifically listed in the Facility Management Plan to fill the corresponding Key Contractor positions listed therein. Developer shall not terminate any Key Contract with a Key Contractor, or permit or suffer any

**Appendix Item 18A**

# BRANSCOMB|PC

Clinton W. Twaddell, III
Direct Dial: (512)735-7809
Email: ctwaddell@branscombpc.com

46147.0104

October 21, 2015

**VIA ELECTRONIC MAIL**
Chanler A. Langham
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096

Re: Cause No. 03-15-00423, *Star Operations, Inc. and Great American Insurance Company of New York vs. Dig Tech, Inc.*, pending before the Third Court of Appeals, Austin, Texas

Dear Chanler:

Please allow your signature in the space provided below to indicate your agreement that Dig Tech does not oppose Star and GAIC's request to supplement the reporter's record with the attached pages 68 and 69 of the Facility Concession Agreement which was admitted in evidence at trial as Defendants' Exhibit 119.

Respectfully,

Clinton W. Twaddell, III

Enclosure

AGREED:

Chanler Langham
Counsel for Dig Tech, Inc.

{C1199547.DOC:1}

802 N. Carancahua, Ste. 1900, Corpus Christi, TX 78401-0036 | P:361-886-3800 F:361-886-3805 | www.branscombpc.com

**Appendix Item 18B**

and Facility Management Plan and (c) to verify the Independent Engineer's proper performance of its responsibilities and obligations. TxDOT shall conduct such activity in accordance with Developer's safety procedures and manuals, and in a manner that does not unreasonably interfere with normal construction activity or normal operation and maintenance of the Facility.

**9.3.2.2** Refer to Section 22.2 for TxDOT's rights to audit Developer and its Contractors. Developer acknowledges and agrees that TxDOT will have the right to audit, monitor and inspect the Independent Engineer and its compliance with Good Industry Practice and its responsibilities and obligations under the Independent Engineer Agreement.

**9.3.2.3** TxDOT will not conduct formal prior reviews of Design Documents except to the extent necessary or advisable to comply with FHWA requirements or unless TxDOT chooses to do so during any period there exists an uncured Persistent Developer Default for which TxDOT has given notice to Developer.

### 9.3.3 Rights of Cooperation and Access; Increased Oversight

**9.3.3.1** Developer at all times shall coordinate and cooperate, and require its Contractors to coordinate and cooperate, with the Independent Engineer to facilitate the full, efficient, effective and timely performance by the Independent Engineer of his or her monitoring, inspection, sampling, measuring, testing, reporting, auditing, and other oversight functions.

**9.3.3.2** Developer at all times shall coordinate and cooperate, and require its Contractors to coordinate and cooperate, with TxDOT and its Authorized Representative to facilitate TxDOT's oversight activities. Developer shall cause its representatives to be available at all reasonable times for consultation with TxDOT and the Independent Engineer.

**9.3.3.3** Without limiting the foregoing, Developer shall afford TxDOT, its Authorized Representative and the Independent Engineer (a) safe and unrestricted access to the Facility at all times, (b) safe access during normal business hours to Developer's Facility offices and operations buildings and (c) unrestricted access to data respecting the Facility design, construction, operations and maintenance, and the Utility Adjustment Work. Without limiting the foregoing, Developer shall deliver to TxDOT and the Independent Engineer upon request accurate and complete books, records, data and information regarding Work, the Facility and the Utility Adjustment Work, in the format required by the Technical Requirements.

**9.3.3.4** TxDOT and the Independent Engineer shall have the right to increase the type and level of their oversight during any period there exists an uncured Persistent Developer Default for which TxDOT has given notice to Developer.

### 9.3.4 Testing and Test Results

Each of the Independent Engineer and TxDOT shall have the right to attend and witness any tests and verifications to be conducted pursuant to the Technical Requirements and applicable Management Plans, including accuracy, availability and performance tests of the Electronic Toll Collection System. Developer shall provide to the Independent Engineer and TxDOT all test results and reports (which may be provided in electronic format in accordance with the Technical Requirements) within ten days after Developer receives them.

TEXAS DEPARTMENT OF TRANSPORTATION     - 68 -     EXECUTION VERSION
SH 130 Segments 5 and 6     FACILITY CONCESSION AGREEMENT
324869_12.DOC

## ARTICLE 10. CONTRACTING AND LABOR PRACTICES

### 10.1 Disclosure of Contracts and Contractors

10.1.1 Developer shall provide TxDOT and the Independent Engineer with a list of all Contracts, the Contractors thereunder, guarantees of Key Contracts and the guarantors thereunder with each monthly report required under this Agreement or the Technical Requirements. Developer shall allow TxDOT and the Independent Engineer ready access to all Contracts and records regarding Contracts, including amendments and supplements to Key Contracts and guarantees thereof; provided, however, that Developer may provide access thereto by depositing unredacted copies in the Intellectual Property Escrow as provided in Section 22.5.

10.1.2 Within five days after Developer enters into a definitive agreement with any Contractor, Developer shall notify TxDOT in writing of the name, address, phone number and authorized representative of such Contractor.

### 10.2 Responsibility for Work, Contractors and Employees

10.2.1 Developer shall retain or cause to be retained only Contractors that are qualified, experienced and capable in the performance of the portion of the Work assigned. Developer shall assure that each Contractor has at the time of execution of the Contract, and maintains at all times during performance of the assigned Work, all licenses required by applicable Laws.

10.2.2 The retention of Contractors by Developer will not relieve Developer of its responsibilities hereunder or for the quality of the Work or materials or services provided by it. Developer will at all times be held fully responsible to TxDOT for the actions, omissions, negligence, willful misconduct, or breach of applicable Law or contract by Contractors.

10.2.3 Each Contract shall include terms and conditions sufficient to ensure compliance by the Contractor with the requirements of the FCA Documents, and shall include those terms that are specifically required by the FCA Documents to be included therein including, to the extent applicable, those set forth in Exhibit 8.

10.2.4 Nothing in this Agreement will create any contractual relationship between TxDOT and any Contractor. No Contract entered into by or under Developer shall impose any obligation or liability upon TxDOT to any Contractor or any of its employees.

10.2.5 Developer shall supervise and be fully responsible for the actions, omissions, negligence, willful misconduct, or breach of applicable Law or contract by any member or employee of Developer or any Developer-Related Entity, as though all such individuals were directly employed by Developer.

### 10.3 Key Contracts; Contractor Qualifications

#### 10.3.1 Use of and Change in Key Contractors

Developer shall retain, employ and utilize the firms and organizations specifically listed in the Facility Management Plan to fill the corresponding Key Contractor positions listed therein. Developer shall not terminate any Key Contract with a Key Contractor, or permit or suffer any

DEFENDANT'S EXHIBIT 9
PAYROLL

(Back to index)

**Appendix Item 19**

S/P C1168698.PDF

Δ π EXHIBIT __13__
Deponent __T.L.__
Date_____ Rpt.____

Date __10-24-11__

I, __Tracy Lambert__ __Office manager__
(Name of Signatory Party) (Title)

do hereby state:

(1) That I pay or supervise the payment of the persons employed by
__Dis Tech Inc.__ ; on the
(Contractor or Subcontractor)
__SH-130 Segment 5.2 and 6.1__ ; that during the payroll period commencing on the
(Building or Work)
__7th__ day of __October__, __204__, and ending the __23__ day of __October__, __2011__
all persons employed on said project have been paid the full weekly wages earned, that no rebates have been or will be made either directly or indirectly to or on behalf of said
__Dis Tech Inc.__ from the full
(Contractor or Subcontractor)

weekly wages earned by any person and that no deductions have been made either directly or indirectly from the full wages earned by any person, other than permissible deductions as defined in Regulations, Part 3 (29 C.F.R. Subtitle A), issued by the Secretary of Labor under the Copeland Act, as amended (48 Stat. 948, 63 Stat. 108, 72 Stat. 967; 76 Stat. 357; 40 U.S.C. § 3145), and described below:

(2) That any payrolls otherwise under this contract required to be submitted for the above period are correct and complete; that the wage rates for laborers or mechanics contained therein are not less than the applicable wage rates contained in any wage determination incorporated into the contract; that the classifications set forth therein for each laborer or mechanic conform with the work he performed.

(3) That any apprentices employed in the above period are duly registered in a bona fide apprenticeship program registered with a State apprenticeship agency recognized by the Bureau of Apprenticeship and Training, United States Department of Labor, or if no such recognized agency exists in a State, are registered with the Bureau of Apprenticeship and Training, United States Department of Labor.

(4) That:
(a) WHERE FRINGE BENEFITS ARE PAID TO APPROVED PLANS, FUNDS, OR PROGRAMS

☐ — In addition to the basic hourly wage rates paid to each laborer or mechanic listed in the above referenced payroll, payments of fringe benefits as listed in the contract have been or will be made to appropriate programs for the benefit of such employees, except as noted in section 4(c) below.

(b) WHERE FRINGE BENEFITS ARE PAID IN CASH

☐ — Each laborer or mechanic listed in the above referenced payroll has been paid, as indicated on the payroll, an amount not less than the sum of the applicable basic hourly wage rate plus the amount of the required fringe benefits as listed in the contract, except as noted in section 4(c) below.

(c) EXCEPTIONS

| EXCEPTION (CRAFT) | EXPLANATION |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

REMARKS:

Payroll # 1

| NAME AND TITLE | SIGNATURE |
|---|---|
| Tracy Lambert - Office manager | |

THE WILLFUL FALSIFICATION OF ANY OF THE ABOVE STATEMENTS MAY SUBJECT THE CONTRACTOR OR SUBCONTRACTOR TO CIVIL OR CRIMINAL PROSECUTION SEE SECTION 1001 OF TITLE 18 AND SECTION 231 OF TITLE 31 OF THE UNITED STATES CODE.

DgTec/Star 028



EXHIBIT
tabbies
9

S/P C1168698.PDF

Star 00223

Date __11-14-11__

I, __Tracy Lambert__ __office manager__
    (Name of Signatory Party)              (Title)

do hereby state:

(1) That I pay or supervise the payment of the persons employed by

__Dig Tech, Inc.__ _____ on the
    (Contractor or Subcontractor)

__SH 130 Segments 5,2 and 6.1__ ; that during the payroll period commencing on the
    (Building or Work)

__7th__ day of __November__ __2011__, and ending the __13th__ day of __November__ __2011__,
all persons employed on said project have been paid the full weekly wages earned, that no rebates have been or will be made either directly or indirectly to or on behalf of said

__Dig Tech, Inc.__ _____ from the full
    (Contractor or Subcontractor)

weekly wages earned by any person and that no deductions have been made either directly or indirectly from the full wages earned by any person, other than permissible deductions as defined in Regulations, Part 3 (29 C.F.R. Subtitle A), issued by the Secretary of Labor under the Copeland Act, as amended (48 Stat. 948; 63 Stat. 108; 72 Stat. 967; 76 Stat. 357; 40 U.S.C. § 3145), and described below:

(2) That any payrolls otherwise under this contract required to be submitted for the above period are correct and complete; that the wage rates for laborers or mechanics contained therein are not less than the applicable wage rates contained in any wage determination incorporated into the contract; that the classifications set forth therein for each laborer or mechanic conform with the work he performed.

(3) That any apprentices employed in the above period are duly registered in a bona fide apprenticeship program registered with a State apprenticeship agency recognized by the Bureau of Apprenticeship and Training, United States Department of Labor, or if no such recognized agency exists in a State, are registered with the Bureau of Apprenticeship and Training, United States Department of Labor.

(4) That:

(a) WHERE FRINGE BENEFITS ARE PAID TO APPROVED PLANS, FUNDS, OR PROGRAMS

☐ — In addition to the basic hourly wage rates paid to each laborer or mechanic listed in the above referenced payroll, payments of fringe benefits as listed in the contract have been or will be made to appropriate programs for the benefit of such employees, except as noted in section 4(c) below.

(b) WHERE FRINGE BENEFITS ARE PAID IN CASH

☐ — Each laborer or mechanic listed in the above referenced payroll has been paid, as indicated on the payroll, an amount not less than the sum of the applicable basic hourly wage rate plus the amount of the required fringe benefits as listed in the contract, except as noted in section 4(c) below.

(c) EXCEPTIONS

| EXCEPTION (CRAFT) | EXPLANATION |
| --- | --- |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

REMARKS:

Payroll #4

| NAME AND TITLE | SIGNATURE |
| --- | --- |
| Tracy Lambert - office manager | _Tracy Lambert_ |

THE WILLFUL FALSIFICATION OF ANY OF THE ABOVE STATEMENTS MAY SUBJECT THE CONTRACTOR OR SUBCONTRACTOR TO CIVIL OR CRIMINAL PROSECUTION. SEE SECTION 1001 OF TITLE 18 AND SECTION 231 OF TITLE 31 OF THE UNITED STATES CODE.

Star 00224

U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division

**PAYROLL**

(For Contractor's Optional Use; See Instructions at www.dol.gov/esa/whd/forms/wh347instr.htm)

Persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

Rev. Dec. 2008

OMB No.: 1215-0149
Expires: 12/31/2011

| NAME OF CONTRACTOR ☐ OR SUBCONTRACTOR: DIG TECH INC. | | ADDRESS: 402 TECHNOLOGY DRIVE BASTROP, TEXAS 78602 | |
|---|---|---|---|
| PAYROLL NO.: 4 | FOR WEEK ENDING: 11/13/2011 | PROJECT AND LOCATION: SH130, 5.2 TRAVIS, 8.1 CALDWELL | PROJECT OR CONTRACT NO. |

| (1) NAME, ADDRESS & INDIVIDUAL IDENTIFYING NUMBER (e.g., LAST FOUR DIGITS OF SOCIAL SECURITY NUMBER) OF WORKER | (2) NO. OF WITHHOLDING EXEMPTIONS | (3) WORK CLASSIFICATION (as set by Prevailing Wage List) | O or D/T or S | M 7 | T 8 | W 9 | Th 10 | F 11 | Sa 12 | Sn 13 | (5) TOTAL HOURS | (6) RATE OF PAY | GROSS AMOUNT EARNED | (7) DENTAL HEALTH INSUR. | WITH-HOLDING TAX | Medicare | (8) DEDUCTIONS MEDICAL SUPPORT etc. DEDUCTION 's | SOCIAL SECURITY | TOTAL DEDUCTIONS | (9) NET WAGES PAID FOR WEEK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WILLIAM B. LESLIE XXX-XX-████ | 0 | SUPERVISOR "SALARY" EMPLOYEE | O | | | | | | | | 0 | 0.00 | 0.00 | | | | | | -0.00 | 0.00 |
| | | | S | | | | | | | | 0 | 0.00 | 0.00 | | | | | | | |
| FRANCISCO C. ARIAS XXX-XX-████ | 0 | BACKHOE, DERRICK, SHOVEL OPERATOR | O | | | | | | | | 0 | 21.75 | 0.00 | | | | | | .0.00 | 0.00 |
| | | | S | | | | | | | | 0 | 14.50 | 0.00 | | | | | | | |
| HENRY C. MARTINEZ XXX-XX-████ | 1 | BACKHOE, DERRICK, SHOVEL OPERATOR | O | | | | | 4.5 | 9 | | 13.5 | 25.25 | 313.88 | 12.92 | 86.09 | 13.35 | | 17.31 | 35.58 | 170.26 | 762.62 |
| | | | S | 11 | 11 | 11 | | 7 | | | 40 | 15.50 | 620.00 | | | | | | | |
| DANIEL M. CHAPARRO XXX-XX-████ | 3 | BACKHOE, DERRICK, SHOVEL OPERATOR | O | | | | | | | | 0 | 26.25 | 0.00 | | | | | | 0.00 | 0.00 |
| | | | S | | | | | | | | 0 | 17.50 | 0.00 | | | | | | | |
| MARIO S. OTERO XXX-XX-████ | 6 | TRUCK DRIVER TANDEM AXLE SEMI-TRAILER | O | | | | | 5 | 9 | | 14 | 21.75 | 304.50 | | 31.00 | 12.33 | | 37.15 | 80.98 | 603.52 |
| | | | S | 12 | 11 | 11 | | 6.5 | | | 40 | 14.50 | 580.00 | | | | | | | |
| JOSUE M. CHAPARRO XXX-XX-████ | 3 | LABORER, COMMON | O | | | | | 4.5 | 9 | | 13.5 | 20.25 | 273.█ | | 76.00 | 11.79 | | 34.16 | 121.95 | 691.43 |
| | | | S | 11 | 11 | 11 | | 7 | | | 40 | 13.50 | 540.00 | | | | | | | |
| JOSE P. MENDEZ XXX-XX-████ | 8 | TRUCK DRIVER TANDEM AXLE SEMITRAILER | O | | | | | 5 | 9 | | 14 | 20.25 | 283.50 | | 24.00 | 11.94 | | 34.59 | 70.53 | 752.97 |
| | | | S | 12 | 11 | 11 | | 6.5 | | | 40 | 13.50 | 540.00 | | | | | | | |
| SINTICO B. CHAPARRO XXX-XX-████ | 0 | BACKHOE, DERRICK, SHOVEL OPERATOR | O | | | | | | | | 0 | 21.75 | 0.00 | | | | | | 0.00 | 0.00 |
| | | | S | | | | | | | | 0 | 14.50 | 0.00 | | | | | | | |
| INDALECIO S. OSORIO XXX-XX-████ | 2 | LABORER, COMMON | O | | | | | | | | 0 | 16.00 | 0.00 | | | | | | 0.00 | 0.00 |
| | | | S | | | | | | | | 0 | 10.00 | 0.00 | | | | | | | |

While compilation of Form WH-347 is optional, it is mandatory for covered contractors and subcontractors performing work on Federally financed or assisted construction contracts to respond to the information collection contained in 29 C.F.R. §§ 3.3, 5.5(a). The Copeland Act (40 U.S.C. § 3145) contractors and subcontractors performing work on Federally financed or assisted construction contracts to "furnish weekly a statement with respect to the wages paid each employee during the preceding week." U.S. Department of Labor (DOL) regulations at 29 C.F.R. § 5.5(a)(3)(ii) require contractors to submit weekly a copy of all payrolls to the Federal agency contracting for or financing the construction project, accompanied by a signed "Statement of Compliance" indicating that the payrolls are correct and complete and that each laborer or mechanic has been paid not less than the proper Davis-Bacon prevailing wage rate for the work performed. DOL and federal contracting agencies receiving this information review the information to determine that employees have received legally required wages and fringe benefits.

**Public Burden Statement**

We estimate that it will take an average of 55 minutes to complete this collection, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding these estimates or any other aspect of this collection, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, ESA, U.S. Department of Labor, Room S3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210

Date 02-27-12

I, Tracy Lambert       Office manager
(Name of Signatory Party)       (Title)

do hereby state:

(1) That I pay or supervise the payment of the persons employed by

Dig Tech Inc.       on the
(Contractor or Subcontractor)

SH-130 Segment 5.2 and 6.1 ; that during the payroll period commencing on the
(Building or Work)

5th day of February, 2012, and ending the 26th day of February 2012.
all persons employed on said project have been paid the full weekly wages earned, that no rebates have been or will be made either directly or indirectly to or on behalf of said

Dig Tech Inc       from the full
(Contractor or Subcontractor)

weekly wages earned by any person and that no deductions have been made either directly or indirectly from the full wages earned by any person, other than permissible deductions as defined in Regulations, Part 3 (29 C.F.R. Subtitle A), issued by the Secretary of Labor under the Copeland Act, as amended (48 Stat. 948, 63 Stat. 108, 72 Stat. 967; 76 Stat. 357; 40 U.S.C. § 3145), and described below:

(2) That any payrolls otherwise under this contract required to be submitted for the above period are correct and complete; that the wage rates for laborers or mechanics contained therein are not less than the applicable wage rates contained in any wage determination incorporated into the contract; that the classifications set forth therein for each laborer or mechanic conform with the work he performed.

(3) That any apprentices employed in the above period are duly registered in a bona fide apprenticeship program registered with a State apprenticeship agency recognized by the Bureau of Apprenticeship and Training, United States Department of Labor, or if no such recognized agency exists in a State, are registered with the Bureau of Apprenticeship and Training, United States Department of Labor.

(4) That

     (a) WHERE FRINGE BENEFITS ARE PAID TO APPROVED PLANS, FUNDS, OR PROGRAMS

        ☐ – in addition to the basic hourly wage rates paid to each laborer or mechanic listed in the above referenced payroll, payments of fringe benefits as listed in the contract have been or will be made to appropriate programs for the benefit of such employees, except as noted in section 4(c) below.

(b) WHERE FRINGE BENEFITS ARE PAID IN CASH

     ☐ – Each laborer or mechanic listed in the above referenced payroll has been paid, as indicated on the payroll, an amount not less than the sum of the applicable basic hourly wage rate plus the amount of the required fringe benefits as listed in the contract, except as noted in section 4(c) below.

(c) EXCEPTIONS

| EXCEPTION (CRAFT) | EXPLANATION |
| --- | --- |
| | |
| | |
| | |
| | |
| | |
| | |

REMARKS:

Payroll # 19

| NAME AND TITLE | SIGNATURE |
| --- | --- |
| Tracy Lambert - office manager | Tracy Lambert |

THE WILLFUL FALSIFICATION OF ANY OF THE ABOVE STATEMENTS MAY SUBJECT THE CONTRACTOR OR SUBCONTRACTOR TO CIVIL OR CRIMINAL PROSECUTION. SEE SECTION 1001 OF TITLE 18 AND SECTION 231 OF TITLE 31 OF THE UNITED STATES CODE.

DgTec/Star 061

U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division

**PAYROLL**

(For Contractor's Optional Use; See Instructions at www.dol.gov/esa/whd/forms/wh347instr.htm)

Persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

Rev. Dec. 2008

| NAME OF CONTRACTOR OR SUBCONTRACTOR | ADDRESS | | OMB No.: 1215-0149 |
|---|---|---|---|
| DIG TECH INC. | 402 TECHNOLOGY DRIVE BASTROP, TEXAS 78602 | | Expires: 12/31/2011 |

| PAYROLL NO. 19 | FOR WEEK ENDING 2/26/2012 [X] | PROJECT AND LOCATION SH130; SEC. 5.2 JOB #1528 | PROJECT OF CONTRACT NO. |
|---|---|---|---|

| (1) NAME, ADDRESS & INDIVIDUAL IDENTIFYING NUMBER (e.g., LAST FOUR DIGITS OF SOCIAL SECURITY NUMBER) OF WORKER | (2) NO. OF WITHHOLDING EXEMPTIONS | (3) WORK CLASSIFICATION (as set by Prevailing Wage List) | OT. OR ST. | M 20 | T 21 | W 22 | Th 23 | F 24 | Sa 25 | Sn 26 | (5) TOTAL HOURS | (6) RATE OF PAY | (7) GROSS AMOUNT EARNED | (8) DENTAL/ HEALTH INSUR. | (8) WITH-HOLDING TAX | (8) Medicare | (8) IRS/CHILD SUPPORT/MISC. DEDUCTIONS | (8) SOCIAL SECURITY | (8) TOTAL DEDUCTIONS | (9) NET WAGES PAID FOR WEEK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WILLIAM S. LESLIE XXX-XX | 0 | SUPERVISOR "SALARY" EMPLOYEE | O | | | | | | | | 0 | 0.00 | 0.00 | | | | | | 0.00 | 0.00 |
| | | | S | | | | | | | | 0 | 0.00 | 0.00 | | | | | | | |
| FRANCISCO C. ARIAS XXX-XX | 0 | BACKHOE,DERRICK, SHOVEL OPERATOR | O | | | | | | | | 0 | 21.75 | 0.00 | 12.03 | 34.00 | 4.56 | | 13.50 | 64.19 | 269.31 |
| | | | S | | | 10 | 13 | | | | 23 | 14.50 | 333.50 | | | | | | | |
| HENRY C. MARTINEZ XXX-XX | 1 | BACKHOE,DERRICK, SHOVEL OPERATOR | O | | | | | | | | 0 | 23.25 | 0.00 | 12.03 | 12.00 | 4.99 | 17.31 | 14.47 | 60.80 | 295.70 |
| | | | S | | | 10 | 13 | | | | 23 | 15.50 | 356.50 | | | | | | | |
| DANIEL M. CHAPARRO XXX-XX | 3 | BACKHOE,DERRICK, SHOVEL OPERATOR | O | | | | | | | | 0 | 26.25 | 0.00 | | | | | | 0.00 | 0.00 |
| | | | S | | | | | | | | 0 | 17.50 | 0.00 | | | | | | | |
| MARIO S. OTERO XXX-XX | 6 | TRUCK DRIVER TANDEM AXLE SEMI-TRAILER | O | | | | | | | | 0 | 21.75 | 0.00 | 12.03 | | 4.56 | | 13.50 | 30.19 | 303.31 |
| | | | S | | | 10 | 13 | | | | 23 | 14.50 | 333.50 | | | | | | | |
| JOSUE M. CHAPARRO XXX-XX | 3 | LABORER, COMMON | O | | | | | | | | 0 | 20.25 | 0.00 | 12.03 | 4.00 | 4.33 | | 12.53 | 32.89 | 277.61 |
| | | | S | | | 10 | 13 | | | | 23 | 13.50 | 310.50 | | | | | | | |
| JOSE P. MENDEZ XXX-XX | 6 | TRUCK DRIVER TANDEM AXLE SEMI-TRAILER | O | | | | | | | | 0 | 20.25 | 0.00 | | | | | | 0.00 | 0.00 |
| | | | S | | | | | | | | 0 | 13.50 | 0.00 | | | | | | | |
| S...CO B. CHAPARRO XXX-XX | 0 | BACKHOE,DERRICK, SHOVEL OPERATOR | O | | | | | | | | 0 | 21.75 | 0.00 | | | | | | 0.00 | 0.00 |
| | | | S | | | | | | | | 0 | 14.50 | 0.00 | | | | | | | |
| INDALECIO S. OSORIO XXX-XX | 2 | LABORER, COMMON | O | | | | | | | | 0 | 15.00 | 0.00 | | | | | | 0.00 | 0.00 |
| | | | S | | | | | | | | 0 | 10.00 | 0.00 | | | | | | | |

While completion of Form WH-347 is optional, it is mandatory for covered contractors and subcontractors performing work on Federally financed or assisted construction contracts to respond to the information collection contained in 29 C.F.R. §§ 3.3, 5.5(a). The Copeland Act (40 U.S.C. § 3145) contractors and subcontractors performing work on Federally financed or assisted construction contracts to "furnish weekly a statement with respect to the wages paid each employee during the preceding week." U.S. Department of Labor (DOL) regulations at 29 C.F.R. § 5.5(a)(3)(ii) require contractors to submit weekly a copy of all payrolls to the Federal agency contracting for or financing the construction project, accompanied by a signed "Statement of Compliance" indicating that the payrolls are correct and complete and that each laborer 29 C.F.R. § 5.5(a)(3)(ii) require contractors to submit weekly a copy of all payrolls to the Federal agency contracting for or financing the construction project, accompanied by a signed "Statement of Compliance" indicating that the payrolls are correct and complete and that each laborer or mechanic has been paid not less than the proper Davis-Bacon prevailing wage rate for the work performed. DOL and federal contracting agencies receiving this information review the information to determine that employees have received legally required wages and fringe benefits.

Public Burden Statement

We estimate that it will take an average of 55 minutes to complete this collection, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding these estimates or any other aspect of this collection, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, ESA, U.S. Department of Labor, Room S3502, 200 Constitution Avenue, N.W. Washington, D.C. 20210

DgTec/Star 062

Subj:    RE: Dig-Tech Payments
Date:    3/16/2012 2:23:17 P.M. Central Daylight Time
From:    kiehnaum@ctxhc.com
To:     Staroper@aol.com
CC:     mike@digtech-finetech.com, woodp@ctxhc.com, gary.dotv@zachrycorp.com

16 March 2012

Lana,

Thank you for your prompt response.

Sincerely,

Mike Kiehnau


Central Texas Highway Constructors LLC
1914 Borchert Drive
Lockhart, Texas 78644

512.462.7510

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Moreover, any such inadvertent disclosure shall not compromise or waive the attorney-client privilege as to this communication or otherwise. If you have received this communication in error, please contact me at my internet address and destroy all copies of the original message.

From: Staroper@aol.com [mailto:Staroper@aol.com]
Sent: Friday, March 16, 2012 2:20 PM
To: kiehnaum@ctxhc.com
Subject: Re: Dig-Tech Payments

Mike,

The invoices are set up for payment on Tuesday, next week.

Sincerely,
Lana Lewis
Star Operations, Inc.

In a message dated 3/16/2012 1:52:48 P.M. Central Daylight Time, kiehnaum@ctxhc.com writes:

16 March 2012

Lana,

CTxHC received today the attached letter from Dig-Tech. Please review it and let us know as soon as possible Star Operations' payment status to Dig-Tech.

Kind regards,

Mike Kiehnau

PLAINTIFF
EXHIBIT
63
CA 12-O-337

Tuesday, December 11, 2012 AOL: Staroper

Star 00254

# Appendix Item 20

**Mike Furry**

| | |
|---|---|
| From: | Mike Kiehnau [kiehnaum@ctxhc.com] |
| Sent: | Friday, March 16, 2012 2:23 PM |
| To: | Staroper@aol.com |
| Cc: | mike@digtech-linetech.com; Phil Wood; Gary Doty |
| Subject: | RE: Dig-Tech Payments |

16 March 2012

Lana,

Thank you for your prompt response.

Sincerely,

Mike Kiehnau

Central Texas Highway Constructors LLC
1914 Borchert Drive
Lockhart, Texas 78644

512.462.7510

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Moreover, any such inadvertent disclosure shall not compromise or waive the attorney-client privilege as to this communication or otherwise. If you have received this communication in error, please contact me at my internet address and destroy all copies of the original message.

---

**From:** Staroper@aol.com [mailto:Staroper@aol.com]
**Sent:** Friday, March 16, 2012 2:20 PM
**To:** kiehnaum@ctxhc.com
**Subject:** Re: Dig-Tech Payments

Mike,

The invoices are set up for payment on Tuesday, next week.

Sincerely,
Lana Lewis
Star Operations, Inc.


In a message dated 3/16/2012 1:52:48 P.M. Central Daylight Time, kiehnaum@ctxhc.com writes:

16 March 2012

Lana,

CTxHC received today the attached letter from Dig-Tech. Please review it and let us know as soon as possible Star Operations' payment status to Dig-Tech.

Kind regards,

DgTec/Star 024

Mike Kiehnau

Central Texas Highway Constructors LLC
1914 Borchert Drive
Lockhart, Texas 78644

512.462.7510

CONFIDENTIALITY NOTICE: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Moreover, any such inadvertent disclosure shall not compromise or waive the attorney-client privilege as to this communication or otherwise. If you have received this communication in error, please contact me at my internet address and destroy all copies of the original message.

DgTec/Star 025



LAW OFFICES OF

# R&M RODGERS & MILLER, P.C.

P. O. BOX 4884, BRYAN, TEXAS 77805-4884

W. STEPHEN RODGERS
    Board Certified Civil Trial Law
    Texas Board of Legal Specialization
JON E. MILLER
    Board Certified Civil Trial Law
    Texas Board of Legal Specialization
MARIE PORTALES RODRIGUEZ

Email: rodgers@rodgersmiller.com
Website: www.rodgersmiller.com

Of Counsel
JAMES B. BOND

May 1, 2012

Great American Insurance Company
   of New York
P.O. Box 2575
Cincinnati OH 45201

CRRR # 7010 3090 0001 3525 5382

**Attention: Jacqueline Kirk**

Re:    *Nonpayment of Invoices from Dig Tech, Inc. on SH130 Segments 5 and 6 Project*

Dear Ms. Kirk:

Your name appears as attorney-in-fact on Agreement #CSIB140 "SH130 Segments 5 and 6 – Intelligent Transportation and Toll Collection Systems Bond No. CA3059458." Please be advised that this law firm represents Dig Tech, Inc. in their claim for unpaid amounts due to their labor and materials provided to your principal, Star Operations, Inc. on the above referenced project.

The further purpose of this letter is to advise you that no payments have been made at all to our client and suit will be filed on the above bond on the 91st day after April 4, 2012, the last day on which Dig Tech's work or labor was done or performed, if all invoices have not been paid in full by that time. All invoices and claims for payment have been previously forwarded to Star Operations, Inc. at P.O. Box 4100, Corpus Christi Texas 78469. For your reference the invoices and descriptions of work are reproduced and enclosed with this letter.

Should you have any questions about this matter, please do not hesitate to contact me directly.

Sincerely,

W. Stephen Rodgers

WSR/jp

PLAINTIFF
EXHIBIT
183
CA 12-O-337

4444 CARTER CREEK PARKWAY, SUITE 208, BRYAN, TEXAS 77802

TELEPHONE: (979) 260-9911
FACSIMILE: (979) 846-7083

# Appendix Item 21

CC:

Star Operations, Inc.                                CRRR #7010 3090 0001 3525 5399
P.O. Box 4100
Corpus Christi TX 78469

Central Texas Highway Constructors, LLC              CRRR #7010 3090 0001 3525 5405
Attention: Mike Kiehnau
1914 Borchert Drive
Lockhart, TX 78644

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _Chris Brink_  ☐ Agent  ☐ Addressee<br>B. Received by (Printed Name) _Chris Brierly_  C. Date of Delivery |
| 1. Article Addressed to:<br><br>Great American Insurance Company of New York<br>P.O. Box 2575<br>Cincinnati OH 46201<br><br>Attention: Jacqueline Kirk | D. Is delivery address different from item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No<br>MAY __ __<br><br>3. Service Type<br>☑ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number<br>(Transfer from service label)  7010 3090 0001 3525 5382 | |
| PS Form 3811, February 2004  Domestic Return Receipt  102595-02-M-1540 | |

# GREAT AMERICAN INSURANCE COMPANY OF NEW YORK
New York
Administrative Office: 580 WALNUT STREET • CINCINNATI, OHIO 45202 • 513-369-5000 • FAX 513-723-2740

The number of persons authorized by
this power of attorney is not more than THREE

No. O14678

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS: That the GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, a corporation organized and existing under and by virtue of the laws of the State of New York, does hereby nominate, constitute and appoint the person or persons named below its true and lawful attorney-in-fact, for it and in its name, place and stead to execute on behalf of the said Company, as surety, any and all bonds, undertakings and contracts of suretyship, or other written obligations in the nature thereof; provided that the liability of the said Company on any such bond, undertaking or contract of suretyship executed under this authority shall not exceed the limit stated below.

| Name | Address | Limit of Power |
|---|---|---|
| LARRY H. SENKEL | ALL OF | ALL |
| PAMELA PROKOP | HOUSTON, TEXAS | $75,000,000 |
| JACQUELINE KIRK | | |

This Power of Attorney revokes all previous powers issued on behalf of the attorney(s)-in-fact named above.

IN WITNESS WHEREOF, the GREAT AMERICAN INSURANCE COMPANY OF NEW YORK has caused these presents to be signed and attested by its appropriate officers and its corporate seal hereunto affixed this 17TH day of JANUARY , 2011 .

Attest

GREAT AMERICAN INSURANCE COMPANY OF NEW YORK

*Assistant Secretary*

*Divisional Senior Vice President*

DAVID C. KITCHIN (510-412-4002)

STATE OF OHIO, COUNTY OF HAMILTON-ss:
On this 17TH day of JANUARY , 2011 , before me personally appeared DAVID C. KITCHIN, to me known, being duly sworn, deposes and says that he resides in Cincinnati, Ohio, that he is a Divisional Senior Vice President of the Bond Division of Great American Insurance Company of New York, the Company described in and which executed the above instrument; that he knows the seal; that it was so affixed by authority of his office under the By-Laws of said Company, and that he signed his name thereto by like authority.



KAREN L. GROSHEIM
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES 02-20-11

This Power of Attorney is granted by authority of the following resolutions adopted by the Board of Directors of Great American Insurance Company of New York by unanimous written consent dated May 14, 2009.

RESOLVED: That the Divisional President, the several Divisional Senior Vice Presidents, Divisional Vice Presidents and Divisional Assistant Vice Presidents, or any one of them, be and hereby is authorized, from time to time, to appoint one or more Attorneys-in-Fact to execute on behalf of the Company, as surety, any and all bonds, undertakings and contracts of suretyship, or other written obligations in the nature thereof; to prescribe their respective duties and the respective limits of their authority; and to revoke any such appointment at any time.

RESOLVED FURTHER: That the Company seal and the signature of any of the aforesaid officers and any Secretary or Assistant Secretary of the Company may be affixed by facsimile to any power of attorney or certificate of either given for the execution of any bond, undertaking, contract of suretyship, or other written obligation in the nature thereof, such signature and seal when so used being hereby adopted by the Company as the original signature of such officer and the original seal of the Company, to be valid and binding upon the Company with the same force and effect as though manually affixed.

## CERTIFICATION

I, STEPHEN C. BERAHA, Assistant Secretary of Great American Insurance Company of New York, do hereby certify that the foregoing Power of Attorney and the Resolutions of the Board of Directors of May 14, 2009 have not been revoked and are now in full force and effect.

Signed and sealed this 15th day of June , 2011

*Assistant Secretary*

S1105F (7/2010)

BOND



**Great American Insurance Company of New York
Great American Alliance Insurance Company
Great American Insurance Company**

**IMPORTANT NOTICE:**

To obtain information or make a complaint:

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

1-800-252-3439

You may write the Texas Department of Insurance at:

> P.O. Box 149104
> Austin, TX 78714-9104
> FAX # 1-512-475-1771

Your notice of claim against the attached bond may be given to the surety company that issued the bond by sending it to the following address:

Mailing Address:
> Great American Insurance Company Claim
> P.O. Box 2575
> Cincinnati, Ohio 45201

Physical Address:
> Great American Insurance Company Claim
> 580 Walnut Street
> 7th Floor
> Cincinnati, Ohio 45201

You may also contact the Great American Insurance Company Claim office by telephone at:

Telephone Number:      1-513-369-5069

**PREMIUM OR CLAIM DISPUTES:**

If you have a dispute concerning a premium, you should contact the agent first. If you have a dispute concerning a claim, you should contact the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR BOND:**

This notice is for information only and does not become a part or condition of the attached document.

# IMPORTANT NOTICE

TO OBTAIN INFORMATION OR MAKE A COMPLAINT:
YOU MAY CONTACT THE TEXAS DEPARTMENT OF INSURANCE
TO OBTAIN INFORMATION ON COMPANIES, COVERAGES,
RIGHTS OR COMPLAINTS AT:

## 1-800-252-3439

YOU MAY WRITE THE TEXAS DEPARTMENT OF INSURANCE:

## P. O. BOX 149104
## AUSTIN, TEXAS 78714-9104
## FAX #(512) 475-1771

## PREMIUM OR CLAIM DISPUTES:

SHOULD YOU HAVE A DISPUTE CONCERNING YOUR PREMIUM
OR ABOUT A CLAIM, YOU SHOULD CONTACT THE AGENT OR
COMPANY FIRST. IF THE DISPUTE IS NOT RESOLVED, YOU MAY
CONTACT THE TEXAS DEPARTMENT OF INSURANCE.

## ATTACH THIS NOTICE TO YOUR POLICY

THIS NOTICE IS FOR INFORMATION ONLY AND DOES NOT BECOME
A PART OR CONDITION OF THE ATTACHED DOCUMENT.

## ATTACHMENT I

### SUBCONTRACT LABOR AND MATERIAL PAYMENT BOND

KNOW ALL MEN BY THESE PRESENTS: That Star Operations, Inc. as principal, hereinafter called Principal, and Great American Insurance Company of New York, a New York corporation, as surety, hereinafter called Surety, are held and firmly bound unto CENTRAL TEXAS HIGHWAY CONSTRUCTORS LLC as Obligee, hereinafter called Obligee, for the use and benefit of Claimants as herein below defined in the amount of THREE MILLION ONE HUNDRED THOUSAND 00/100 Dollars ($3,100,000.00 ), for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has by written agreement dated May 18, 2011 entered into a subcontract with Obligee for SH130 Segments 5 and 6** in accordance with drawings and specifications prepared by _____ which subcontract is by reference made a part hereof, and is hereafter referred to as the Subcontract. **Intelligent Transportation and Toll Collection Systems

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that if the Principal shall promptly make payment for all Claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the Subcontract, then this obligation shall be void; otherwise, it shall remain in full force and effect, subject, however, to the following conditions:

1. A Claimant is defined as one who furnished labor, material, or both, used or reasonably required for use in the performance of the Subcontract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Subcontract.
2. Principal and Surety hereby jointly and severally agree with the Obligee that every Claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such Claimant's work or labor was done or performed, or materials were furnished by such Claimant, may sue on this bond for the use of such Claimant, prosecute the suit to final judgment of such sum or sums as may be justly due Claimant, and have execution thereon. The Obligee shall not be liable for the payment of any costs or expenses of any such suit.
3. No suit or action shall be commenced hereunder by any Claimant (a) after the expiration of 25 months following the date on which Principal ceased work on said Subcontract, it being understood, however, that if any limitation embodied in this bond is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law, (b) other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the project, or any part thereof, is situated, or in the United States District Court for the district in which the project, or any part thereof, is situated, and not elsewhere.
4. The amount of this bond shall be reduced by and to the extent of any payment or payments made in good faith hereunder.
5. The amount of this bond shall be increased by the amount of any change orders issued to the Subcontract between Principal and Obligee, notice to Surety of the issuance of such change orders being hereby waived.
6. Any alterations, additions or changes which may be made in the terms of the Subcontract or in the work to be performed under it or the giving by the Obligee of any consent to assign or sublet the work or any part thereof, or the giving of any extension of time for the performance of the Subcontract or any forbearance on the part of either the Obligee or the Principal to the other, shall not in any way release the Principal and the Surety, or either of them, their respective heirs, executors, administrators, successors or assigns from their liability hereunder, notice to the Surety of any such alteration, change, addition, consent, extension or forbearance being hereby waived.

Signed and sealed this 15th day of June , 20 11 .

In the presence of:

Witness Karen Lehmann

Witness Pamela Prokop

Star Operations, Inc.

Principal By: _____ (seal)

Great American Insurance Company of New York

Surety (seal)

By _____ Jacqueline Kirk Attorney-in-Fact

(Attach Power of Attorney)